[No. S012943. Apr. 3, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID ALLEN RUNDLE, Defendant and Appellant.

**COUNSEL**

Lynn S. Coffin and Michael J. Hersek, State Public Defenders, under appointments by the Supreme Court, and Denise Anton, Deputy State Public Defender, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves and Michael P. Farrell, Assistant Attorneys General, and Patrick J. Whalen, Deputy Attorney General, for Plaintiff and Respondent.

OPINION

GEORGE, C. J.—A jury convicted defendant David Allen Rundle of the first degree murders of Caroline Garcia and Lanciann Sorensen, and of attempting to forcibly rape them. (Pen. Code, §§ 187, 261, subd. (a)(2), 664.)[1] It found true the special circumstances that defendant was convicted of multiple murders in this proceeding, and that defendant committed the murders in the course of attempting to rape the victims. (§ 190.2, subd. (a)(3), (17).) After the penalty phase of the trial, the jury returned a verdict of death. The trial court denied the automatic motion to modify the verdict (§ 190.4, subd. (e)) and sentenced defendant to death.[2] This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

## I. FACTS

### A. *Introduction*

In November of 1986, the bodies of two young women, Caroline Garcia, 18 years of age, and Lanciann Sorensen, 15 years of age, were found in rural areas of Placer County. The bodies were unclothed and the arms of both victims were bound tightly behind their backs. Both bodies were badly decomposed, such that the causes of death could not be authoritatively established, nor was there definitive remaining evidence that the victims had been sexually assaulted. Despite his earlier denials of any involvement in the murders, defendant, who was 21 years of age at the time, confessed to the authorities that he had sexual relations with the victims and killed them by strangulation. At trial, defendant testified he had killed the women in fits of rage induced by the victims' behavior, but did not decide to engage in sexual activities with them until after they were dead. The evidence presented by the defense suggested that defendant's rage was the result of psychological problems arising from the incestuous sexual abuse inflicted upon him as a child by his mother, his mother's extensive history of engaging in other inappropriate sexual behavior (such as exhibitionism and having numerous extramarital affairs) which was common knowledge in the small towns where defendant and his family resided, and the general difficulties defendant had with his family.

The jury deliberated for less than a full court day before returning guilty verdicts and true findings on all charges and allegations.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Defendant was sentenced to four years' imprisonment for the attempted rape of Garcia and one year, to run consecutively, for the attempted rape of Sorensen. The trial court ordered that this five-year sentence be served forthwith.

At the penalty phase, the prosecution presented evidence of an earlier similar murder of a third woman in Sacramento, whose body was found unclothed in a wooded area near the Sacramento River with her arms tied behind her back, and who had been raped and strangled to death. Defendant confessed to this murder during the investigation of the Garcia and Sorensen killings. The evidence also established that defendant committed three sexual assaults against other children when he was 14 years of age, for which he was subjected to juvenile delinquency proceedings. Defendant's ex-wife testified that he physically and sexually abused her during their marriage. The defense presented further evidence of defendant's mental state, his family and employment background, and his good behavior while incarcerated following his arrest for the charged offenses.

The jury deliberated further for less than a full court day before returning a verdict of death.

## B. *Guilt Phase*

### 1. *Prosecution Evidence*

At approximately 3:00 p.m. on Sunday, September 7, 1986, Caroline Garcia left her home in Roseville. She planned to go to the bus station to take a bus to Colfax, where she planned to visit her husband Trinidad Garcia, from whom she was separated. She was wearing a black skirt and a red jacket. Trinidad saw Caroline at a park in Colfax sometime near 9:00 p.m. She told him she was going to the house of Chris Paoli, a friend who lived in Colfax. She also called Kim Manzano, who lived with Garcia in Roseville, and told Manzano she was going to Paoli's house and was planning to take a bus back to Roseville that night and would be home at approximately 1:00 a.m.

After arriving at Paoli's house, Garcia told Paoli a drunk man had bothered her earlier that evening, but another person had intervened on her behalf. She said she expected that person to come to Paoli's house to drive her back to the bus station. At approximately 10:45 p.m., defendant arrived in his car and Garcia left with him.

No one, other than defendant, reported seeing Garcia alive again.

On Monday, September 8, 1986, the day after Garcia disappeared, a motorist reported finding discarded clothing near a turnout on Interstate Highway 80 between Weimar Cross Road and Colfax. A California Highway Patrol officer responded to the scene and found a dark-colored denim skirt, a pair of black and purple women's panties, and a blue and white striped

blanket that appeared to have a spot of blood and mucus on it. The area later was searched, but no other item of significance was found.

On September 16, 1986, another motorist reported finding a red blazer, a purse, and a wallet containing Garcia's identification near a railroad crossing on Carpenter Road, a secluded area approximately two miles from Chris Paoli's house in Colfax and six miles by road from where the skirt, underwear, and blanket had been found. Inside the purse was a bus ticket issued on September 7, 1986, for travel from Colfax to Roseville, a pipe commonly used to smoke marijuana, and an unopened package containing a condom. An extensive search of the area the next day failed to disclose any other evidence.

At trial, Kim Manzano testified that on September 7, 1986, Garcia was wearing the skirt, blouse, and jacket that were found. Manzano also identified the purse as the one Garcia took with her that day, and the panties as a pair Garcia had purchased the day before when she and Manzano were shopping. Defendant's mother testified she had given defendant the blanket in May 1986 and that it did not have any red stains on it when she gave it to him.

Criminalist James Streeter examined the clothes and the blanket. He testified the clothing did not appear to be ripped or torn in any way, and was not stained with blood or any other bodily fluid. The blanket showed several bloodstained areas, in which there was a mixture of blood and a mucous material, most likely saliva, but no semen or seminal fluid. Based upon a comparison of the blood on the blanket and blood samples from Garcia's parents, it was determined that the blood on the blanket was consistent with Garcia's blood type.

In September 1986, defendant was employed as a general laborer by George Willson, a carpenter. The work involved physical labor, and defendant was strong for his size. Defendant did not show up for work on September 8 or 9, the days following Garcia's disappearance.

On September 8, 1986, defendant told his ex-girlfriend Heather Smith that the authorities had been speaking with him about Garcia, and that they appeared to believe he had killed her. On the following day, defendant told his friend James Sciacca that he (defendant) was the number one suspect in Garcia's disappearance because he was the last person seen with her. Defendant also had a chance meeting with Trinidad Garcia in Colfax on that day. Defendant mentioned he had given her a ride to the bus station the night she had disappeared. Trinidad insisted defendant go to the police to make a report, which defendant did. Defendant told the officers he had given Caroline Garcia a ride to the bus station, and had dropped her off after she declined his

offer to wait with her. Defendant also said that on the way to the station they had seen the drunk man who had harassed Garcia earlier that day, but Garcia said she would go to the nearby gas station if there was any trouble.

Several days after Garcia's disappearance, defendant and Sciacca went to a carwash, where defendant cleaned and vacuumed the interior of defendant's car.

Defendant had two more interviews with the authorities, on September 11 and October 21, 1986, during which he provided essentially the same statement of events as above, except for adding that on the way to the bus station, they had stopped and smoked a small amount of marijuana Garcia had with her, and that defendant had asked Garcia to have coffee with him but she declined. Defendant denied he had anything to do with Garcia's disappearance or had given her his blanket, and maintained he returned to the trailer where he was staying after dropping Garcia off that night. Defendant said a person named Bob who was staying at the trailer could verify that defendant had returned there that night, but defendant could not find Bob. He also told the officers "things had heated up" for him in Colfax because people thought he was involved in Garcia's disappearance, and therefore he was avoiding the Colfax area.

On September 15 or 16, 1986, George Willson mentioned to defendant he had seen a search party looking for the "missing girl." Defendant told Willson the authorities would not find anything, because they were "stupid," adding they no longer were interested in him as a suspect in Garcia's disappearance because someone else had been seen with her at the bus station and officers had found blood at her husband's apartment. Defendant also said Garcia was a "slut" and a "sleep around," as were most of the girls in Colfax.

On the evening of Thursday, October 10, 1986, Lanciann Sorensen and her friend Laura Yowell were at a friend's house in Roseville, where they each consumed a beer. Later, they went to Yowell's sister's house, also in Roseville. Sorensen left alone sometime between 9:00 and 10:00 p.m., stating she was planning to hitchhike back to her mother's house in Auburn. At approximately 10:00 p.m., Sorensen called her boyfriend, Matthew Sklansky, and said she was in a telephone booth near the freeway in Loomis. Sorensen sounded intoxicated, and told Sklansky she had been drinking alcohol and smoking marijuana. She said she was with a person she met that day named Dave, who lived in Colfax and with whom she had been hitchhiking. Sklansky had told Sorensen he wanted to see her that night, and Sorensen agreed to come to his house when she arrived back in Auburn, but also told him they could not have sexual intercourse because she was menstruating. Sorensen and Sklansky twice before had engaged in sexual intercourse together. Their conversation ended when Sorensen said she should go because

Dave was bored. Sorensen also called her mother at approximately 10:15 p.m. and said she was making her way home.

No one reported talking to or seeing Sorensen alive after this telephone call. Her mother reported her missing on Monday, October 13, 1986.

In mid-October Willson observed that defendant was not his usual energetic and well-groomed self. Eventually, on October 17, 1986, Willson noticed defendant was distracted and unable to complete a simple project. Defendant told Willson that "Violence is golden." Willson sent defendant home for the day, and defendant did not work for Willson again, despite a well-paying assignment that was to start soon thereafter.

At the October 21, 1986 interview, defendant also was asked about Sorensen's disappearance. He denied ever having met her, stating he had worked in Roseville on October 10, the day Sorensen disappeared, and had spent the evening in Colfax with James Sciacca, a friend. Sciacca testified, however, that he had breakfast with defendant on October 11, 1986, and defendant told him that the previous day he had traveled to Sacramento where he had sexual relations with a prostitute, and then hitchhiked back, receiving a ride from a newspaper delivery man.

After the interview on October 21, 1986, Sciacca drove defendant to Reno, Nevada. Defendant told Sciacca he had spoken to the officers earlier that day about Garcia's disappearance, and asked Sciacca whether he knew how defendant could secure identification in order to assume a new identity.

On November 7, 1986, a motorist traveling on Interstate Highway 80 stopped at the Loomis exit to let his dog out and saw what appeared to be a human body in a culvert off the road. Because he was afraid, the motorist waited several days to report the sighting. Thereafter, on November 14, 1986, officers went to that location and found Sorensen's body mostly covered with dirt and weeds in a culvert approximately six feet below the level of the road. Her body was completely nude, and her hands were tied behind her back with a pair of pants. The officers also found a blouse and a purse in the area. Sorensen's mother identified the pants, blouse, and purse as belonging to Sorensen.

The pathologist who conducted the autopsy testified Sorensen was slightly over five feet tall and weighed approximately 110 pounds. Because of the advanced decomposition of her body, the pathologist was unable to determine conclusively the cause of death, although a likely cause, in his opinion, was asphyxiation, secondary to strangulation, based upon hemorrhages and damage to muscle and cartilage in the neck area. The decomposition also

prevented the pathologist from rendering an opinion whether Sorensen had been raped or whether sperm or other foreign bodily fluids might have been present at the time of her death.

The authorities obtained a warrant for defendant's arrest for the murder of Garcia. On November 20, 1986, after defendant was arrested in Carson City, Nevada, two officers traveled there and interviewed him at the jail. After being advised of and waiving his *Miranda* rights,[3] defendant admitted killing Garcia and having sexual relations with her at the location where he strangled her. He drew a map marking where her body had been left. He denied any involvement in the Sorensen killing, however. Defendant said he was "loaded" on "acid"[4] during the last 30 days he was in Colfax, including the night Garcia was killed.

The area depicted on defendant's map was searched on November 21, 1986. Garcia's unclothed body was found draped around a tree approximately 30 to 40 feet from the road down a very steep incline, partially covered with dirt, rocks and debris, and badly decomposed and largely skeletonized. There was a red cloth tied around her mouth, and her arms were tied behind her back with a piece of wire looped around both wrists and tied with five knots. No other evidence was found in the area. As with Sorensen's body, the advanced state of decomposition prevented the pathologist who performed the autopsy from determining the cause of Garcia's death, or whether trauma from a sexual assault had occurred. The pathologist did conclude, however, that the evidence supported the opinion that Garcia's death had been violent and had been caused by another person.

As defendant returned with the officers to the Placer County Jail in Auburn that day, he provided them with more details concerning the murder of Garcia. Defendant related the following. He ingested LSD before picking up Garcia, and then smoked some marijuana with her. He and Garcia were kissing in the backseat of his car, which was covered with the blue and white striped blanket, but when defendant placed his hand on Garcia's leg, she said "No," which led to an argument between them about having sexual relations. When defendant asked Garcia whether she wanted to have sex, she declined because she thought he was "all fucked up." Defendant "flipped out," "partly" because of this rejection, and pushed Garcia down and had sex with her. Garcia "partly" resisted by squirming. Defendant said he thought he ejaculated, but was not sure. He did not remember having tied her hands.

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] *(Miranda)*. The term *"Miranda* rights" refers to the now ubiquitous advisement of the defendant's right to remain silent, that anything he or she does say may be admitted at trial, and of the right to have an attorney present and to have an attorney appointed if the defendant is indigent. *(Id.* at p. 479.)

[4] Defendant's reference presumably was to lysergic acid diethylamide (LSD).

Afterward, defendant became fearful that Garcia would tell others about what had happened, so he decided to kill her. Garcia started fighting, and defendant again pushed her down, grabbed a piece of wire, wrapped it around her neck, and held it there until she stopped moving. Defendant stated he remembered rolling Garcia's body down a hill, but did not recall anything else.

Despite his earlier denials, defendant also admitted during the drive to Auburn that he killed Sorensen, providing the following details. He had met Sorensen at a mall earlier that day. Defendant had ingested LSD and was "really stoned." Defendant killed Sorensen by strangling her "by a road." He said, "It was all so fuzzy." When asked whether he had sexual relations with Sorensen, defendant said, "I think so." He stated he did not remember tying her hands, or exactly how he had returned to Colfax that night, although he remembered delivering newspapers along the way.

After arriving at the jail in Auburn and having dinner, defendant was interviewed by the authorities again, providing more details concerning the murder of Sorensen. Defendant said he and Sorensen were hitchhiking and were dropped off at the Loomis exit. Sorensen walked into town, returned about an hour later, and they then smoked marijuana together. Defendant began thinking about his difficulties with his family and became enraged. Sorensen thought defendant was "freaking out," which made defendant more angry. He placed his hands on her shoulders and Sorensen swung at him, at which point defendant "blew up." Defendant said he did not remember much after that point, but knew he engaged in sexual relations with Sorensen at some point, and ultimately strangled her because he was frightened. He also remembered covering the body with weeds and throwing away Sorensen's purse before leaving the scene.

Teresa Jackson testified she introduced defendant to Garcia in July of 1986. According to the testimony of James Sciacca and Janet Spafford, defendant on several occasions prior to September 7, 1986, had asked Garcia out for a date, but Garcia had declined, once commenting that she thought defendant was "strange" or "weird."

Teresa Jackson, Janet Spafford, and Heather Smith, all former girlfriends of defendant, testified they had seen defendant smoke marijuana, but never had seen him ingest LSD. George Willson testified that in July or August of 1986, when he and defendant were conversing about drug use, defendant said he did not consume LSD. James Sciacca testified, however, that defendant once ingested LSD in his presence.

Heather Smith visited defendant on several occasions in the Placer County jail after his arrest. During her last visit, Smith asked defendant why he killed

Garcia and Sorensen. He said it was partly because he did not like "sleazy women." He then said, "I had a good thing going while it lasted. Too bad I got caught." Smith asked defendant why he had not killed her, and defendant replied he had no reason to kill her. Spafford testified that Smith told her defendant had said the reason he had not killed Smith or Spafford was because they had "said yes."

## 2. *Defense Evidence*

Defendant testified as follows: He met Garcia in June or July 1986, and they became friends. They twice went to Rollins Lake and smoked marijuana together, and once defendant invited Garcia to spend the night at the house where he was staying because she had no place to sleep. Defendant and Garcia never had sexual intercourse on these occasions, although they engaged in "deep kissing" during their visits to the lake. Garcia at that time did not want to be sexually involved with defendant or other men, because she was still in the process of divorcing Trinidad Garcia.

Contrary to what defendant confessed to the authorities, he testified very clearly remembering what happened on the nights he killed Garcia and Sorensen. After defendant picked up Garcia from Chris Paoli's house on the night of September 7, 1986, Garcia inquired whether he had any marijuana. To avoid being detected, they went to the remote location of Carpenter's Flat, parked, smoked marijuana, and talked. Garcia mentioned that her bus left at midnight. As Garcia began to speak about her difficulties with her husband, Trinidad, defendant became annoyed because he felt Garcia was nagging and overdramatizing her problems. Defendant began talking about his problems with his own family, but Garcia did not adequately recognize the seriousness of defendant's troubles, which led to a heated discussion. After things calmed down, the two kissed for about 10 minutes. At some point, Garcia pulled away from defendant and again started talking about her problems with Trinidad. She said, "I can't do this because of Trino." They began to argue again about the relative seriousness of their personal difficulties, and Garcia again belittled defendant's problems by stating they "don't mean nothing," telling him he "should just sit there and listen to her and keep [his] mouth shut." This made defendant very angry and he, in rapid succession, punched Garcia in the face with his fist, lowered the back of the front seat in which she was sitting, and pushed her into the backseat of his car. At some point during these actions, Garcia said what had happened was all defendant's fault. As Garcia was facedown in the backseat, defendant climbed on top of her, found a piece of wire on the floor of the car, wrapped the wire around Garcia's neck, and strangled her. Defendant intended to kill Garcia when he put the wire around her neck, but at that point had no intention of having sexual relations with her.

After a minute or two had passed and Garcia stopped struggling, defendant released the wire and sat back on the seat. Approximately five to 10 minutes later, he became sexually aroused and began undressing Garcia's body. Defendant testified on direct examination that, while he was doing so, he heard a gurgling sound and saw a bloody substance coming from Garcia's mouth. He tied the red cloth around her head over her mouth to stop the blood, and then continued undressing her. He was still fully clothed, but 15 to 20 minutes later, he undressed and engaged in sexual activities with Garcia's body. On cross-examination, defendant testified he already had fully undressed Garcia's body and himself and was engaged in sodomizing the body when he heard the gurgling sound, saw the blood, and placed the red cloth over her mouth.

When the blood came out of Garcia's mouth, defendant stopped sodomizing the body, but continued again several minutes later after the bleeding ended. He eventually had an orgasm. About five to 10 minutes later, after again becoming aroused, he turned the body over and had vaginal intercourse until he had another orgasm. While defendant was having sexual relations with Garcia's body, he tied her arms behind her back.

When he finished, defendant dressed, got out of the car briefly, then returned to the car, threw Garcia's purse and jacket out the window, and drove away. Defendant drove around Colfax for approximately an hour and a half, during which time he went to his parents' house, parked in the driveway and honked the horn, and also repeatedly drove past the Colfax police station—all while Garcia's body was lying uncovered in the backseat of the vehicle. Defendant eventually disposed of Garcia's body by throwing it down an embankment adjacent to a remote road, and rolled up Garcia's clothes in the blanket and threw them from his car while en route to the nearby town of Weimar. Defendant did not know why he discarded the various items at different locations.

The next day, defendant returned to the location where he had discarded the body, but could not find it. Defendant proceeded there again on the following day, found the body, and pulled it up to the tree. He sat next to the body, thinking and talking to himself and to the body about his remorse at what had happened, how he hated his mother, and how Garcia's actions had reminded him of his mother. Defendant returned to the body several times. After his last visit, defendant covered it with a piece of wood, rocks, and leaves.

On October 10, 1986, defendant hitchhiked to Sacramento. He ingested LSD during the trip, and smoked marijuana and consumed alcohol while there. He engaged in sexual activities with two prostitutes and then began

hitchhiking back to Colfax at approximately 7:30 p.m. He met Sorensen at a restaurant near the highway on Douglas Boulevard, when she approached and asked him to light her cigarette. They decided to hitchhike together. After about 30 minutes, they got a ride, which took them to the Horseshoe Bar Road exit in Loomis. They arrived there about 10:00 p.m., and walked into town because Sorensen needed to make some telephone calls. After she did so, they returned to the freeway exit and smoked marijuana. Sorensen then left to walk back to town to make another phone call. When she returned, they moved off to the side of the road because the weather was cold, smoked more marijuana, and conversed. Sorensen said she thought defendant was cute, and later started "getting real friendly" toward him by inviting him to spend the night in the trailer behind her mother's house in Auburn and sitting very close to him or on his lap. He, however, was not interested in engaging in sexual relations, because he already had been with the two prostitutes earlier that day and was, in fact, feeling guilty about those earlier activities.

At some point, while defendant was lying on his side on the ground and Sorensen was next to him, she reached over and unbuttoned his pants, reached inside his underwear, grabbed his penis, and moved her head toward him in an attempt to orally copulate him. Defendant became infuriated because he did not want to be touched, and jumped up, grabbing Sorensen by the neck in the process. He held her off the ground, spun her around while shaking her violently, and then threw her down. When she did not move, defendant knew she was dead. He was not thinking clearly when he killed Sorensen; he was very angry because of her unexpected and unwelcome sexual advance.

After realizing Sorensen was dead, defendant stomped around the area for several minutes and punched a nearby fence. He then returned to the body and sat down next to it for approximately 10 minutes. Defendant thought about the Garcia incident and became sexually aroused. He undressed himself as well as Sorenson's body, and sodomized and had vaginal intercourse with the body. During a second act of sodomy, defendant tied Sorensen's arms behind her back with her pants. After having an orgasm, he moved the body 15 to 20 feet away, covered it with grass and weeds, and left.

The sexual activities defendant engaged in with Garcia's and Sorensen's bodies were more exciting than any prior sexual encounters he had ever had, because he had complete control of the victims. The act of tying the victims' hands behind their back, even though they already were dead, was thrilling to him and was brought on by (and heightened) his feeling of total control over the two women.

Defendant testified that when he was eight or nine years of age and residing with his family in Charleston, South Carolina, his mother began

sexually molesting him. The molestation continued while the family resided in Idaho Falls, Idaho, and St. Mary's, Georgia, when defendant was a teenager. The sexual abuse was frequent, especially in Idaho, and involved various types of sexual acts, including oral copulation and sexual intercourse.

Defendant also saw his mother having sexual intercourse with a 17-year-old neighbor in South Carolina, Ron K., and learned she had exposed her naked body to, and had sexual relations with, other men who visited the family home or were crew members on trains that passed behind the family's house in Georgia. This behavior occurred in each of the towns in which the family resided, and continued in Colfax until close to the time of the Garcia and Sorensen killings.

Defendant's mother also was present one night when Ron K. tied a rope to a rafter, placed the rope around defendant's neck, and kicked away the chair upon which defendant was standing. Defendant hanged by his neck for 10 to 12 seconds before Ron K. removed the rope. Defendant's mother laughed while defendant was hanging.

After one final incident of molestation in Georgia when defendant was 15 years of age, he refused to participate further and began to stay away from home. Defendant's absences caused problems with defendant's father, who believed defendant merely was being rebellious. Defendant, however, felt he could not tell his father why he was avoiding home. When defendant was 16 years of age, he left home permanently after a severe argument with his father about defendant's behavior.

Defendant moved often during the next year, eventually coming to Colfax. Thereafter, defendant's family, which included defendant's two younger brothers and a younger sister, also moved to Colfax, causing more problems because defendant's parents did not want him residing near them. Defendant was not welcome in their home, and his parents spread rumors about him to make his life in Colfax difficult. They twice paid him to move away, which he did, although he returned in May 1986 and decided to remain there despite his difficulties.

Defendant testified his mother's molestation of him caused him to feel angry and defenseless. He also later became confused when he reached sexual maturity and sometimes felt pleasure during the sexual activities he engaged in with his mother. His mother's exhibitionism and her affairs with Ron K. and other men, which were widely known by other persons in the several communities in which they resided, angered and embarrassed defendant, especially when his friends or others mentioned the subject to him.

Defendant denied having said anything to Heather Smith about the killings or about having "had a good thing going while it lasted." He admitted he had

lied to numerous persons, including the authorities, when he first denied having anything to do with the deaths of Garcia and Sorensen. He explained his later confessions had some elements of truth, but that he lied when he stated that Garcia was alive and resisting when he had sex with her and lied when he stated he killed her and Sorensen because he was frightened. He did not tell the authorities he had had sex with the bodies only after the women were dead, because this was embarrassing and he believed it would appear worse if he admitted what happened rather than relating that he had raped the victims while they were alive. He also did not want to discuss the incestuous relationship he had with his mother. Defendant asserted that he believed he simply could admit having killed the women, and that would end the questioning. When the officers continued to press him for details, he gave false answers because he wanted the questioning to stop—but he also acknowledged voluntarily speaking with the officers and being advised he could stop the interviews at any point, and that they in fact had honored defendant's request to stop on one occasion when he complained of a headache. Defendant testified that he decided to tell the truth at trial because he had learned from a defense investigator that defendant's younger brother had legal problems relating to a sexual incident, and defendant did not want his brother to be in defendant's position at some point in the future. Defendant, however, also admitted learning before giving his testimony at trial that it might benefit his defense if he were to testify he had not intended to have sex with the victims until after he had killed them.

Philip Bodily, who resided near defendant from 1975 to 1977 in South Carolina, testified that he, too, observed defendant's mother having sex with Ron K. He never saw defendant's mother engage in sexual behavior with defendant, but testified she did act in a sexually provocative manner toward Bodily on two occasions and Ron K. teased defendant about his mother's sexual activities.

The parties stipulated that James and Sara Jo Ennis were defendant's neighbors when his family resided in Georgia, and would testify that defendant's mother often stood nude at the rear door of the house and sometimes would open and close her blouse while trains were passing on the tracks behind the house, but they did not see her board any of the trains.

Jeffrey Miner and Ronald Ballard testified that, on approximately five or 10 occasions over a two-month period in 1985, a woman standing at a window in defendant's grandfather's house in Colfax exposed her breasts by lifting up her shirt as Miner and Ballard drove by on the road in front of the house. Once, the woman exposed herself to Miner as he drove by, and then about 15 to 20 minutes later Miner and Ballard drove on a dirt road approximately 50 yards behind the house in order to avoid seeing the woman, but she came out

on the road and again exposed herself. Scott Greger also saw a woman at that house exposing herself on numerous occasions during the four months he resided on the same street. Greger later learned the woman was defendant's mother and he told defendant of this activity, but defendant appeared unconcerned.

Dr. Richard Yarvis, a psychiatrist employed by the defense, had treated victims of incest and molestation. He met with defendant for a total of approximately 20 hours. According to Dr. Yarvis, boys who are victims of incest committed by their mothers are more likely to become psychotic than girls who have incestuous relationships with their fathers. Both types of victimization, however, have "disastrous" impacts upon the victims. Victims of parental incest often have significant feelings of guilt, despondency, anxiety, and anger created by their powerlessness at being compelled by a parent to engage in behavior that the victim knows is wrong. Dr. Yarvis considered it very unlikely that a victim of parental incest would be "normal" in the psychological sense. Rather, the three likely outcomes were severe psychosis, in which the victim would be unable to distinguish reality from fantasy; less severe mental illnesses, such as chronic depression and drug and alcohol abuse; and antisocial behavior, such as criminal activity and sexual promiscuity.

During their meetings, defendant described to Dr. Yarvis an unpleasant childhood in which his father, who was in the Navy, was mostly absent and was often physically abusive to defendant when he was home. Defendant told Dr. Yarvis that his mother was sexually provocative, promiscuous, and an exhibitionist, and carried on an incestuous relationship with defendant for several years. Although Dr. Yarvis did not believe defendant was psychotic, defendant exhibited low self-esteem and nervousness at close physical proximity to others, and had a serious temper with a "short fuse." Defendant unreasonably interpreted a remark made by Dr. Yarvis during one interview, and on another occasion defendant fell out of his chair and became so angry, distressed, and embarrassed that Dr. Yarvis became mildly frightened that defendant might become violent.

Dr. Yarvis testified it is rare for a woman to be an exhibitionist, and that exhibitionists rarely commit more active sexual crimes. He also stated that necrophilia, or sexual activity with dead bodies, is quite abnormal and rare, and he had no clinical or research experience in that area.

Defendant re-called his mother as a witness for the defense. She denied, however, that she had an incestuous relationship with defendant, that she had sexual relations with Ron K. or any train crew members, or that defendant had been subjected to a hanging in her presence. She denied ever having

intentionally exposed her body to anyone at any of the places in which she had resided. She said defendant had been a liar since he was a young child, and had left the family home because he would not follow the rules, rather than because of any incestuous relationship with her.

### 3. *Prosecution Rebuttal Evidence*

The prosecution re-called the lead investigating officer, who testified that photographs of defendant's vehicle showed that the lever that would lower the back of the driver's seat was on the outside of the seat, near the door. The officer did not photograph or examine the lever for the front passenger seat, and did not know whether the front seats would fully recline.

## C. *Penalty Phase*

### 1. *Prosecution Evidence*

#### a. *Murder of Elizabeth Lactawen*

After defendant was arrested, officers from the Sacramento County Sheriff's Department interviewed him concerning a series of other homicides in the Sacramento area. During the first interview, defendant waived his *Miranda* rights and denied involvement in any other murders. During a second interview, defendant continued to deny any role in the murders the officers were investigating, but confessed to another murder that had occurred in the City of Sacramento. Investigators from the Sacramento Police Department were summoned and they interviewed defendant for a third time regarding the murder of Elizabeth Lactawen.

On May 10, 1986, a homeless man reported finding a dead body near the Sacramento River in an area overgrown with vegetation and known as a homeless encampment. Responding police officers found a woman's body, mostly covered by plastic and cardboard. The unclothed body of Elizabeth Lactawen was not yet cold to the touch. Lactawen was 24 years of age, was four feet five inches tall, and weighed 76 pounds. A cloth gag was tied around her mouth, and her arms were tied behind her back with an electrical cord. There were bruises around her neck and left breast, and blood and other fluids coming out of her nose. The pathologist who performed the autopsy believed Lactawen had been strangled with a thin rope or wire.

There also was evidence of sexual assault, including blood clots in the vagina and on the cervix and bruising on Lactawen's inner thighs, injuries which in the pathologist's opinion could have been caused by someone forcibly spreading open her legs and raping her. The bruises were inflicted

before she died. Clothes matching Lactawen's small stature were scattered around the area. There also was fecal matter in the pubic area, which possibly was caused by a person sodomizing Lactawen before having vaginal intercourse with her. There was no tearing of the vagina or anus or evidence of sperm. Lactawen had no alcohol or drugs in her blood.

During the interview with the Sacramento police officers, defendant said he was sitting near the Sacramento River when Lactawen walked by. They began talking, and then walked to a more secluded spot nearby, where they had consensual sex. They spoke some more, and defendant became angry and strangled her. He did not remember how he strangled her or whether he tied her up or used a gag.[5]

b. *Childhood Sexual Assaults*

In 1979, when defendant was 14 years of age and residing in Idaho Falls, Idaho, he sexually assaulted a six-year-old girl, Rebecca Y., and two boys, 12-year-old Brian M. and 11-year-old Cori H., in two separate incidents. On March 17, 1979, Rebecca Y. was walking home from her friend's house when a teenage boy told her he knew her mother and that Rebecca should do what he said or she would be in trouble. The boy promised he would give her money if she did what he said. Rebecca positively identified defendant in court as the boy.

Defendant led Rebecca to an area under a bridge and told her to do what he said or he would kill her with a rock. He removed his penis from his pants and told Rebecca to put her mouth on it while forcing her head down. When Rebecca's babysitter called for her, defendant ran away.

Rebecca's father received a telephone call about what had happened and drove to the bridge, where he saw a young man jump out of the canal and get on a bicycle. Rebecca's father chased after the boy, eventually tackling him. The zipper of the boy's pants was down, and the boy said he "did not hurt her." The father could not recognize defendant in court, but did identify a picture of him from that time period as looking like the boy.

When a police officer arrived, the boy identified himself as David Allen Rundle. Defendant initially denied having assaulted Rebecca, but later that

---

[5] During the prior interview with the sheriff's officers when he admitted killing Lactawen, defendant said he became angry while he and she were speaking, but later calmed down, at which point they had sex. Defendant said he did "not really" force Lactawen to have sex. After having sex, they began to argue, and defendant "flipped out" and strangled her. He did not remember exactly how he strangled her or how or why he tied her hands.

day at the police station admitted taking her under the bridge, threatening to kill her with a rock, and trying to "have sex" with her.

On April 24, 1979, Brian M. and Cori H. were riding their bikes when they came across a person jogging who said he knew of good trails for bike riding. During his testimony Brian identified defendant as this person. The boys agreed to follow defendant, who led them to the bottom of a 15- to 20-foot-deep pit in a very remote area. Once there, defendant said he had a gun in his pocket and threatened he would either shoot the boys or crush them with a rock if they did not do what he said. Defendant ordered the boys to disrobe and then told Cori to lie on the ground and Brian to "fuck him." When Brian said he did not understand, defendant told him to lie on top of Cori, which he did. Defendant then told them to get up, took out his penis, and had the boys orally copulate him until he ejaculated. He then left with the boys' clothes and told them not to leave the pit for 15 minutes or he would shoot them, and not to tell anyone about what had happened or he would find them and kill them. After the boys left the pit, they found their clothes nearby, returned home, and reported what had happened. Later, Brian was taken to a house, where he identified defendant as the perpetrator.

### c. *Marital Abuse*

Defendant's ex-wife testified she married defendant in March of 1984 and separated from him in July of 1985. Defendant was physically violent toward her during the marriage. He often struck her, once pushed her from a moving car, and on one occasion during an argument threw her down and pounded her head on the floor approximately 20 times. On many occasions defendant also physically forced her to engage in oral copulation and sodomy. Defendant continued with these acts even though on various occasions she told him to stop, vomited while his penis was in her mouth, and tried to keep away from him.

### d. *Psychiatric Testimony*

Dr. Irwin Lyons, a psychiatrist, interviewed defendant on behalf of the district attorney's office soon after defendant's arrest, in order to evaluate defendant's mental status. Defendant described the incidents with Rebecca Y., Brian M., and Cori H., as well as the Garcia and Sorensen murders. Defendant did not mention that Sorensen had attempted to orally copulate him, or that his mother sexually molested him as a child. Defendant said his family rejected him, and his problems with his family caused him to have attacks of extreme rage during which he could not control himself. Dr. Lyons did not believe defendant suffered from any psychosis, but concluded he did

have a personality disorder arising partly from deficient child-rearing practices by his parents. Defendant was egocentric, immature, lacking in capacity for empathy, and amoral. He was subject to impulsive behavior during his rage attacks.

## 2. *Defense Evidence*

Dr. Richard Thomas, a psychologist, treated defendant in Idaho after his sexual assault on Rebecca Y. In his opinion, defendant at that time had an "explosive personality disorder," which commonly involves overreacting to a situation, blaming others, and making excuses for one's difficulties and inappropriate actions. Defendant was not psychotic or schizophrenic.

At counseling sessions, defendant refused to speak about the assault, a circumstance that concerned Dr. Thomas because defendant also said he enjoyed inflicting pain upon others and, in the doctor's opinion, had a "real high potential . . . to act out." Defendant's mother encouraged his refusal to speak about the incident, thus negatively affecting defendant's ability to accept responsibility and obtain any benefit from treatment. Dr. Thomas felt defendant's family had problems in communicating and that defendant's mother was overwhelmed by having to care for the four children during the father's frequent, and at times lengthy, absences. Dr. Thomas, having provided marriage counseling to defendant's parents after defendant was sent to a state juvenile facility, believed they had made progress in addressing their problems.

Defendant's aunt and uncle, George and Bonnie Mae Russell, testified that defendant was a "bright, alert" child and was "full of promise and potential." According to them, defendant's mother singled defendant out for discipline and often verbally abused him, never acting in a motherly way toward him. George testified he saw defendant's mother attempt to stab his father during a fight that occurred in defendant's presence. When defendant was no more than a year and a half old, George also observed what he thought was evidence of sexual abuse upon seeing defendant's penis. In George's opinion, defendant's mother's denial of abuse was insincere, and she often lied. George viewed defendant as a victim of his mother's abusive parenting and of dealers who supplied defendant with drugs.

Several of defendant's past employers testified he was a hard-working, conscientious, and trustworthy employee. Deborah Peters, with whom defendant resided in Nevada after the murders, testified he was nice and helpful and that she would not have expected him to be charged with murder. Sherry Couzens, an instructor in a high school equivalency program who met with defendant in jail once a week for approximately two months, testified defendant completed

the program while incarcerated and was a quiet, focused, and thorough student. A sergeant at the jail testified defendant provided deputies with information concerning another inmate's plan to escape from the jail and helped them locate two prisoner-made weapons.

A defense investigator testified defendant's ex-wife said defendant's relationship with his family was very strained and she never saw them act affectionately toward him. She also said defendant told her his mother was not faithful to his father, and his mother had strange sexual "quirks." Defendant's ex-wife told another investigator she wanted to "pull the switch" on defendant and have a party to celebrate.

### 3. *Prosecution Rebuttal Evidence*

The prosecution's investigator testified that George Russell, defendant's uncle who testified on defendant's behalf, stated he felt very strongly that the death penalty should not be imposed in this case because defendant was not fully responsible for the crimes. Additionally, Russell earlier told the investigator he was unaware of any sexual conduct between defendant and his mother; Russell had not mentioned observing any evidence of sexual abuse when defendant was an infant or of defendant's being physically disciplined by his parents.

Donald Rundle, defendant's brother, testified that defendant was not treated differently from any of his siblings, was not subjected to violent discipline or verbal abuse, and refused to follow the family's rules. Donald saw marijuana in defendant's possession, but never observed other drugs. Donald told a defense investigator that after defendant was arrested for the murders, their father was so upset that "if [defendant] was to get hit by a car in front of Dad, Dad would turn around and walk away sooner than help him."

### 4. *Defense Surrebuttal Evidence*

The defense investigator testified that Donald had said defendant's father would rather run over defendant with a car than stop for him, and that this statement referred to the father's attitude before defendant was arrested for the murders.

## II. DISCUSSION

### A. *Sufficiency of Appellate Record*

Defendant contends his rights under state law and the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution to a record adequate to permit meaningful appellate review were violated by the trial

court's failure to order transcribed (1) a proceeding in which it was established that defendant, contrary to his prior wishes, had chosen not to be absent from the penalty phase of the trial, and (2) in-chambers discussions regarding jury instructions. These claims fail.[6]

## 1. *Defendant's Decision to Attend the Penalty Phase*

During a noon recess in the presentation of the prosecution's opening statement at the penalty phase of the trial, defendant told court staff he did not wish to be present for the remainder of the trial. The trial court subsequently mentioned this on the record outside the presence of the jury, and a second recess was taken to allow defendant to discuss the matter with his attorneys. After that recess, the court held an in camera meeting with defense counsel, at which counsel requested the court adjourn for the day to allow more discussions with defendant. Back in open court, the court adjourned the proceedings until the following morning and also advised defendant the court was concerned that his decision be made in a careful, rational, calm, and reflective manner, mentioning to him that his absence during the penalty phase was likely to "make it worse" for him. Defense counsel were directed to "report" to the court by 8:30 the next morning, at which point the prosecution and the jurors would be notified as to when the proceedings would resume.

The following morning, on the record and outside the presence of the jury, the trial court "confirm[ed] for the record that at present there is no request from Mr. Rundle at this time to be absent." Defense counsel agreed, and trial proceeded with defendant present.

Defendant now contends the "court and defense counsel met on the morning o[f] May 25, 1989, to determine whether [defendant] was willing or

---

[6] In this claim and most others on appeal, defendant also contends that the asserted error or misconduct infringed various of his constitutional rights to a fair and reliable trial. What we stated in *People v. Boyer* (2006) 38 Cal.4th 412, 441, footnote 17 [42 Cal.Rptr.3d 677, 133 P.3d 581], and subsequent cases applies here: "In most instances, insofar as defendant raised the issue at all in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances. In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind (e.g., failure to instruct sua sponte; erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.] [¶] In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well. No separate constitutional discussion is required in such cases, and we therefore provide none."

able to participate in the remainder of the trial." In the absence of a record of these discussions, defendant argues, it is impossible to determine whether defendant was competent to proceed with trial, or whether some improper influence, including possible forced medication, was exerted upon defendant in order to convince him to change his decision to be absent.

Defendant, however, has not established that any hearing actually occurred that morning that could have been transcribed. The trial court merely directed defense counsel to contact the court in the morning before proceedings began and report to the court defendant's decision so the jury and the prosecution could be notified when proceedings would resume. The court then confirmed on the record that defendant no longer wished to absent himself from the proceedings, which presumably is what defense counsel reported earlier that morning. Unlike other instances in which the record explicitly mentions off-the-record discussions, here there is no indication anywhere in the record, including in the settled statements on appeal, that any discussion between counsel and the court took place regarding defendant's ultimate decision to attend the proceedings. Defendant's suggestion a meeting occurred at which such a discussion transpired is no more than unsupported speculation, and he has not shown the existing record is inadequate in this respect.

### 2. Jury Instructions

█ In contrast to the situation discussed above, it is undisputed that a number of informal meetings concerning proposed guilt and penalty phase jury instructions were held off the record and hence were not transcribed. The trial court instead afforded defendant the opportunity to place on the record after the instructions were finalized any objections to the jury instructions to be given or requests for other instructions that were not resolved to his satisfaction during the conferences. As the trial court and the parties later acknowledged, this procedure was erroneous. Section 190.9, subdivision (a)(1), requires that all conferences and proceedings in a death penalty case must be conducted "on the record with a court reporter present." We previously have held, however, that such an error is not reversible per se; instead the defendant must demonstrate prejudice. (See *People v. Freeman* (1994) 8 Cal.4th 450, 509 [34 Cal.Rptr.2d 558, 882 P.2d 249]; *People v. Cummings* (1993) 4 Cal.4th 1233, 1333, fn. 70 [18 Cal.Rptr.2d 796, 850 P.2d 1].) We decline defendant's request to reconsider this holding.

█ "[S]tate law entitles a defendant only to an appellate record 'adequate to permit [him or her] to argue' the points raised in the appeal. [Citation.] Federal constitutional requirements are similar. The due process and equal protection clauses of the Fourteenth Amendment require the state to furnish an indigent defendant with a record sufficient to permit adequate and effective

appellate review. [Citations.] Similarly, the Eighth Amendment requires reversal only where the record is so deficient as to create a substantial risk the death penalty is being imposed in an arbitrary and capricious manner. [Citation.] The defendant has the burden of showing the record is inadequate to permit meaningful appellate review. [Citation.]" (*People v. Rogers* (2006) 39 Cal.4th 826, 857–858 [48 Cal.Rptr.3d 1, 141 P.3d 135] (*Rogers*).)

After the unreported discussions regarding jury instructions at each phase of the trial, the trial court discussed the proposed final instructions in open court and invited counsel for both sides to place on the record any continuing objections to those instructions, including requested instructions that were not accepted by the court. In reviewing the guilt phase instructions, the court specifically warned counsel that "your silence after a [jury instruction] number is read indicates that we are all in concurrence. If I don't stop myself, stop me because that will be the way we reflect the rulings." Similarly, at the penalty phase, on-the-record, substantive discussions took place concerning all of the instructions before the final instructions were adopted, during which the trial court invited the defense to state agreement or disagreement with the instructions. Defense counsel testified during the record settlement proceedings that all unresolved objections and requests were placed on the record during these transcribed proceedings, and the prosecutor stated that he too confirmed from his notes that all of the defense objections were stated on the record.

Defendant observes, however, that even with these explanations thus placed into the record, the specifics as to whether additional objections were raised and how those objections were resolved so as to eliminate any ongoing disputes are absent from the record.[7] He contends that because of this shortcoming, he cannot definitively determine which instructions initially were objected to or requested, whether the resolution of any such objections was "the correct outcome or the result of an erroneous application of law or an unreasonable interpretation of the evidence," or whether some instruction that was supported by the evidence was intentionally or negligently omitted.

Although there is a gap in the record of the process by which the final jury instructions were compiled, defendant has not carried his burden of demonstrating that this gap in any way affects our ability to undertake meaningful appellate review of the jury instructions. The instructions actually given to the jury are contained in the record, and defendant was afforded the opportunity to make, on the record, all his objections to those instructions, which he did. The record, therefore, is adequate to allow us to determine which objections defendant preserved for appeal and to review the merits of these

---

[7] During the record settlement proceedings, the trial court and trial counsel were unable to recall the specifics of the unrecorded discussions.

objections. It is unfortunate that we do not have the added benefit of a more complete record of the bases for the preserved objections or requests, any response to them from the prosecution, and the reasoning of the trial court in overruling an objection or denying a request, but this circumstance does not prevent us from adequately reviewing the preserved challenges to the instructions. (See *People v. Huggins* (2006) 38 Cal.4th 175, 204–205 [41 Cal.Rptr.3d 593, 131 P.3d 995] (*Huggins*).)[8] We also are able to adequately review claims—several of which defendant has raised and are addressed below—that the trial court had a duty to give certain instructions on its own motion, because we may assume that when the existing record is silent, no invited error by defense counsel occurred. (Cf. *People v. Young* (2005) 34 Cal.4th 1149, 1203 [24 Cal.Rptr.3d 112, 105 P.3d 487] (*Young*) ["because it cannot be ascertained whether defense counsel specifically requested clarification [of an instruction], we shall give defendant the benefit of the doubt and find the issue preserved for appeal"]; *People v. Cooper* (1991) 53 Cal.3d 771, 830 [281 Cal.Rptr. 90, 809 P.2d 865] [" 'the court's responsibility [on its own motion to give a required instruction] could be negated only in that special situation in which the defense counsel deliberately and expressly, as a matter of trial tactics, objected to the rendition of an instruction' "].)

Although defendant's ability to challenge the adequacy of his attorneys' representation vis-à-vis jury instructions may be limited at this point by the absence of a complete record, defendant has not shown that he has been prejudiced in his ability to advance any claims of ineffective assistance of counsel he might have raised on appeal. Defendant has not established that had these conferences been transcribed, the record would demonstrate defense counsel's understanding of the law and counsel's tactical reasons, if any, for objecting to or requesting particular instructions, or choosing not to do so. (See *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267 [62 Cal.Rptr.2d 437, 933 P.2d 1134].)

Accordingly, the error in failing to transcribe the jury instruction conferences was harmless under the applicable state (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243] (*Watson*)) and federal (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]) standards.

### B. *Denial of Pretrial Motion to Exclude Defendant's Confessions*

As mentioned above, defendant participated in a series of eight interviews with representatives of law enforcement after he was arrested: the first three

---

[8] To the extent there were preliminary objections or requests that were resolved to defense counsel's satisfaction, resulting in no objection to the final instruction and thus no memorialization of any objection in the on-the-record discussions, such objections would be forfeited or waived if raised on appeal. Even had all the conferences been transcribed, our determination in this regard would be the same.

with officers from the Placer County Sheriff's Department regarding the murders of Garcia and Sorensen; the next two with officers from the Sacramento County Sheriff's Department regarding other murders they were investigating that had similarities to the Garcia and Sorensen cases; one interview with officers from the City of Sacramento Police Department regarding the Lactawen murder; another interview with Sacramento County Sheriff's officers; and finally an interview with Dr. Irwin Lyons, a psychiatrist who was evaluating defendant on behalf of the district attorney's office. Defendant was advised repeatedly of his *Miranda* rights, waived those rights, and agreed to talk. Nonetheless, he moved before trial to suppress the statements he made to the officers as involuntary and as obtained in violation of *Miranda*, on the ground the waivers were not knowingly, intelligently, and voluntarily made. The trial court, conducting a hearing at which several officers testified, found the waivers valid and the statements voluntary. Defendant's motion later was expanded to include the statements he made to Dr. Lyons, and a second pretrial hearing was held at which Dr. Lyons, various peace officers, and defendant testified.[9] In light of the new testimony offered, the trial court reconsidered its earlier ruling on the admissibility of the statements made to the officers, but again found that all of the statements, including those made to Dr. Lyons, were voluntary and that defendant's *Miranda* waivers were valid. Critical to the trial court's decision were its findings that (1) although the Sacramento County officers made some representations to defendant about possible leniency and psychological treatment, these statements were not specific promises but were statements of the "generalized benefit to be gained by speaking"; (2) these representations were not the cause of defendant's decision to make the statements; and (3) defendant never invoked his right to remain silent or to the assistance of counsel, even though he once asked the Sacramento County officers to stop questioning him, and mentioned an attorney during the interview with Dr. Lyons.

During the guilt phase of the trial, over defendant's renewed objection, a Placer County officer testified concerning defendant's confessions to the Garcia and Sorensen murders. At the penalty phase, again over renewed objection, tape recordings of defendant's confessions to the Lactawen murder were played to the jury, and Dr. Lyons testified concerning defendant's confessions. On appeal, defendant contends the trial court erred by not suppressing his statements. We are not persuaded.

---

[9] Defendant did not file a written motion to exclude the statements made to Dr. Lyons; his first motion mentioned only the statements made to law enforcement officers. At the conclusion of the first suppression hearing, defense counsel objected to the prospect of Dr. Lyons testifying concerning defendant's statements, and the court said it would schedule another hearing on that issue.

■ The admission at trial of a defendant's statements made involuntarily to government officials violates the defendant's federal due process rights under the Fifth and Fourteenth Amendments. (*Dickerson v. United States* (2000) 530 U.S. 428, 433–434 [147 L.Ed.2d 405, 120 S.Ct. 2326] (*Dickerson*).) Similarly, a defendant must be advised of his or her *Miranda* rights, and must make a valid waiver of these rights, before questioning begins or any statements resulting from interrogation can be admitted. (*Id.* at p. 435; *Miranda, supra,* 384 U.S. at p. 479.)

When a defendant challenges the admission of his or her statements on the ground they were involuntarily made, the prosecution must prove by a preponderance of the evidence the statements were, in fact, voluntary. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1093 [40 Cal.Rptr.3d 118, 129 P.3d 321] (*Guerra*).) A statement is involuntary if it is "not ' "the product of a rational intellect and a free will." ' " (*Mincey v. Arizona* (1978) 437 U.S. 385, 398 [57 L.Ed.2d 290, 98 S.Ct. 2408] (*Mincey*).) The court in making a voluntariness determination "examines 'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." (*Dickerson, supra,* 530 U.S. at p. 434.) Coercive police tactics by themselves do not render a defendant's statements involuntary if the defendant's free will was not in fact overborne by the coercion and his decision to speak instead was based upon some other consideration. (*Colorado v. Connelly* (1986) 479 U.S. 157, 167 [93 L.Ed.2d 473, 107 S.Ct. 515] (*Connelly*); *People v. Maury* (2003) 30 Cal.4th 342, 404–405 [133 Cal.Rptr.2d 561, 68 P.3d 1] (*Maury*).) The determination whether the authorities improperly coerced a defendant's statements involves an evaluation of the totality of the circumstances, including the nature of the interrogation and the circumstances relating to the particular defendant. (*Dickerson, supra,* 530 U.S. at p. 434.)

The same inquiry applies when a court evaluates the voluntariness of a *Miranda* waiver. (*Connelly, supra,* 479 U.S. at pp. 169–170.) Such a waiver must be knowingly and intelligently made, meaning that the defendant must have been capable of freely and rationally choosing to waive his or her rights and speak with the officers. (*People v. Frye* (1998) 18 Cal.4th 894, 988 [77 Cal.Rptr.2d 25, 959 P.2d 183] (*Frye*).)

■ Even if a defendant voluntarily has waived his or her *Miranda* rights to remain silent and to have counsel present, the defendant later may revoke the waiver. In such a case, "once a defendant has indicated an intent to assert his right to remain silent or to counsel, all further attempts at police interrogation should cease." (*People v. Jennings* (1988) 46 Cal.3d 963, 977 [251 Cal.Rptr. 278, 760 P.2d 475].) "In order to invoke the Fifth Amendment privilege after it has been waived, and in order to halt police questioning after it has begun, the suspect 'must *unambiguously*' assert his right to silence or

counsel. (*Davis v. United States* (1994) 512 U.S. 452, 459 [129 L.Ed.2d 362, 114 S.Ct. 2350] (*Davis*), italics added.) It is not enough for a reasonable police officer to understand that the suspect *might* be invoking his rights. (*Ibid.*) Faced with an ambiguous or equivocal statement, law enforcement officers are not required under *Miranda, supra,* 384 U.S. 436, either to ask clarifying questions or to cease questioning altogether. (*Davis, supra,* 512 U.S. at pp. 459–462.)" (*People v. Stitely* (2005) 35 Cal.4th 514, 535 [26 Cal.Rptr.3d 1, 108 P.3d 182] (*Stitely*).) A defendant has not invoked his or her right to silence when the defendant's statements were merely expressions of passing frustration or animosity toward the officers, or amounted only to a refusal to discuss a particular subject covered by the questioning. (*Ibid.; Jennings, supra,* 43 Cal.3d at p. 978; *People v. Silva* (1988) 45 Cal.3d 604, 629–630 [247 Cal.Rptr. 573, 754 P.2d 1070]; see also *Miranda, supra,* 384 U.S. at pp. 473–474.)

On appeal, we review independently the trial court's legal determinations of whether a defendant's statements were voluntary (*Guerra, supra,* 37 Cal.4th at p. 1093), whether his *Miranda* waivers were knowingly, intelligently, and voluntarily made (*People v. Mayfield* (1993) 5 Cal.4th 142, 172 [19 Cal.Rptr.2d 836, 852 P.2d 331] (*Mayfield*)), and whether his later actions constituted an invocation of his right to silence (*People v. Gonzalez* (2005) 34 Cal.4th 1111, 1125 [23 Cal.Rptr.3d 295, 104 P.3d 98]). We evaluate the trial court's factual findings regarding the circumstances surrounding the defendant's statements and waivers, and " 'accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence.' " (*Ibid.; Guerra, supra,* 37 Cal.4th at pp. 1092–1093.)

### 1. *Invocation of Right to Silence at First Interview*

Defendant first contends he invoked his right to remain silent at the conclusion of the first interview with the Placer County officers at the Carson City jail when he told them he wanted to stop the interview because he had a headache and wished to return to his cell. Defendant never raised this claim in the trial court. He filed only a generic written motion requesting the suppression of all statements made to the authorities, without any discussion of which particular grounds for suppression existed; indeed, his attorney conceded after the first suppression hearing that there was no basis to challenge the admission of the statements made by defendant to Placer County officers on grounds of involuntariness, and never mentioned an invocation of the right to silence. No further testimony or argument regarding an invocation of the right to remain silent during the interviews conducted by the Placer County officers was offered at the second hearing, and the trial court made no finding regarding whether defendant invoked his right to silence at the conclusion of the first interview.

 "Evidence Code section 353, subdivision (a) allows a judgment to be reversed because of erroneous admission of evidence only if an objection to the evidence or a motion to strike it was 'timely made and so stated as to make clear the specific ground of the objection.' Pursuant to this statute, ' "we have consistently held that the 'defendant's failure to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable." ' [Citation.]" (*People v. Demetrulias* (2006) 39 Cal.4th 1, 20–21 [45 Cal.Rptr.3d 407, 137 P.3d 229] (*Demetrulias*).) "To satisfy Evidence Code section 353, subdivision (a), the objection or motion to strike must be both timely *and* specific as to its ground. An objection to evidence must generally be preserved by specific objection at the time the evidence is introduced; the opponent cannot make a 'placeholder' objection stating general or incorrect grounds (e.g., 'relevance') and revise the objection later in a motion to strike stating specific or different grounds." (*Id.* at p. 22.)

Thus, defendant's entirely generic motion to exclude all of his statements to law enforcement officers, coupled with the absence of specific argument that defendant had invoked his right to silence at the end of the first interview, failed to preserve this claim for appeal.[10] (See also *People v. Partida* (2005) 37 Cal.4th 428, 434–435 [35 Cal.Rptr.3d 644, 122 P.3d 765] (*Partida*).)

Even if this claim had not been forfeited, it is without merit. Defendant's request to stop the interview at the Carson City jail was not an assertion of his right not to incriminate himself. Defendant already had confessed to the Garcia murder and provided the officers with a map showing where the body was located. Defendant had not expressed any reluctance to speak further about the murder before asking to stop the interview because he had a headache. Immediately after defendant asked to end the interview, the officers, in fact, stopped the questioning, and asked him only whether they could pose more questions during the next few days, to which he answered, "Yes." Defendant never testified during the suppression hearing that when he asked to stop the interview because he had a headache, he at that time had decided not to speak further with the officers at any future occasion concerning the crimes. In fact, defendant's testimony was to the contrary: that he always intended to cooperate with the authorities because he thought "that's what you do." It is clear from this record that defendant did not invoke his right not to incriminate himself, but merely asked for a break from questioning. The statements made by defendant during the later session with the officers, including the questioning by the Sacramento officers, therefore were

---

[10] Defendant's written motion, in fact, explicitly challenges the validity of only the initial *Miranda* waivers, and nowhere asserts that to the extent defendant waived his rights, he later invoked them.

not the "fruits" of any constitutional violation resulting from the continued questioning of defendant after he asked for a temporary suspension of questioning for the night.

### 2. *Asserted Inducements by Sacramento County Officers*

Defendant contends his confessions to the Lactawen murder, which were admitted at the penalty phase of the trial, should have been suppressed because they were the product of improper coercion by officers from the Sacramento County Sheriff's Department. We disagree.

After defendant confessed to the Garcia and Sorensen murders, the Placer County officers contacted homicide investigators in the Sacramento County Sheriff's Department who were investigating a series of other murders of young women in the Interstate Highway 5 corridor in Sacramento County (the I-5 murders). During the first interview with the Sacramento County officers, defendant denied any involvement in any murders other than the two to which he had confessed. In a second interview, defendant continued to deny involvement in the I-5 murders but admitted having committed another murder, which turned out to be the Lactawen homicide. After defendant provided details of that incident, the officers realized the murder was under the jurisdiction of the City of Sacramento Police Department and contacted homicide officers in that agency. Those officers then conducted a third interview, during which defendant provided more details of the Lactawen murder.[11] These interviews were tape-recorded, and a redacted recording of the second interview, with references to the I-5 murders excised, was played to the jury along with a recording of the third interview.

Defendant argues these recorded statements were involuntary, and thus improperly admitted, because his will was overborne when the Sacramento County officers, during their second interview, threatened to withhold psychiatric treatment if defendant did not confess, promised him leniency and treatment if he did confess, and predicted defendant's mental difficulties would seriously worsen if he did not talk but would lessen if he did. The trial court found the officers did make "inducements" but their statements did not extend beyond suggestions defendant would realize some "generalized benefit" by speaking. More significantly, the court found the representations that were made were not the cause of defendant's decision to make the statements. Rather, the trial court concluded, defendant chose to confess "because of his preexisting belief that that's what you did" and his desire to "unburden himself."

---

[11] The Sacramento County officers conducted another interview the following day and again questioned defendant concerning the I-5 murders. Defendant continued to deny any involvement. By the time of the suppression hearing, it had been determined that defendant was not a suspect in those murders.

On appeal, defendant argues primarily that the trial court erred by finding that the actions of the officers did not constitute improper coercion. We need not resolve that question. Even assuming—without deciding—the statements made to defendant might constitute improper promises or threats under some circumstances, we conclude the trial court did not err by finding that a preponderance of the evidence in this case established defendant's decision to confess to the Lactawen murder was voluntary and was "completely separate and apart from any apparent inducements that [the officers] might have given to him." (See *Connelly, supra*, 479 U.S. at p. 167; *Maury, supra*, 30 Cal.4th at pp. 404–405.)

Defendant's challenge to the trial court's finding of a lack of causation centers on the circumstance that his confession to the Lactawen murder followed close in time to when the officers made their representations in attempting to convince him to talk. He argues, relying upon the Court of Appeal's decision in *People v. Cahill* (1994) 22 Cal.App.4th 296, 316 [28 Cal.Rptr.2d 1], that there is a rebuttable presumption his confession resulted from the representations, because of their temporal proximity. Assuming, without deciding, defendant's reading of *People v. Cahill, supra*, 22 Cal.App.4th 296, is a correct statement of the law,[12] we nonetheless conclude the totality of the circumstances in this case establishes defendant's confession was not the product of the representations made by the officers.

First, the tape-recorded statements upon which defendant relies were made after defendant had admitted committing a third murder. As the officer testified at the suppression hearing, the first interview conducted by the Sacramento County officers concerning the I-5 murders was unproductive. The officers then returned a few minutes later with their supervisor, who "covered a lot of the ground [they] had already talked about . . . and got the

---

[12] The Court of Appeal did not specifically use the term "rebuttable presumption"; the word "presumption" comes from our decision in *People v. Jimenez* (1978) 21 Cal.3d 595, 614 [147 Cal.Rptr. 172, 580 P.2d 672], overruled on another ground in *People v. Cahill* (1993) 5 Cal.4th 478, 509–510, footnote 17 [20 Cal.Rptr.2d 582, 853 P.2d 1037], which the Court of Appeal cited. In *Jimenez*, however, we addressed the question whether a second confession is tainted by improper police coercion that rendered a first confession involuntary. In such cases, "[t]he rule has been long and well settled in this state, that when an accused who has been subjected to improper influences makes a confession, and shortly thereafter again incriminates himself, '. . . there is a presumption that the influence of the prior improper treatment continues to operate on the mind of the defendant and that the subsequent confession is the result of the same influence which rendered the prior confession inadmissible, and the burden is upon the prosecution to clearly establish the contrary. [Citations.]' " (*People v. Jimenez, supra*, 21 Cal.3d at p. 614.) That is a situation different from when, as in *People v. Cahill, supra*, 5 Cal.4th 478, and this case, a court is evaluating whether, in the first instance, there was an involuntary confession. Although the lapse of time between an officer's promise or threat and a defendant's decision to confess certainly may be a relevant factor when assessing the totality of the circumstances surrounding the voluntariness of the statement, it is not clear that closeness in time should give rise to a presumption that a confession was coerced.

same sort of denials that [they] had earlier encountered." Approximately 27 minutes into the second interview, defendant told the officers he had not committed any of the killings about which they were questioning him, but had committed another murder. It was at this point that the tape recorder was turned on. Although this tape recording begins with the officers discussing possible benefits defendant might receive by telling the officers about the murder, defendant's initial admission obviously came before *those* particular statements. Indeed, defendant testified at the hearing that the first time the Sacramento County officers mentioned obtaining help for him was when an officer made a statement about another murderer who supposedly was placed in a prison psychiatric facility—a statement found more than one minute into the tape (that is, after defendant had admitted committing another murder). There was no testimony at the suppression hearing concerning any promise, threat, or other inducement having been made before the tape recorder was turned on. Thus, the record does not contain evidence suggesting the officers made any representations before defendant confessed to the Lactawen murder, although defendant, apparently, had not yet supplied them with the details.

Second, as the trial court observed, it appears from statements made by defendant during the interviews that he never believed he would receive the benefits discussed by the officers. Despite their statements that defendant could receive help if he talked, he repeatedly expressed his belief that even if he spoke to them he would be sent to prison, forgotten about, and receive no help. He continued to voice this belief even after providing the details of the murder. At no point during the interview did defendant explicitly state or even imply that he had been convinced otherwise. Although defendant testified at the *suppression hearing* that he believed, even before speaking to the authorities, he would receive help from them, this after-the-fact, self-serving testimony is directly contradicted by the prior contemporaneous expressions of his state of mind: that he would not receive any help, but instead would be sent to prison and forgotten.[13] In fact, on cross-examination, defendant testified he told the officers during the interviews he would not be offered a beneficial deal because "the way the people were cussing at me and stuff out in the booking room, I figured it was over."[14]

---

[13] Indeed, even when defendant was speaking during the interview about his experiences at the reform school in Idaho, he told the officers that "People didn't try to help you. They just played games with you and made you stand in corners and shit."

[14] The trial court noted that some of defendant's testimony at the hearing arguably was self-serving, but stated it would "accept his testimony as a generally accurate portrayal of his state of mind at the time." As defendant's answer on cross-examination makes clear, however, his testimony was contradictory regarding whether he believed he would receive the benefits mentioned by the officers.

Third, defendant's own testimony at the suppression hearing established that his decision to confess to the three murders was based upon his own preexisting personal belief that a person should cooperate with the authorities and tell them what he knows about a crime, completely separate from any representations made by the officers. On direct examination, when asked about his *Miranda* waivers, defendant said, "I figured I had to cooperate. I always did before. When I got in trouble in Idaho, I did it then." On cross-examination and redirect examination, defendant reiterated many times his belief that confessing is "what you do when you are caught by the law." Indeed, the trial court examined defendant briefly, specifically asking him: "When you say you felt you had to cooperate with [the officers], that was something you felt from before this ever started and you believed that all the way through?" Defendant responded, "Yes, because you tell them what you know."[15] In addition, the circumstance that defendant had confessed to the Placer County officers concerning two murders, although those officers had not given any "inducements," is further evidence of his state of mind concerning his willingness to admit his role in the Lactawen murder regardless of any representation made by the Sacramento County officers.

In sum, there is ample evidence supporting the conclusion that defendant's decision to confess to the Lactawen murder was not the product of any coercive tactic by the officers, but rather was based upon defendant's free will and his preexisting belief that when questioned by the authorities, a person should tell what he knows. This evidence substantially outweighs any implication arising from defendant's decision to confess to the Lactawen murder a relatively short time after the officers made their representations about defendant's receiving help—the primary circumstance cited by defendant in support of his claim of error. Accordingly, the trial court properly denied the motion to suppress these statements.

### 3. *Statements to Dr. Lyons*

Defendant challenges the admission of Dr. Lyons's testimony regarding statements made by defendant during the interview conducted in the Placer County Jail soon after his arrest. Defendant contends these statements should have been excluded on the ground the waiver of his *Miranda* right to remain silent was not knowing, intelligent, and voluntary, because his preoccupation with receiving psychological treatment rendered him unable to appreciate the circumstance that Dr. Lyons was acting on behalf of the prosecution. Defendant also claims his statements were involuntary because they were the

---

[15] The trial court earlier had asked defendant, "I want you to tell me whether I'm understanding you correctly. [¶] It sounds to me that you're saying that you assumed from when this first started, from the first moment they picked you up, that what you had to do was tell them what happened." Defendant responded, "Correct."

product of the prosecution's "highly disturbing practice" of sending a psychiatrist to visit a mentally disturbed defendant. Defendant never raised these specific claims below, and the trial court accordingly made no finding on these issues.[16] The only issues raised and addressed by the trial court in this regard were whether defendant had invoked his right to silence at the conclusion of the interview with the Sacramento County officers immediately prior to Dr. Lyons's interview, and whether defendant invoked his right to counsel during Dr. Lyons's interview.[17] Defendant does not renew those issues on appeal, and therefore they are waived. (Cal. Rules of Court, rule 8.204(a)(1)(B) [former rule 14(a)(1)(B)]; *People v. Wilkinson* (2004) 33 Cal.4th 821, 846, fn. 9 [16 Cal.Rptr.3d 420, 94 P.3d 551].) The claims he does raise regarding his statements to Dr. Lyons are forfeited. (*Demetrulias, supra*, 39 Cal.4th at p. 22.)

Even if they were not forfeited, defendant's claims that he did not knowingly and intelligently waive his *Miranda* rights and that his waivers and statements to Dr. Lyons were involuntary would fail, because there is no evidence supporting them. To the contrary, Dr. Lyons testified in detail concerning his giving defendant the *Miranda* advisements, including informing defendant that Lyons had been appointed by the district attorney and might testify against defendant at trial, and that his purpose in meeting with defendant was not to provide him with medical or psychiatric treatment. Dr. Lyons testified defendant stated that he understood his rights and Dr. Lyons's role before agreeing to speak to Dr. Lyons. Defendant repeatedly and emphatically stated he wished to speak to Dr. Lyons despite Lyons's potentially adverse role in the case. Throughout the interview, defendant appeared to understand Dr. Lyons's questions and was able to communicate.[18]

---

[16] As we observed above, defendant did not make any mention of his statements to Dr. Lyons in the written motion to suppress.

[17] Regarding defendant's possible invocation of the right to counsel, Dr. Lyons testified that approximately 15 to 25 minutes after defendant gave his *Miranda* waivers, he mentioned that the officers in the jail "won't let him see a public defender." Dr. Lyons immediately ceased questioning defendant about the case, and reminded him that Dr. Lyons was there on behalf of the district attorney's office and might testify against defendant, and then asked defendant whether he wanted to stop the interview so he could speak to a lawyer. Defendant "emphatically" said no, he wanted to continue talking to Dr. Lyons. Defendant did not mention to Dr. Lyons that he had made any specific request for an attorney at the jail.

Defendant testified that he asked Dr. Lyons, "When do I get to see an attorney?" He claimed not to remember Dr. Lyons's admonishment that the interview would be stopped so defendant could consult an attorney if he wished, but acknowledged that they continued to discuss the crimes.

The trial court found that there was only a "general discussion concerning the right to representation," not an invocation of the right to counsel by defendant.

[18] Dr. Lyons did, however, prescribe at the end of the interview a tranquilizer for defendant due to his high level of anxiety.

Moreover, defendant testified he generally realized from the various *Miranda* advisements he received that what he said would be used in court, and although he testified he believed he would receive "help" from the authorities, he never stated his own thinking was so affected by his desire for help that he did not understand the implications of speaking with Dr. Lyons or felt unable to exercise his free will to refuse to do so. Although defendant's answers on cross-examination were somewhat evasive, defendant, when asked whether he realized his statements to Dr. Lyons might be used against him answered, "I didn't know *what extent* he would, no." When specifically asked whether he voluntarily spoke with Dr. Lyons about his crimes, defendant answered, "Yes. That's what his job was. He wanted to know my state of mind, how I felt about the crimes."

It was not until defendant was asked somewhat leading questions on redirect examination that he testified his "principal motivation" for speaking to Dr. Lyons was his desire to receive help from him. Even if this claim is true, it does not establish that defendant's decision to speak with Dr. Lyons was the result of any coercive activity by Dr. Lyons, as opposed to defendant's internal beliefs and desires.

Defendant argues on appeal, however, that the very circumstances of the interview were improperly coercive because, prior to meeting Dr. Lyons, the officers had told defendant they had arranged for psychological help for him. This argument, however, is refuted by the evidence in the record. Dr. Lyons testified he repeatedly told defendant he was not meeting with him to provide psychiatric help, and defendant, in fact, understood this and did not expect help from Dr. Lyons, but rather expressed his desire for future psychological help in a general sense. Thus, any misapprehension defendant initially may have had regarding Dr. Lyons's role and what defendant might gain from speaking with him would have been dispelled during the interview. There is no evidence in the record supporting defendant's claim that he did not knowingly, intelligently, and voluntarily waive his *Miranda* rights before speaking with Dr. Lyons, or that his statements were otherwise involuntary because of improper coercion.

### 4. *Total Length of Interrogations*

Defendant makes an additional claim on appeal that was not raised below: he asserts his statements to the officers concerning the Lactawen murder and to Dr. Lyons were involuntary because of the "extensiveness of the interrogations." Defendant stresses the total amount of time he was interrogated on the day he was transferred from Nevada to California. (See *Mincey, supra,* 437 U.S. 385; *Spano v. New York* (1959) 360 U.S. 315, 322 [3 L.Ed.2d 1265, 79 S.Ct. 1202].) Again, this claim was not raised or addressed in the trial

court and therefore is forfeited. (*Demetrulias, supra*, 39 Cal.4th at p. 22.) Additionally, even if not forfeited, this claim is without merit. Unlike the situations in *Mincey* and *Spano*, here there was no single interview that lasted many hours, ultimately resulting in a confession after the defendant earlier had refused to speak. (See *Mincey, supra*, 437 U.S. at p. 401 [four-hour interrogation of a "seriously and painfully wounded man on the edge of consciousness" that stopped only during those periods when he was unconscious]; *Spano, supra*, 360 U.S. at p. 322 [eight-hour interrogation at night with only one break while defendant was moved to a new location for further questioning].) Rather, there was a series of relatively short interviews by various officers about different crimes, often with significant breaks in between, including the first night after his arrest and a dinner break the next day when he arrived at the Placer County Jail. Even during the first two interviews with officers from the Sacramento County Sheriff's Department, which were separated by only a few minutes, defendant admitted to the Lactawen killing after less than one hour of questioning in total. There simply is no evidence in the record, including the tape-recorded statements and defendant's testimony at the suppression hearing, suggesting that the authorities exploited any "slowly mounting fatigue" resulting from prolonged questioning, or that such fatigue occurred or played any role in defendant's decision to confess. (Cf. *Spano, supra*, 360 U.S. at p. 322.)

C. *Guilt Phase Claims*

1. *Assertedly Erroneous Evidentiary Rulings*

a. *Admission of Defendant's Suppression Hearing Testimony During Cross-examination at Trial*

Before defendant testified at the hearing on his motion to suppress his statements to the officers, his counsel clarified that defendant was making a "limited waiver" of his right not to be called as a witness, in that he would not be testifying as to the substance of any of his statements, but only regarding his *Miranda* waivers and the voluntariness of his statements. During cross-examination at the suppression hearing, the prosecutor asked defendant whether he had spoken with the officers at the Carson City jail and given them a "full statement" concerning the Garcia killing. When defendant answered that he had not given them a *full* statement, defense counsel objected and moved to strike the answer as nonresponsive, further objecting to the question because "to the extent that the question calls for anything substantive, it is beyond the scope of the limited waiver of self-incrimination." The court struck the answer and asked the prosecutor to rephrase the question. The court also advised defendant to answer the prosecutor's questions "without saying the actual things that you said." Soon thereafter, the following questions and answers were exchanged:

"Q [by prosecutor]: Were you cooperating with [the officers] because you thought that that was the right thing to do and you were going to just tell the truth?

"A [by defendant]: I was sure that's what you do when you are in that position. I had to do it before.

"Q: Did you decide to talk to them yourself? Did you make that decision that 'I'll talk with them because I am going to tell them the truth'?

"A: Well, they come and asked me. They said they had all the evidence, so I—yes, I guess so.

"Q: Okay. You decided on your own to talk to them, is that right?

"A: After they told me they had all the evidence, yes.

"Q: Okay. And did you want to tell the truth at that interview at the jail yourself?

"A: I did."

At that point defense counsel objected to the prosecutor's question as "substantive." The trial court described the question as "mixed" and stated, "I think the question [sic] will be admitted not for the substantive notion of wanting to tell the truth—" at which point the prosecutor interjected, stating the answer was offered "for his state of mind." The court then stated, "Yes. Accepted solely for that purpose, limited to it." The prosecutor then followed up with a reiteration of the question whether defendant wanted to tell the truth to the officers, and defendant answered, "I didn't walk in voluntarily. I figured that that's what you do when you are caught by the law. Tell them what you know."

At trial, defendant testified that the version of the Garcia and Sorensen killings he gave the officers during the interviews—that he engaged in sexual activities with the victims and strangled them because he was frightened—was not true, primarily because he now was stating that he had strangled the victims in fits of rage and did not decide to engage in sexual activities with them until after they were dead. He also testified he did not want to tell the officers what really happened because the truth was embarrassing; he did not want to talk about his problems with his mother; he thought it would be worse for him if he gave them a true account, and he thought that giving the untrue versions would cause the officers to stop questioning him.

On cross-examination, the prosecutor sought to impeach defendant with the testimony from the suppression hearing set forth above, in which defendant said he wanted to tell the officers the truth. Defendant objected on the ground that use of his hearing testimony would "mislead[] the jury, in that the purpose of any of those questions and answers didn't have to do with the substantive truth of the statements. [¶] They had to do with the *Miranda* warnings, the admissibility." The prosecutor disagreed, arguing some of the questions and answers concerned the substantive issue of whether the statements to the officers were true. The trial court stated, somewhat cryptically, that with regard to "some of the questions, at least, the jury could find [they] went to substance, and I think those are arguably sufficient within the substance to be permissible."

Defense counsel then expressed concern that the only way to avoid misleading the jury would be to disclose the context in which defendant's prior testimony was given, but telling the jury that the hearing concerned defendant's motion to suppress those statements would unduly prejudice defendant. Accordingly, defense counsel argued, the testimony should be excluded under section 352 of the Evidence Code. The trial court, although not convinced disclosure of the full context of the testimony would be prejudicial, agreed that disclosure of these circumstances was unnecessary and could be avoided through certain precautions, and therefore permitted the prosecutor to make use of the prior testimony during cross-examination.

The prosecutor then cross-examined defendant primarily by reading the suppression hearing questions and answers and asking defendant whether his testimony at the hearing—that he wanted to tell the truth to the officers—was itself truthful. Defendant responded essentially that he wanted to tell the truth in part—that he killed Garcia and Sorensen—but did not want to tell the whole truth, for example, the details of the murders. Defendant did not request any clarifying admonition to the jury or revisit his prior testimony during the subsequent redirect examination.

On appeal, defendant contends that the trial court erred by allowing the prosecutor to impeach him with this testimony from the suppression hearing, and that this error denied him his "rights to a fair trial, confrontation, due process, effective assistance of counsel and a reliable and non-arbitrary sentencing process under the Fifth, Sixth, Eighth and Fourteenth Amendments." Defendant argues use of the prior testimony was improper because it was limited specifically to his state of mind and should not have been used to impeach his testimony about the actual truthfulness of his confessions. Allowing the prosecutor to do so, defendant contends, changed "the rules in the middle of the game," depriving him of a fair trial and effective assistance

of counsel and, in effect, retroactively depriving him of a fair opportunity to challenge the admission of the statements in the first instance. We are not persuaded.

Preliminarily, defendant's arguments on appeal are not the same as those he raised in the trial court. Defense counsel did not argue the hearing testimony was inadmissible per se, as defendant does now; rather, he argued that its use was misleading without its being placed in context, and that providing the jury with this context would be unduly prejudicial.[19] Defendant does not renew this argument on appeal. He therefore has forfeited the new claims he now raises on appeal. (See *Partida, supra,* 37 Cal.4th at pp. 434–435.)

Even if defendant had preserved these claims, we would find them to be without merit. At the suppression hearing, defendant testified he wanted to tell the authorities the truth, which in the context of the motion to suppress was relevant evidence on the issue whether his confessions were voluntary and his *Miranda* waivers were valid. (Evid. Code, § 210 [relevant evidence is that "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action"].) At trial, defendant testified he did *not* want to tell the truth to the officers, and he was impeached with his hearing testimony on that issue. In addition, defendant's own trial testimony put in issue not only whether he wanted to tell the truth to the officers, but also the very truthfulness of his confessions.

Defendant, however, never testified at the suppression hearing that he actually *told* the truth to the officers, and therefore no such statement was admitted as evidence at trial. Indeed, whether or not he actually told the truth to the officers was not germane at the suppression hearing, where the only issues were whether his statements were voluntary and his *Miranda* waivers were valid. Nevertheless, once defendant at trial also put at issue the veracity of his confessions, the same testimony regarding his state of mind admitted at the suppression hearing took on threefold significance: it tended generally to impeach his credibility as a witness; it tended directly to prove he *did* want to tell the truth to the officers (see *People v. Crew* (2003) 31 Cal.4th 822, 849 [3 Cal.Rptr.3d 733, 74 P.3d 820]); and it tended circumstantially to prove he did, in fact, *tell* the truth to the officers.

On appeal defendant takes issue with this third use, but, notably, this was not the concern he raised at trial. There he argued, in essence, that the jury

---

[19] Indeed, when the prosecutor first brought up his intention to use the suppression hearing testimony during cross-examination, defense counsel stated, "I don't think that's inappropriate as long as the questions are phrased in terms of, you know, 'Did you testify at a prior proceeding,' without emphasizing to the jury that there was an attempt to suppress statements. [¶] I don't think that's any of their business."

would not recognize the thin line between his stating he *wanted* to tell the truth and his *not* saying he *told* the truth, without some explanation of the context in which his suppression hearing statements were made. In other words, at trial defendant contended the jury improperly might view his hearing testimony as an admission that he told the truth to the officers when, in fact, the truthfulness of the confessions was not in issue at that time. Defendant did not argue at trial, however, that it would be improper to view his wishing to tell the truth as circumstantial evidence he told the truth, perhaps because, as we shall explain, this inference was proper.

In using the prior testimony in cross-examination at trial, the prosecution adduced the same evidence admitted at the suppression hearing—that defendant wanted to tell the truth to the officers. No "substantive" evidence of the confessions beyond what defendant previously gave pursuant to his "limited waiver of the right to self-incrimination" was admitted at trial. In fact, no such "substantive" evidence existed, because of the properly circumscribed nature of the suppression hearing testimony.[20] Instead, at trial a new inference could be drawn from that same evidence: because defendant wished to tell the truth, he probably did tell the truth.[21] (Cf. *People v. Griffin* (2004) 33 Cal.4th 536, 578 [15 Cal.Rptr.3d 743, 93 P.3d 344] [state-of-mind exception to the hearsay rule under Evid. Code, § 1250 permits admission of a hearsay statement as proof of "the declarant's future conduct in accordance with his or her expressed intent"].) Defendant's own trial·testimony put the truthfulness of his testimony and his earlier confessions at issue. There was nothing improper, therefore, in admitting the suppression hearing testimony to rebut his trial testimony or in allowing the jury to infer from this evidence that defendant acted in accordance with his state of mind, and that his confessions to the officers were truthful. Because there was no error in admitting the testimony given at the suppression hearing, no violation of defendant's constitutional rights occurred. (See *Partida, supra,* 37 Cal.4th at pp. 434–435.)

---

[20] Indeed, it was somewhat of a truism for the trial court to state at the suppression hearing that defendant's statement that he wished to tell the truth was admitted solely for the purpose of showing his state of mind. Defendant was questioned and gave answers about *only* his state of mind. This was unlike the situation in which, for instance, a hearsay statement about a fact is admitted for the limited purpose of showing the declarant's state of mind. There, without such limitation, the hearsay statement would be evidence of two matters: the state of mind of the declarant and the truth of the underlying matter asserted in the hearsay statement. (Cf. Evid. Code, § 1250, subd. (a); *People v. Noguera* (1992) 4 Cal.4th 599, 620–621 [15 Cal.Rptr.2d 400, 842 P.2d 1160].) Here, defendant's state of mind—his desire to tell the truth—simply was the only matter at issue. That the jury could infer from defendant's statement of his state of mind that he acted in accordance with that mental state does not change the "limited" nature of the admitted evidence itself.

[21] Although the trial court's brief statement of its reasons for allowing the use of the prior testimony is cryptic, this may be exactly what the court meant when it stated that "some of the questions, at least, the jury could find . . . went to substance . . . ."

b. *Exclusion of List of Names in Sorensen's Address Book*

During the cross-examination of Lanciann Sorensen's mother, Stephanie Bradish, defense counsel inquired whether she "had any evidence that Lanciann was sexually active at about the time of her disappearance." The prosecution objected on relevance grounds. A sidebar discussion was held, at which the defense made an offer of proof that Bradish found a book containing a list of men or boys with whom Sorensen had sexual relations. Defense counsel argued this evidence showed Sorensen was sexually active and therefore it was more likely she made the supposedly unwelcome sexual advance toward defendant that caused him to become enraged and strangle her. The trial court sustained the prosecutor's objection, subject to revisiting the issue outside the presence of the jury. At the following noon recess, defendant clarified his offer of proof, contending a list of the names and ages of 16 males found on a page in Sorensen's address book was a list of her sexual partners, and a police report prepared by Officer Valerie Miller, who was investigating the initial missing persons report, mentioned that Bradish told Miller that Sorensen "kept a list of men she slept with."

Bradish and Officer Miller then testified outside the presence of the jury regarding the list. Bradish said she did not remember telling Miller there was a list of men with whom Sorensen had had sexual relations. In fact, Bradish stated she had no information about Sorensen's sexual activity in general or about the meaning of the list. Bradish did not find the address book until after Sorensen was missing, and Sorensen never had mentioned a list of individuals with whom she had had sexual relations. In Bradish's opinion it was equally likely the list was, or was not, a list of Sorensen's sexual partners.

Officer Miller testified that after the missing persons report was filed, Bradish frequently furnished the officers with the names of individuals who might have had information concerning Sorensen's whereabouts. At some point there was a discussion of Sorensen's boyfriends and sexual partners, which Miller found noteworthy because Sorensen was a minor. Miller did not know where Bradish had obtained her information, but was under the impression Bradish "was working off some reference to guide us." It was Miller's understanding that a list of Sorensen's boyfriends existed, and some of the names on this list were those of persons with whom Sorensen had had sexual relations. Miller never saw an actual list of names, and did not recognize the list of 16 names in Sorensen's address book as a list of boyfriends.

The trial court found that, even assuming the list was admissible under a hearsay exception and did not constitute prohibited character evidence, defendant had not established a sufficient foundation for its admission. The

trial court therefore sustained the prosecutor's objection and excluded the proffered evidence of Sorensen's sexual activity. On appeal, defendant challenges the trial court's decision. We conclude the trial court did not err.[22]

■ "Of course, only relevant evidence is admissible. (Evid. Code, § 350.) Sometimes the relevance of evidence depends on the existence of a preliminary fact. [Citations.] The court should exclude the proffered evidence only if the 'showing of preliminary facts is too weak to support a favorable determination by the jury.' [Citations.] The decision whether the foundational evidence is sufficiently substantial is a matter within the court's discretion." (*People v. Lucas* (1995) 12 Cal.4th 415, 466 [48 Cal.Rptr.2d 525, 907 P.2d 373] (*Lucas*); see also Evid. Code, § 403, subd. (a)(1) [when the relevance of proffered evidence depends upon the existence of a preliminary fact, the proponent of the evidence has the burden of producing sufficient evidence of that fact].)

Here, defendant failed to establish as preliminary facts that Bradish and Officer Miller were competent to testify concerning Sorensen's sexual history in general or, specifically, concerning the meaning of the list of names. At most, if one accepts Miller's testimony to the extent it conflicts with that of Bradish, Miller testified only that she believed Bradish had a list of Sorenson's boyfriends, some of whom had had sexual relations with Sorensen. There was no testimony from Miller that the list in Sorensen's address book was the presumed list of sexual partners, and Bradish likewise testified she did not know the significance of the list, having discovered it only after Sorensen was missing. In short, defendant failed to establish as a preliminary fact that the list was what he claimed it to be. Rather, defendant's belief that the list of names chronicled Sorensen's sexual partners was only speculation. The list therefore was irrelevant, and the trial court properly excluded it. (*People v. Scheid* (1997) 16 Cal.4th 1, 14 [65 Cal.Rptr.2d 348, 939 P.2d 748] [trial court lacks discretion to admit irrelevant evidence].) In addition, because Bradish testified she could only guess with whom Sorensen may have been sexually involved and Officer Miller also knew of no specifics, the two witnesses had

---

[22] In his closing argument, the prosecutor asserted that defendant's testimony that Sorensen made an unannounced, unwelcome sexual advance was unbelievable, and the evidence of Sorensen's sexual activities with her boyfriend Matthew Sklansky did not support any inference that she would attempt to have oral sex with a stranger she had just met while hitchhiking. After the prosecutor completed his summation, defendant asked the court to reopen the defense case to present the previously excluded evidence of Sorensen's other sexual activities, that is, the list of 16 names. Defendant asserted the prosecutor exploited the exclusion of the list when arguing that Sorensen would not have sex with a stranger. The trial court denied the motion to reopen, because the prosecutor's argument did not change the circumstance that defendant had failed to establish the foundation for admission of the list. For the same reasons, as we shall discuss, we conclude the trial court also did not err in this regard.

no other relevant evidence to present in that regard. Accordingly, the trial court did not err in excluding the proffered evidence of Sorensen's sexual activities.[23]

### c. *Exclusion of Evidence That Defendant's Mother Was Sexually Abused by Her Father*

Prior to defendant's mother being called as a witness in the defense case, defendant notified the trial court he planned to introduce evidence establishing that his mother had ·been sexually abused by her father—defendant's grandfather—when she was a young girl. Defendant argued this evidence would corroborate his testimony that his mother sexually abused him, because Dr. Yarvis earlier had testified about a correlation between a person's being the victim of incest as a child and later, as a parent, becoming the perpetrator of incest on his or her children. The trial court sustained the prosecution's objection on relevance grounds, finding Dr. Yarvis's testimony insufficient to establish the correlation between being a victim of incest and becoming a perpetrator. Therefore, the evidence of abuse inflicted by defendant's grandfather was irrelevant. Defendant contends on appeal the trial court erred and claims, as he did in the trial court, that exclusion of this evidence violated his state and federal constitutional rights. We conclude the trial court did not abuse its discretion in excluding this evidence, and defendant's constitutional rights were not violated.

As mentioned above, when a defendant has proffered evidence, the relevance (and therefore the admissibility) of which depends upon the existence of a preliminary fact, he or she bears the burden of producing sufficient evidence of the preliminary fact. (*Lucas, supra,* 12 Cal.4th at p. 466; Evid. Code, § 403, subd. (a)(1).) Sufficient evidence in this context means evidence strong enough to " 'support a favorable determination by the jury.' " (*Lucas,*

---

[23] We note this evidence was not only irrelevant for lack of foundation, it also properly was excluded because the inferences defendant wished to draw from the list were entirely speculative. (*People v. Babbitt* (1988) 45 Cal.3d 660, 684 [248 Cal.Rptr. 69, 755 P.2d 253] ["exclusion of evidence that produces only speculative inferences is not an abuse of discretion"].) First, even if the list of 16 names in the address book was the list Officer Miller had in mind, she testified that only "some" of the names were of Sorensen's sexual partners. This indefinite quantification provided no support for the inference that Sorensen's sexual history was "extensive," which was the primary basis for defendant's claim that the list would corroborate his testimony about her actions. Second, because the list provides no details of the relationships Sorensen had with these individuals, it again would be speculation to infer from the fact Sorensen had some unspecified sexual experiences (with some unknown number of persons) that she would have behaved in the manner to which defendant testified at trial. We also observe that the jury was made aware of the circumstance that Sorensen was sexually active through Sklansky's testimony, the significance of which was discussed by counsel in the final arguments to the jury.

*supra*, 12 Cal.4th at p. 466.) The determination of the existence, or nonexistence, of sufficient evidence of a preliminary fact is committed to the sound discretion of the trial court. (*Ibid.*)

Here, the preliminary fact at issue was whether there is an increased probability a child whose parent subjected her to incest will, as an adult, inflict similar abuse upon her own children. As the trial court pointed out, there is no *inherent* logical connection between being a victim of incest and later engaging in incest with one's own children. Rather, proof of such a correlation would require, as the trial court described it, some type of "scientific" support, for example, medical, psychological, or statistical studies.

In arguing for admission of this evidence, defendant relied exclusively upon the testimony of Dr. Yarvis to establish such a connection, but Yarvis's testimony was remarkably equivocal and limited. The entirety of the questions and answers touching upon this subject, cross-examination included, comprises less than one full page of the reporter's transcript. During direct examination, the following exchange occurred:

"Q [by defense counsel]: Just incidentally, is incestuous behavior by a parent frequently associated with similar victimization of that parent when the parent was a child?

"A [by Dr. Yarvis]: We're really just beginning to study this area, so it's still one where more is not known than is known. [¶] There certainly appears to be some evidence in the psychiatric literature that suggests that a parent who has been either physically or sexually abused has a greater likelihood to inflict similar abuse on their child than a parent who has not been so affected. But how much more likely is not clearly known.

"Q: Okay. [¶] Is it an accurate and general statement that incest tends to run in families?

"A: Well, on the basis of what I just said, I suppose you'd have to conclude that. I hesitated because I said it is much more clear about physical abuse than it is clear at this point about sexual abuse, although I think what you've just said is probably correct."

On cross-examination, the prosecutor asked Dr. Yarvis: "You would agree with me, would you not, that all children who have been the subject of sexual abuse do not become sexual abusers?" Dr. Yarvis replied: "Absolutely not."[24]

---

[24] In the following question, Dr. Yarvis was asked whether he agreed that "there is no cause and effect automatic relationship between a victim of child molestation and a person becoming a violent rapist," to which he answered, "You mean a one-to-one causal effect? Absolutely

The shortcomings of this testimony in establishing the preliminary fact at issue are obvious. According to Dr. Yarvis, at the time of defendant's trial, study of the possibility of this correlation was just beginning, though there was "some" evidence that "appear[ed]" to "suggest" a relationship existed. There was, however, more *not* known than known, especially with regard to sexual abuse as opposed to physical abuse. Moreover, even if a victim of incest were more likely than another person to later engage in incest with her children, the increased level of likelihood was "not clearly known."

Dr. Yarvis's answer to the more abstract question concerning whether incest "tends to run in families" was based upon the equivocal opinion discussed in his prior response, not his knowledge of any separate statistical analysis of the frequencies of incest within families. Thus, his response, "what you've just said is probably correct," was merely a restatement of the prior answer in a slightly different context and did not add independent weight to the testimony.

On appeal, defendant cites other evidence of the asserted correlation, but we evaluate the trial court's exclusion of the proffered evidence based upon the evidence before the court when it made its decision. (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1249 [69 Cal.Rptr.2d 784, 947 P.2d 1321] ["Of course, we cannot consider on appeal evidence that is not in the record."].) Defendant also cites, for the first time on appeal, the opinion of the Supreme Court of Minnesota in *State v. Cermak* (Minn. 1985) 365 N.W.2d 238 (*Cermak*), in which the court rejected the appellant's challenges, including lack of foundation, to an expert's testimony regarding the "intergenerational" nature of incest. That case, however, is distinguishable and only serves to reinforce our conclusion here.

In *Cermak*, the expert testified concerning her own extensive research into (and treatment of) families affected by incest, which at that time had spanned several years and included her publication of a demographic study on the characteristics of offenders, victims, and spouses. She unequivocally expressed an opinion that incest was a learned behavior that was passed from

---

not." In light of the double negative contained in some of the questions, although Dr. Yarvis's negative answers, if read literally, would express disagreement with the proposition stated in the question, it seems clear that this was not the intent of the answer and that he, in fact, was in agreement.

We also note that although the trial court read into the record this second question and answer about violent rapists when discussing the issue of whether to admit the evidence of incest between defendant's mother and grandfather, this testimony is not relevant to the question whether incest victims are more likely than other persons to engage in incest with their own children. Both of the prosecutor's questions appear to have been intended to address the separate issue of the effects upon defendant of the sexual abuse allegedly inflicted by his mother, though the first question also was general enough to apply to abuse inflicted upon defendant's mother by her father.

one generation to the next unless there was outside intervention. (*Cermak, supra,* 365 N.W.2d at pp. 241–242.) This testimony stands in stark contrast to Dr. Yarvis's statements, which were exceedingly tentative in expressing the opinion that a correlation existed, and lacked citation to the sources of the information upon which his opinion—such as it was—was based, other than a general reference to the "psychiatric literature."[25]

■ Based upon the evidence presented by defendant at trial, we conclude, as the trial court found, that defendant failed to establish as a preliminary fact that a correlation exists between being a victim of incest as a child and later as a parent engaging in incest with her children. The trial court therefore did not abuse its discretion in excluding as irrelevant the proffered evidence of the incestuous relationship between defendant's mother and grandfather. Because we conclude the proffered evidence was irrelevant, and properly was excluded as such, it follows defendant's constitutional rights were not violated. (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1249–1250 [9 Cal.Rptr.2d 628, 831 P.2d 1210] (*DeSantis*) [exclusion of irrelevant evidence does not violate a defendant's due process, confrontation, or 8th Amend. rights].)

## 2. *Defendant's Absence During His Mother's Testimony*

Defendant was voluntarily absent during the second part of the guilt phase testimony of his mother. He contends on appeal his absence violated his federal and state constitutional rights, as well as state statutory law.

■ "As a constitutional matter, a criminal defendant accused of a felony has the right to be present at every critical stage of the trial. (*Illinois* v. *Allen* (1970) 397 U.S. 337, 338 [25 L.Ed.2d 353, 90 S.Ct. 1057].) The right derives from the confrontation clause of the Sixth Amendment to the federal Constitution and the due process clauses of the Fifth and Fourteenth Amendments, and article I, section 15 of the California Constitution." (*Frye, supra,* 18 Cal.4th at p. 1010.) A critical stage of the trial is one in which a defendant's " 'absence might frustrate the fairness of the proceedings' (*Faretta* v. *California* (1975) 422 U.S. 806, 819, fn. 15 [45 L.Ed.2d 562, 95 S.Ct. 2525]), or 'whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge' (*Snyder* v. *Massachusetts* (1934) 291 U.S. 97, 105–106 [78 L.Ed. 674, 54 S.Ct. 330])." (*People v. Rodriguez* (1998) 17 Cal.4th 253, 260 [70 Cal.Rptr.2d 334, 949 P.2d 31] (*Rodriguez*).) A defendant may waive his or her constitutional right to be present during a critical stage, provided the waiver is knowing,

---

[25] Our discussion of *Cermak* does not imply that evidence similar to the expert's opinion in that case would be sufficient to establish a correlation between victimization and later becoming a perpetrator. We address the evidence in that case only to highlight the equivocal nature of Dr. Yarvis's opinion in the present case.

intelligent, and voluntary. (*People v. Moon* (2005) 37 Cal.4th 1, 20–21 [32 Cal.Rptr.3d 894, 117 P.3d 591].)

■ Under California statutory law, section 1043, subdivision (a) provides that "[e]xcept as otherwise provided in this section, the defendant in a felony case shall be personally present at the trial." Although, pursuant to section 1043, subdivision (b)(2), a felony trial that has commenced generally may continue if the defendant subsequently is voluntarily absent, this exception does not apply in capital cases. (§ 1043, subd. (b)(2).) Similarly, section 977, subdivision (b)(1) requires, in part, that defendants charged with a felony must be present "during those portions of the trial when evidence is taken before the trier of fact." Under that statute, a defendant is not permitted to waive his or her presence at that stage of the proceedings. (§ 977, subd. (b)(1); see also *People v. Weaver* (2001) 26 Cal.4th 876, 967–968 [111 Cal.Rptr.2d 2, 29 P.3d 103] (*Weaver*).) Thus, under the statutes, a capital defendant generally must be present during the trial when evidence is taken. A defendant seeking reversal of a judgment based upon statutory error, however, must demonstrate prejudice under *Watson, supra,* 46 Cal.2d at page 836—that it is reasonably probable a result more favorable to the defendant would have been reached in the absence of the error. (*Weaver, supra,* 26 Cal.4th at p. 968.)

After defendant testified, defense counsel announced they would re-call defendant's mother as a witness in order to examine her concerning the claimed incestuous relationship she had with defendant and about her exhibitionism. Outside the presence of the jury, defense counsel notified the court that defendant was "experiencing extreme stress at the prospect of hearing his mother testify concerning these subjects," and instead wished to voluntarily absent himself during her testimony. Counsel stated they had advised defendant of his right to be present and his right to waive that right, and of the possible advantages and disadvantages of his not being present. The court then directly questioned defendant as to whether he had sufficiently discussed the matter with his attorneys and still wished to waive his presence. Defendant said he had, and wanted to absent himself from that testimony.

The trial court, finding defendant knowingly and voluntarily had waived his right to be present, granted his request to be absent. Before defendant's mother testified, the court explained to the jury that due to the nature of the expected testimony, the court had granted defendant's request to exercise "his right" to be absent during the testimony. Defendant returned to the courtroom after his mother completed her testimony.

Defendant first contends that in a capital case the defendant's presence during the taking of testimony is so fundamental to the fairness of the

proceeding that he or she should not be permitted to waive the constitutional right to be present, even if done so knowingly, intelligently, and voluntarily. We have rejected this very claim (*People v. Price* (1991) 1 Cal.4th 324, 405 [3 Cal.Rptr.2d 106, 821 P.2d 610]), and defendant's argument, which relies primarily upon three nearly 200-year-old United States Supreme Court cases, the relevant parts of which the high court itself has rejected as "broad dicta" (*Illinois v. Allen, supra,* 397 U.S. at pp. 342–343), provides no compelling reason to revisit the issue. (See also *People v. Davis* (2005) 36 Cal.4th 510, 531 [31 Cal.Rptr.3d 96, 115 P.3d 417]; *Weaver, supra,* 26 Cal.4th at p. 966; *People v. Jackson* (1996) 13 Cal.4th 1164, 1209–1210 [56 Cal.Rptr.2d 49, 920 P.2d 1254]; *Campbell v. Wood* (9th Cir. 1994) 18 F.3d 662, 672 (en banc) ["There is no principled basis for limiting to noncapital offenses a defendant's ability knowingly, voluntarily, and intelligently to waive the right of presence. Nor do we find logic in the proposition that a right that may be waived by disruptive behavior cannot be waived by an affirmative petition freely made and based on informed judgment."].)

 Defendant correctly contends that despite his valid waiver of his constitutional right to be present during the testimony in question, his absence violated sections 977 and 1043. We must stress that a defendant's statutory ability to waive his presence in a capital case is more circumscribed than the associated ability to waive his constitutional right. As we previously have observed, " '[t]he Legislature evidently intended that a capital defendant's right to voluntarily waive his right to be present be severely restricted.' " (*Weaver, supra,* 26 Cal.4th at p. 968.)

Even assuming defendant has not forfeited his appellate claim of statutory error by failing to raise the claim in the trial court (cf. *People v. Vera* (1997) 15 Cal.4th 269, 276–281 [62 Cal.Rptr.2d 754, 934 P.2d 1279] (*Vera*) [claim of deprivation of statutory right to jury trial on prior-prison-term sentence enhancement was not a claim of the deprivation of a fundamental constitutional right that may be raised for the first time on appeal]), defendant nonetheless has not demonstrated that such statutory error warrants reversal, because it is not reasonably probable that without the error, the result of the trial would have been more favorable to him. Defendant admitted killing the victims, and the jury rejected his version of the events—that he did so in uncontrolled fits of rage and did not form the intent to have sexual relations with his victims until after they were dead—in less than one full day of deliberations. In short, the guilt phase evidence against him was overwhelming. Although, unlike the situation in *Weaver,* the proceedings as to which defendant was absent involved the testimony of a live witness, defendant already had testified on the subjects about which his mother was to be examined. Indeed, she was asked primarily whether defendant's and other witnesses' testimony was true, and she responded in the negative. Defendant's attorneys obviously were quite familiar with what defendant possibly

might add to the examination, and there is no evidence in the record that defendant might have assisted counsel in some other manner had he been present. Defendant has not established that a different outcome at this phase of the trial would have been reasonably probable had he been forced to remain in the courtroom against his will. (See also *Weaver, supra*, 26 Cal.4th at p. 968 [noting it was possible defendant's absence, which was based upon his fear of becoming overly emotional in the presence of the jury, helped his case rather than prejudiced it].)[26]

 Defendant, relying upon *Hicks v. Oklahoma* (1980) 447 U.S. 343, 346 [65 L.Ed.2d 175, 100 S.Ct. 2227], contends the statutory violation deprived him of his federal constitutional procedural due process rights because, he argues, he was denied his "liberty interest" in the proper application of state law. Sections 977 and 1043, however, do not create a liberty interest for the benefit of defendants of the type involved in *Hicks*. (Cf. *People v. Breverman* (1998) 19 Cal.4th 142, 170–172 [77 Cal.Rptr.2d 870, 960 P.2d 1094] (*Breverman*) [distinguishing *Hicks* based upon the different right created by the state law provision at issue]; *Vera, supra*, 15 Cal.4th at pp. 279–280 [deprivation of statutory right to jury trial on sentencing enhancement "does not constitute a claim of federal constitutional dimension" under *Hicks*].) Indeed, as a practical matter, the statutes here at issue *deprive* a capital defendant of his or her ability to voluntarily waive the constitutional right to be present, and require him or her to remain in the courtroom. We cannot accept the premise that the federal constitutional right of due process was implicated in this case by an error of state law that afforded defendant something he asked for—and which was permissible under the state and federal Constitutions—but should not have received under state statutory law, and, moreover, that did not directly implicate his interest in freedom from restraint, as did the error in *Hicks*. (See *Cabana v. Bullock* (1986) 474 U.S. 376, 387, fn. 4 [88 L.Ed.2d 704, 106 S.Ct. 689] ["In *Hicks*, we held only that where state law creates for the defendant a liberty interest in having the jury

---

[26] During his penalty phase argument, the prosecutor asserted that defendant's absence during his mother's testimony demonstrated that his testimony about the murders was false. Defendant cites the prosecutor's comment in support of defendant's claim that he was prejudiced by his absence. (Cf. *People v. Visciotti* (1992) 2 Cal.4th 1, 82 [5 Cal.Rptr.2d 495, 825 P.2d 388] (*Visciotti*) [references by counsel to improperly admitted evidence, although not misconduct, "may be considered in determining the prejudicial effect of the error in admitting evidence"].) It is not reasonably probable that the prosecutor's comment, though strongly worded, had an effect on the outcome of the penalty phase. At that point in the trial, the jury already had determined that defendant's version of the murders was false, because it had convicted him as charged, so the likely impact of the prosecutor's comment was minimal. Moreover, the aggravating evidence against defendant at the penalty phase was overwhelming. Thus, the prosecutor's comment during the penalty phase argument did not add any significant prejudice to the statutory error in allowing defendant to be absent during his mother's guilt phase testimony. To the extent defendant contends the comment might be considered penalty phase prosecutorial misconduct, that issue is discussed *post*, in part II.E.4.d.

make particular findings, the Due Process Clause implies that appellate findings do not suffice to protect that entitlement."], overruled on other grounds in *Pope v. Illinois* (1987) 481 U.S. 497, 502, fn. 7 [95 L.Ed.2d 439, 107 S.Ct. 1918]; *Engle v. Isaac* (1982) 456 U.S. 107, 121, fn. 21 [71 L.Ed.2d 783, 102 S.Ct. 1558] ["We have long recognized that a 'mere error of state law' is not a denial of due process. [Citation.] If the contrary were true, then 'every erroneous decision by a state court on state law would come [to this Court] as a federal constitutional question.' [Citations.]"].)

### 3. *Asserted Insufficiency of the Evidence*

#### a. *Evidence of Attempted Rape of Sorensen*

At the close of the prosecution's case-in-chief, defendant moved to dismiss, under section 1118.1, the charge of attempted forcible rape of Sorensen and the associated attempted-rape felony-murder charge and special circumstance allegation on the ground of insufficiency of the evidence. The trial court denied the motion. On appeal, defendant again contends the evidence was legally insufficient to support his convictions and the special circumstance finding. He is incorrect.

Our role in reviewing such a challenge is limited. "In reviewing a challenge to the sufficiency of the evidence under the due process clause of the Fourteenth Amendment to the United States Constitution and/or the due process clause of article I, section 15 of the California Constitution, we review the entire record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People v. Cole* (2004) 33 Cal.4th 1158, 1212 [17 Cal.Rptr.3d 532, 95 P.3d 811].) "The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053 [99 Cal.Rptr.2d 1, 5 P.3d 68] (*Kraft*).)

Defendant's challenge to the sufficiency of the evidence of the attempted rape of Sorensen consists primarily of viewing various items of evidence in isolation and arguing each could be viewed as pointing to his innocence of the charge rather than his guilt. Even if defendant's premise is correct, this is not persuasive on the issue we must address: whether no rational juror could have drawn the opposite inference from the evidence as a whole. Defendant also cites several past opinions in which we and the Courts of Appeal have found evidence insufficient to support a conviction for a crime involving sexual assault. Reviewing the sufficiency of evidence, however, necessarily calls for analysis of the unique facts and inferences present in each case, and

therefore comparisons between cases are of little value. (*People v. Thomas* (1992) 2 Cal.4th 489, 516 [7 Cal.Rptr.2d 199, 828 P.2d 101].) Except as specifically mentioned below, the cases cited by defendant are not particularly helpful in reviewing the facts of the present case.

 Conviction of the crime of attempted forcible rape requires proof the defendant formed the specific intent to commit the crime of rape and performed a direct but ineffectual act, beyond mere preparation, leading toward the commission of a rape. (§ 21a; *People v. Carpenter* (1997) 15 Cal.4th 312, 387 [63 Cal.Rptr.2d 1, 935 P.2d 708] (*Carpenter*).) The elements of the crime of forcible rape[27] are "an act of sexual intercourse accomplished with a person not the spouse of the perpetrator . . . [¶] . . . [¶] . . . [w]here it is accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." (§ 261, subd. (a)(2).)[28] There is no dispute defendant and Sorensen were not spouses. The following evidence and the reasonable inferences that could be drawn from it are sufficient to prove the remaining elements of the crime and the special circumstance in question.[29]

The incident occurred at night near a secluded highway exit in a rural area, beyond sight of passing motorists, a place and time defendant might attempt a rape more readily than in a place where discovery or intervention was a stronger possibility. The victim was a small 15-year-old girl, whereas defendant was a 21-year-old man who described himself as quite strong for his size, giving rise to a reasonable inference he knew that by physical force or threats of harm he could compel Sorensen to acquiesce in any demand he might make. In addition to the circumstances that defendant and Sorensen had first met that day and that Sorensen had a boyfriend, earlier that very evening in her telephone call to her boyfriend, Sorensen said she would not have sexual intercourse with him because she was menstruating. These facts lead to a

---

[27] Rape of a spouse is separately punishable under section 262.

[28] Under section 663, a defendant can be convicted of an attempt to commit a crime even though the crime, in fact, was completed. Further, evidence tending to prove that the crime was completed, even though not absolute proof of the crime of attempt, gives rise to a reasonable inference that the perpetrator intended to commit that crime. (Cf. *People v. Colantuono* (1994) 7 Cal.4th 206, 218, fn. 9 [26 Cal.Rptr.2d 908, 865 P.2d 704] [evidence of a completed battery is relevant in determining whether the defendant committed an assault].)

[29] To avoid the possibility of confusion, we emphasize that defendant was charged with *attempted* forcible rape, which, unlike the crime of forcible rape, is a specific intent crime. (See *People v. DePriest* (2007) 42 Cal.4th 1, 48 [63 Cal.Rptr.3d 896, 163 P.3d 896].) Accordingly, in the following discussion, our references to the specific intent to commit rape are made in the context of discussing the sufficiency of the evidence of the charges in the present case, and do not implicate the basic distinction between the intent elements of attempted rape (specific intent) and rape (general intent).

reasonable inference that Sorensen would not have willingly agreed to have sexual relations with a relative stranger on a cold night, on the ground, near a highway exit.

The victim was found nude and with her arms bound very tightly behind her back. Although, as we have stated in cases such as those cited by defendant, the circumstance of the victim's being found partially or wholly unclothed is not by itself sufficient to prove a rape or an attempted rape has occurred, such a fact is not irrelevant and is one of the relevant circumstances. Moreover, the combination of the nude state of Sorensen's body and the presence of physical restraint in this case provides stronger evidence that a forcible rape or attempted rape occurred than where the body simply is unclothed. Additionally, the jury reasonably could infer that the absence of signs of a struggle—such as trauma to Sorensen's body or damage to her clothing—was the result of her surrender to defendant's demands in the hopes of surviving her ordeal, rather than proof she was a willing participant or was dead when she was undressed.

Also, unlike several of the cases cited by defendant, here there was no evidence tending to show a sexual assault did *not* occur. When a victim is discovered a relatively short time after the crime, it is more likely the crime scene and the victim's body will show evidence of sexual assault—such as trauma to the body or sexual organs, or the presence of the perpetrator's bodily fluids—if such an assault occurred. An absence of such evidence in that type of case may be strong evidence the perpetrator did not have or intend to have sexual contact with the victim, which may tend to outweigh other facts and inferences, rendering the evidence of sexual assault legally insufficient. (See, e.g., *People v. Johnson* (1993) 6 Cal.4th 1, 39 [23 Cal.Rptr.2d 593, 859 P.2d 673], overruled on another ground in *Rogers, supra,* 39 Cal.4th at p. 879; *People v. Anderson* (1968) 70 Cal.2d 15, 22 [73 Cal.Rptr. 550, 447 P.2d 942]; *People v. Craig* (1957) 49 Cal.2d 313, 317 [316 P.2d 947].) Here, by contrast, the evidence did not tend to eliminate a sexual assault; it simply was inconclusive due to the nature of the crime scene and the advanced state of decomposition of Sorensen's body.

Finally, and perhaps most importantly, defendant's own admissions support the conclusion there was sufficient evidence for a rational trier of fact to find he attempted to rape Sorensen.[30] Defendant told the officers he "had sex"

---

[30] Of course, the jury is charged with evaluating the credibility of witness testimony and out-of-court statements such as party admissions, and on appeal we may not substitute our determination as to credibility. Indeed, we must view the evidence in the light most favorable to the verdict and presume the existence of each fact that a rational juror could have found proved by the evidence. (*People v. Smith* (2005) 37 Cal.4th 733, 739 [37 Cal.Rptr.3d 163, 124 P.3d 730].) We therefore need not reweigh the credibility of defendant's various versions

with Sorensen and he ultimately strangled her because he "was scared." The jury reasonably could infer defendant was frightened because he just had forcibly raped Sorensen and feared being reported to the authorities. In addition, defendant told the officers that, while in a remote location at night, he had forced Garcia to have sex with him despite her resistance, and Garcia similarly later was found dead, nude, and with her hands tied behind her back. This was a significant prior act the jury could consider highly relevant in determining defendant also had the intent to rape Sorensen. (See Evid. Code, § 1101, subd. (b).)

Defendant argues that even if the evidence adequately supports a finding he attempted to commit some sexual assault upon Sorensen, insufficient evidence existed for the jury to determine he specifically intended to have vaginal intercourse, which, as we stated in *People v. Holt* (1997) 15 Cal.4th 619, 676 [63 Cal.Rptr.2d 782, 937 P.2d 213] (*Holt*), is required for the commission of a rape. He relies upon our decision in *People v. Raley* (1992) 2 Cal.4th 870, 889–891 [8 Cal.Rptr.2d 678, 830 P.2d 712] (*Raley*), in which we concluded the evidence was insufficient to sustain a guilty verdict on a charge of attempted forcible oral copulation. As mentioned above, however, the facts of other cases, such as *Raley*, are not particularly helpful in evaluating the sufficiency of the evidence in this case. Here, the victim was found in a remote area, dead, nude, and bound; defendant admitted having had sex with her; evidence of the nature of the sexual assault was inconclusive due to the passage of time before her body was discovered; and defendant confessed to raping and killing another young woman in similar circumstances not long before this incident. (See, e.g., *People v. Holloway* (2004) 33 Cal.4th 96, 138–139 [14 Cal.Rptr.3d 212, 91 P.3d 164].) That defendant *also* may have had the intent to sodomize the victim, as one might surmise from his trial testimony, does not mean the jury rationally could not have inferred from the evidence as a whole that he had the specific intent to rape Sorensen and took a direct step beyond mere preparation toward effectuating his intent. Such a finding was not based upon suspicion and speculation, as defendant argues, but upon reasonable inferences from the evidence and, as such, was supported by legally sufficient evidence. Because sufficient evidence supported the jury's verdict of guilt of the attempted rape of Sorensen, we reject defendant's claim that the associated first degree murder conviction must be reversed and the attempted-rape special circumstance finding set aside.

b. *Evidence of Premeditation and Deliberation*

Defendant next claims the evidence was insufficient to uphold the jury's first degree murder verdicts on a theory of premeditated and deliberated

---

of the Sorensen murder, and shall address only those statements that the jury could have found credible and reasonably indicative of defendant's guilt.

murder. "We need not consider this claim since reversal is not necessary when the court can determine from the record that the verdict rested on a theory which is supported by sufficient evidence. (*People* v. *Hernandez* (1988) 47 Cal.3d 315, 351 [253 Cal.Rptr. 199, 763 P.2d 1289].)" (*Holt, supra,* 15 Cal.4th at p. 671.) We properly can, and do, make that determination here.

■ The court correctly instructed the jury on theories of both first degree felony murder and premeditated, deliberated murder. We previously have concluded there was sufficient evidence to support a finding that defendant attempted to rape Sorensen, and defendant has not challenged on appeal the sufficiency of the evidence supporting his conviction for attempting to rape Garcia. Indeed, the evidence of the latter crime, which is strikingly similar to that supporting the Sorensen verdict (and, in view of defendant's admissions to the officers, even stronger), is sufficient to support the verdict on the Garcia murder charge. In addition, adequate evidence existed for a rational jury to find the murders were committed during the commission of the attempted rapes, so as to support felony-murder convictions under section 189. (See *People* v. *Hernandez, supra,* 47 Cal.3d at p. 348 ["the focus is on the relationship between the underlying felony and the killing and whether the felony is merely incidental to the killing, an afterthought"].)

Further, the jury's verdicts convicting defendant of first degree murder were accompanied by true findings on the special circumstance allegations that he committed the murders in the commission of the attempted rapes. Thus, the present case is similar to one "in which the murder verdict did not indicate the theory on which the defendant was convicted, but the jury also returned special circumstances findings on rape . . . . (See also *People* v. *Boyd* (1985) 38 Cal.3d 762, 770 [215 Cal.Rptr. 1, 700 P.2d 782] ['Those [attempted-robbery special-circumstance] findings make it clear that whatever the jurors thought about premeditation, they agreed upon all of the elements necessary for a verdict of first degree murder based on a felony-murder theory. Consequently, any error in instructing on premeditation could not have prejudiced defendant.'].)" (*Holt, supra,* 15 Cal.4th at p. 671.) We therefore need not evaluate the sufficiency of the evidence of premeditation and deliberation to uphold the jury's first degree murder verdicts in this case. (See also *Young, supra,* 34 Cal.4th at pp. 1177–1178.)

4. *Asserted Instructional Errors*

a. *Assault As a Lesser Included Offense of Attempted Rape*

Defendant contends the evidence presented at trial was sufficient for the jury to find that, because of his intoxicated state, he was unable to form the

specific intent to commit rape, precluding conviction on the attempted rape charges. But because his intoxication cannot negate the general intent required for simple assault, defendant argues, the jury should have been instructed on the offense of assault as an "intoxication based" lesser included offense of attempted rape. Although defendant did not request the trial court to instruct the jury on the crime of assault as a lesser included offense, he claims on appeal the court violated its alleged duty to so instruct on its own motion, and this failure violated his state and federal constitutional rights. (See *Breverman, supra*, 19 Cal.4th 142; *Beck v. Alabama* (1980) 447 U.S. 625 [65 L.Ed.2d 392, 100 S.Ct. 2382] (*Beck*).) We disagree.

■ It is clear, as a matter of state constitutional law, that trial courts are required to give instructions on all lesser offenses necessarily included within the filed charges, when there is substantial evidence supporting a conviction for a lesser offense, regardless of whether the parties request such instructions or even oppose them. (*Breverman, supra*, 19 Cal.4th at pp. 154–155.) As we explained in *Breverman*, however, the related federal constitutional right is more circumscribed, prohibiting only in capital cases those situations in which the state has created an " ' "artificial barrier" ' " preventing the jury from considering a noncapital verdict other than a complete acquittal and thereby calling into question the reliability of the outcome. (*Id.* at pp. 166–168, citing *Beck, supra*, 447 U.S. 625, *Schad v. Arizona* (1991) 501 U.S. 624 [115 L.Ed.2d 555, 111 S.Ct. 2491], and *Hopkins v. Reeves* (1998) 524 U.S. 88 [141 L.Ed.2d 76, 118 S.Ct. 1895] (*Reeves*).)

Defendant contends the trial court's failure to give an assault instruction violated the rule of *Beck*, because the jury was forced into an "all-or-nothing" situation in which the choice on the attempted rape charges essentially was between the death penalty and acquittal, due to the felony-murder rule and the attempted-rape special-circumstance allegations. (See *Beck, supra*, 447 U.S. at p. 637.) For several reasons, defendant's assertion is incorrect.

First, the jury was not forced to choose between convicting defendant of crimes he did not commit (assertedly, the attempted rapes and associated first degree felony murder and attempted-rape special-circumstance findings) and a complete acquittal. The jury had the option of finding that defendant did not form the intent to have sexual relations with the victims until after they were dead (and therefore of acquitting him of the attempted rape charges), but nonetheless of finding—if this was supported by sufficient evidence—that defendant murdered the victims with premeditation and deliberation, as well as the associated multiple-murder special circumstance, rendering him still eligible for the death penalty. In addition, the jury had the option of finding him guilty of some lesser degree of noncapital homicide for one or both of the murders, instead of issuing a complete acquittal.

Second, as discussed in *Reeves* in the context of Nebraska law, there is a structural difference in California's death penalty statute distinguishing this case from *Beck*. Under the Alabama law applicable to Beck's trial, if the jury convicted the defendant of capital murder, it was required to impose the death penalty, a circumstance that "threatened to make the issue at trial whether the defendant should be executed or not, rather than 'whether the State ha[d] proved each and every element of the capital crime beyond a reasonable doubt.' " (*Reeves, supra,* 524 U.S. at p. 98.) In California, as under Nebraska law, a guilty verdict of first degree murder with true special circumstance findings does not require the jury automatically to set defendant's punishment at death. Defendant's jury was instructed that if its verdict at the conclusion of the guilt phase of the trial made defendant eligible for the death penalty, it then would consider whether a sentence of death or life imprisonment without the possibility of parole should be imposed. The jury, therefore, when considering defendant's guilt or innocence, was not placed in the position of determining whether or not he should be executed instead of whether his guilt had been adequately proven.

Thus, for both these reasons, there is no likelihood the lack of an instruction on assault as a lesser included offense of attempted rape affected the reliability of the jury's verdict, in violation of defendant's federal constitutional rights. (See *Reeves, supra,* 524 U.S. at p. 95.)

■ Additionally, there is a third reason why defendant's federal constitutional claim must fail, also disposing of his state constitutional claim: assault is not a lesser included offense of attempted rape in the present case. (*Reeves, supra,* 524 U.S. at p. 96; *Breverman, supra,* 19 Cal.4th at p. 154.) We apply the statutory elements and accusatory pleading tests to determine whether one offense is a lesser included offense of another. (*People v. Reed* (2006) 38 Cal.4th 1224, 1227–1228 [45 Cal.Rptr.3d 353, 137 P.3d 184] (*Reed*).) First, under the elements test, we look to the two statutes to determine whether in the defendant's commission of the greater offense, his or her actions necessarily would satisfy all of the elements of the lesser offense. (*Ibid.*) One who has committed the crime of attempted rape has not necessarily committed an assault, because an essential element of assault—the present ability to inflict harm—is not necessarily present in an attempted rape.

In order to commit an attempted rape, a person must form the intent to rape and perform a direct but ineffectual act, beyond mere preparation, leading toward commission of a rape. (§ 21a; *Carpenter, supra,* 15 Cal.4th at p. 387.) An assault is "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) Although there is no doubt that a rape is a violent injury to another, an attempted rape is not necessarily

also an assault, because the attempt to commit a rape does not require that the perpetrator ever progress to the point of having the present ability to commit a rape. As we previously have noted, although in a criminal attempt the underlying conduct completing the attempt may be remote from the completion of the intended crime, in an assault that underlying conduct must immediately precede the commission of the violent injury; that is, " ' "[t]he next movement would, *at least to all appearance*, complete the battery." ' " (*People v. Williams* (2001) 26 Cal.4th 779, 786 [111 Cal.Rptr.2d 114, 29 P.3d 197]; see *ibid.* ["Indeed, our criminal code has long recognized this fundamental distinction between criminal attempt and assault by treating these offenses as *separate and independent* crimes."]; cf. *People v. Licas* (2007) 41 Cal.4th 362, 368–369 [60 Cal.Rptr.3d 31, 159 P.3d 507] [assault with a firearm (§ 245, subd. (a)(2)) is not a lesser included offense of shooting at another person from a vehicle (§ 12034, subd. (c)), because the latter offense does not include the element that the shooter have the present ability to inflict a violent injury on the target]; *People v. Marshall* (1997) 15 Cal.4th 1, 38–39 [61 Cal.Rptr.2d 84, 931 P.2d 262] [the crime of battery (§ 242)—an unlawful touching of the victim—is not a lesser included offense of attempted rape, because the victim of attempted rape might never be touched].)[31] Because a person who has committed an attempted rape has not necessarily committed an assault, assault is not a lesser included offense of attempted rape under the elements test.

Second, in the present circumstances, assault also is not a lesser included offense under the accusatory pleading test. Nothing in the information's charges of attempted forcible rape alleged defendant possessed the present ability to inflict injury upon the victims. (Cf. *Reed, supra*, 38 Cal.4th at p. 1228 [charge of being a felon in possession of a firearm was a lesser included offense of the charges of carrying a concealed firearm and carrying a loaded firearm in a public place under the accusatory pleading test (but not the elements test) when the information alleged in all counts that defendant was a convicted felon].)

Because under the elements and accusatory pleading tests assault is not a lesser included offense of the charges that defendant attempted to forcibly rape Garcia and Sorensen, the trial court had no duty on its own motion to instruct on the crime of assault.

---

[31] Indeed, assault with intent to commit a particular crime is considered a more aggravated crime than mere attempt to commit that crime, because in the former there exists the present ability to commit the crime. (*People v. Ghent* (1987) 43 Cal.3d 739, 757 [239 Cal.Rptr. 82, 739 P.2d 1250].)

### b. *Voluntary Intoxication*

 Defendant contends the trial court was required to instruct concerning the effect of voluntary intoxication on his ability to form the mental states required for the murder and attempted rape charges, despite defendant's failure to request such an instruction. An instruction on the significance of voluntary intoxication is a "pinpoint" instruction that the trial court is not required to give unless requested by the defendant. (*People v. Saille* (1991) 54 Cal.3d 1103, 1120 [2 Cal.Rptr.2d 364, 820 P.2d 588] (*Saille*); see also *People v. Clark* (1993) 5 Cal.4th 950, 1022 [22 Cal.Rptr.2d 689, 857 P.2d 1099] (*Clark*).) Defendant raises three arguments why *Saille* is not controlling in his case, none of which we find persuasive.

Defendant first asserts because the trial court had a duty to instruct the jury on its own motion concerning the crime of assault as an "intoxication based" lesser included offense of the attempted rape charges, it also had an associated duty to instruct the jury concerning how voluntary intoxication could negate defendant's ability to form the intent to rape, such that the jury could find he committed only an assault. Because, however, we have concluded the trial court had no duty to instruct on the crime of assault as a lesser included offense, it accordingly had no duty to clarify how the jury might reach a verdict of assault through a finding of voluntary intoxication.

Second, defendant contends the holding of *Saille* cannot be applied retroactively to his case because of constitutional ex post facto concerns. We previously have rejected this claim in *People v. Hughes* (2002) 27 Cal.4th 287, 342 [116 Cal.Rptr.2d 401, 39 P.3d 432] (*Hughes*), and defendant advances no persuasive reason why we should reconsider that conclusion.

Third, defendant essentially argues the trial court was required to instruct on voluntary intoxication because other instructions regarding the mental states required for the offenses and other potential mental impairments reducing his culpability were incomplete and misleading absent an instruction concerning voluntary intoxication. Were we to accept defendant's argument, we would, in effect, overrule our decision in *Saille*. If the defendant in a particular case believes voluntary intoxication is an issue that could affect the jury's determination of the mental state elements of the charged crimes, he or she must request an instruction on that subject. Any lack of clarity regarding the consideration, if any, the jury should give to evidence of voluntary intoxication, in the absence of a request for an instruction on this subject, is of the defendant's doing, and on appeal he cannot avail himself of his own inaction. (*People v. San Nicolas* (2004) 34 Cal.4th 614, 669–670 [21 Cal.Rptr.3d 612, 101 P.3d 509] (*San Nicolas*).)

For these reasons, the trial court was not required, in the absence of a request from defendant, to instruct the jury regarding the effect of voluntary intoxication on the various mental state elements of the charged offenses.

### c. *Mutilation of Human Remains As a Lesser Related Offense of Attempted Rape*

Defendant contends his state and federal constitutional rights were violated by the trial court's denial of his request for an instruction on the crime of unlawful mutilation of human remains, as then defined in section 7052 of the Health and Safety Code, as a lesser offense related to the charges of attempted rape.[32] He argues he was entitled under the California Constitution to such an instruction pursuant to our decision in *People v. Geiger* (1984) 35 Cal.3d 510 [199 Cal.Rptr. 45, 674 P.2d 1303] (*Geiger*), and that our subsequent decision in *People v. Birks* (1998) 19 Cal.4th 108 [77 Cal.Rptr.2d 848, 960 P.2d 1073] (*Birks*), overruling *Geiger*, should not be retroactively applied in the present case, because defendant relied upon the state of the law under *Geiger* in presenting his case at trial. Defendant also claims refusal of this instruction violated his federal constitutional right to a jury instruction on the defense theory of the case. Defendant's contentions are without merit.[33]

At the time of defendant's crimes in 1986, Health and Safety Code section 7052 provided, in part, "Every person who mutilates, disinters, or removes from the place of interment any human remains without authority of law, is guilty of felony." (Health & Saf. Code, former § 7052, added by Stats. 1939, ch. 60, p. 672.) Defendant argues this is an offense "related" to the attempted rape charges in this case, because he testified he did not form the intent to have sexual intercourse with Garcia and Sorensen until after they were dead, and therefore did not attempt to rape the victims but instead mutilated their remains.

■ Under the now overruled holding of *Geiger*, defendants, upon their request, were entitled to jury instructions on offenses that were not "necessarily included" in the charged offense, but instead were merely "related," if (1) there was some basis for a finding of guilt of the related offense, (2) the offenses were closely related such that the requested instruction on the related offense

---

[32] The requested instruction read: "Every person who mutilates any human remains without authority of law is guilty of a felony. [¶] As used in these instructions, mutilation of human remains may be accomplished by sexual intercourse or other sexual conduct with human remains."

[33] Because of the error—discussed *ante*, in part II.A.2.—in not transcribing all of the discussions related to jury instructions, the record contains only the trial court's brief summary of its ruling denying defendant's request for this instruction. We therefore will assume defendant adequately preserved for appeal his constitutional challenges to the trial court's failure to give this instruction.

would have been relevant to determining whether the defendant committed the charged offense, and (3) the defendant's theory of the case was consistent with his or her guilt of the related offense. (*Geiger, supra*, 35 Cal.3d at pp. 530–531.) In *Birks*, however, we overruled the holding of *Geiger* that a defendant's unilateral request for a related-offense instruction must be honored over the prosecution's objection. (*Birks, supra*, 19 Cal.4th at p. 136.) We also concluded this change in the law generally should be applied retroactively. (*Id.* at pp. 136–137.)

Defendant argues, however, that *Birks* should not be applied in the present case, because he relied upon the state of the law under *Geiger* in presenting his defense. We are not persuaded. In *Birks*, we observed that although the defendant in that case had not raised any claim of reliance upon *Geiger* in presenting his case, such a claim of reliance could not "easily" have been made by him or any other defendant, in view of the circumstance that all defendants have a strong motivation to vigorously challenge the sufficiency of the evidence of the charged offenses regardless of whether an instruction on a lesser related offense is given to the jury. (*Birks, supra*, 19 Cal.4th at p. 137.) We did not address whether a defendant under circumstances similar to those in the present case could prove reliance upon *Geiger* and thereby preclude retroactive application of *Birks*. Moreover, in the present case, because the prosecution's theory was that the murders were committed to facilitate the rapes and defendant's avoidance of detection, the presentation of defendant's version that he did not form the intent to have sexual relations with the victims until after they were dead was essential to the defense's attempt to rebut the prosecution's case. This is true regardless of whether the jury might have been instructed that it could find defendant guilty of mutilation of human remains instead of attempted rape. Indeed, as defendant himself points out, defense counsel committed themselves to the presentation of the defense theory of the case in the opening statement, *before* the trial court resolved the issue of whether the related-offense instruction would be given. Defendant has not shown he would have conducted his defense any differently had he known he was not entitled to an instruction on the allegedly related offense of mutilation of human remains. We therefore conclude *Birks* retroactively applies in this case and *Geiger* is not controlling. Accordingly, the trial court did not commit state constitutional error in refusing to give this instruction.[34]

Nor did the trial court's refusal to give the requested instruction violate defendant's federal constitutional rights. As we discussed in *Birks*,

---

[34] Because defendant had no right to the lesser-related-offense instruction in light of the prosecution's objection, we need not address whether the trial court erred by finding that having sexual relations with a corpse did not constitute mutilation of human remains in violation of the statute. We also note that this statute was amended in 2004 expressly to encompass "sexual penetration" of and "sexual contact" with human remains. (See Health & Saf. Code, § 7052.)

there is no federal constitutional right of a defendant to compel the giving of lesser-related-offense instructions. (*Birks, supra,* 19 Cal.4th at p. 124, citing *Reeves, supra,* 524 U.S. 88.) Further, except for the limited situation in a capital case in which the state has created an artificial barrier to the jury's consideration of an otherwise available noncapital verdict, there is no federal constitutional right to instruction on lesser necessarily included offenses. (*Breverman, supra,* 19 Cal.4th at pp. 165–169.) To the extent defendant challenges these holdings by arguing there is a general federal constitutional due process right to present the "theory of the defense case," thus requiring that the instruction he requested on the crime of mutilation of human remains be given under the circumstances of this case, he merely has recast in different terms the same claims we already have rejected. The absence of an instruction on mutilation of a corpse did not prevent defendant from presenting his version of the events, or from arguing to the jury that he was not guilty of the capital charges, such that we could conclude his trial was fundamentally unfair. Defendant has not presented any compelling reason for us to revisit our decisions in *Birks* and *Breverman,* and we decline to do so.

### d. *Mental Condition Evidence*

At the conclusion of the guilt phase of the trial, the court instructed the jury pursuant to a modified version of CALJIC No. 3.32, as follows: "Evidence has been received from which you may find that the defendant was affected by a mental condition at the time of the crimes charged. You may consider such evidence solely for the purpose of determining whether or not the defendant actually formed any intent or mental state which is an element of the crimes charged." Defendant contends the trial court erred by failing to specifically name for the jury the intent or mental state to which defendant's "mental condition" evidence was relevant. He argues that without such an instruction, it is likely the jury did not understand that premeditation and deliberation and the specific intent to commit rape were the intent and mental states to which this instruction referred.[35]

As an initial matter, defendant failed to preserve an objection to the adequacy of the instruction given at the guilt phase, and therefore has forfeited that challenge. (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011–1012 [44 Cal.Rptr.3d 632, 136 P.3d 168] (*Hudson*) [" 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' "].)

---

[35] It appears from defense counsel's closing argument that the "mental condition" at issue was the psychological impact of the supposed incestuous relationship between defendant and his mother. In other words, counsel asserted that defendant had unique sensitivities that could cause uncontrollable rage, precluding premeditation and deliberation and explaining why he had no intent to rape the victims before killing them.

██ To the extent we may review defendant's claim despite his failure to preserve the issue, it is without merit. (See § 1259 ["The appellate court may . . . review any instruction given, . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."].) When we review challenges to a jury instruction as being incorrect or incomplete, we evaluate the instructions given as a whole, not in isolation. (*People v. Mayfield* (1997) 14 Cal.4th 668, 777 [60 Cal.Rptr.2d 1, 928 P.2d 485].) "For ambiguous instructions, the test is whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction." (*Ibid.*) ██ We previously have rejected challenges similar to defendant's regarding the failure explicitly to define the term "mental states" in instructions concerning the effect of a mental defect upon the defendant's ability to form mental states required for the commission of various offenses. Thus, we have found no error in cases in which a mental defect instruction merely mentioned the term "mental state" in a generic sense, but the trial court elsewhere either specifically explained that premeditation and deliberation were mental states necessary for a conviction of first degree murder (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1247–1249 [74 Cal.Rptr.2d 212, 954 P.2d 475] (*Musselwhite*); *People v. Jones* (1991) 53 Cal.3d 1115, 1145 [282 Cal.Rptr. 465, 811 P.2d 757]), or generally instructed that " '[t]he mental state required is included in the definition of the crime charged.' " (*People v. Smithey* (1999) 20 Cal.4th 936, 988 [86 Cal.Rptr.2d 243, 978 P.2d 1171] (*Smithey*).)

Defendant observes that in the present case, the trial court did not specifically define premeditation and deliberation or the intent to rape as "mental states," rendering *Musselwhite* and *People v. Jones* inapplicable. He further argues the trial court did not clearly instruct the jury that the mental states were defined in the instructions concerning the charged offenses. The trial court did give a modified version of CALJIC No. 3.31 regarding the concurrence of act and mental state, with language similar to the instruction on which we based our decision in *Smithey*, but there was a slight variance in the oral reading of the instructions. The written version stated in relevant part: "These specific intent and mental states are set out in the instructions pertaining to the specific crimes." The oral version was: "These specific intents and mental states required in each of these crimes are set out in the instructions pertaining to a specific crime which I'll be giving you." Defendant argues the jury likely was confused by the oral version because it referred to *a* specific crime's instructions, in the singular, which was not possible because there were two specific crimes charged. He claims this potential for confusion makes *Smithey* inapplicable as well.

Even assuming the transcription is completely accurate and the instructions did not clearly inform the jury that the mental states referred to in the mental condition instruction were defined in the instructions on the crimes (plural),

we still conclude there is no possibility the jury failed to realize this connection. Recently, we found no error even when "the jury neither was informed that premeditation and deliberation were mental states, nor told that the mental state required for each crime was included in the definition of that crime . . . ," because no reasonable juror, when properly instructed on the elements of first degree murder, could fail to realize that premeditation and deliberation are mental states at issue in such a charge and to make the connection between the elements of the crime and the limited purpose of the admission of mental defect evidence. (*Rogers, supra*, 39 Cal.4th at p. 881, citing *People v. Castillo* (1997) 16 Cal.4th 1009, 1017 [68 Cal.Rptr.2d 648, 945 P.2d 1197].) Although in *People v. Jones, Musselwhite,* and *Smithey* other instructions were given lessening the chance of confusion, the absence of such instructions in the present case, as in *Rogers*, does not suggest the jury was unable to make the connection between the mental states referred to in the mental condition instruction and those described in the instructions on the charged offenses.

In the present case, the trial court properly instructed the jury concerning the concepts of premeditation and deliberation required for an express-malice first degree murder finding, the specific intent to commit rape required for an attempted-rape finding and an associated felony-murder finding, and the elements of the attempted-rape special-circumstance allegations. The primary issue at trial, moreover, was defendant's mental state at the time he killed Garcia and Sorensen—whether he intended to rape them then and/or whether he premeditated and deliberated before killing them—and the arguments of counsel further clarified the connection between defendant's asserted mental condition and the relevant mental states. (See *Rogers, supra*, 39 Cal.4th at p. 882.) We therefore conclude no reasonable jury would have failed to realize these were the mental states to which the mental condition instruction referred. Accordingly, the absence of specific reference to them in the instructions was not error.

e. *Sexual Intercourse Element of Rape*

Defendant contends the trial court inadequately instructed on the crime of rape because it failed to define the term "sexual intercourse" as meaning vaginal intercourse.[36] (See *Holt, supra*, 15 Cal.4th at p. 676.) He observes that he testified at trial that he sodomized both victims (after they were dead)

---

[36] The instruction given was CALJIC No. 10.00, which provided in relevant part: "Every person who engages in an act of sexual intercourse with a female person who is not the spouse of the perpetrator accomplished against such a person's will by means of force, violence or fear of immediate and unlawful bodily injury, to such person is guilty of the crime of rape. [¶] In order to prove the crime of rape, each of the following elements must be proved: [¶] 1. A male and female person engaged in an act of sexual intercourse. . . ."

in addition to having vaginal intercourse, and that forcible sodomy, at the time of his trial, was not an offense supporting a felony-murder conviction. (*Hughes, supra,* 27 Cal.4th at p. 368.)

■■■ The Attorney General contends that because defendant did not request a clarifying instruction defining the term "sexual intercourse," he therefore forfeited his appellate claim. The long-standing general rule is that the failure to request clarification of an instruction that is otherwise a correct statement of law forfeits an appellate claim of error based upon the instruction given. (See *Hudson, supra,* 38 Cal.4th at pp. 1011–1012; see also *People v. Jenkins* (2000) 22 Cal.4th 900, 1019–1020 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; *People v. Bolin* (1998) 18 Cal.4th 297, 327–328 [75 Cal.Rptr.2d 412, 956 P.2d 374].) We agree that defendant's failure to request that the trial court further define the meaning of the term "sexual intercourse," which is the element set forth in the statute (§ 261, subd. (a)), forfeited his claim on appeal. To the extent our recent decision in *Guerra, supra,* 37 Cal.4th 1067, 1138, might be interpreted as concluding that the failure to request a similar instruction in that case did not forfeit an appellate challenge to the adequacy of the instruction given, we disapprove any such interpretation. Our statement in *Guerra* that the asserted error consisted of an alleged failure to instruct on an essential element of the offense, and our citation to *People v. Flood* (1998) 18 Cal.4th 470, 482, footnote 7 [76 Cal.Rptr.2d 180, 957 P.2d 869], cannot support a conclusion that the claim was not forfeited. When, as in *Guerra* and the present case, the trial court has given only an instruction on the crime of rape using the term "sexual intercourse" without further definition, the court correctly has instructed on this essential element of the crime, which, as explicitly set forth in the statute, is sexual intercourse between the perpetrator and the victim. (§ 261, subd. (a).) Defendant (like the defendant in *Guerra*) claims only that the instruction did not clearly explain the meaning of the term used in the statute and the instruction. This is distinguishable from the circumstances present in *Flood,* in which the trial court did not give an instruction defining "peace officer" and instead told the jury that the police officers involved were peace officers, thereby removing that element from the jury's deliberations. (*Flood, supra,* 18 Cal.4th at p. 482.) Thus, the general forfeiture rule applies to the claims raised in *Guerra* and the present case.

Of course, despite defendant's failure to preserve this issue for appeal, we *may* review his claim of instructional error to the extent his substantial rights were affected. (§ 1259.) We previously have rejected the contention that the term "sexual intercourse" must be defined for the jury. (*Stitely, supra,* 35 Cal.4th at p. 554, citing *Holt, supra,* 15 Cal.4th at p. 676.) Defendant presents no compelling reason for us to revisit that holding. Further, the charges and special circumstance allegations in the present case involved *attempted* rape. We see no possibility that because defendant testified he sodomized the

victims in addition to having vaginal intercourse—assuming the jury believed that portion of his testimony, despite its obvious rejection of his testimony regarding the timing of these acts—any juror found that defendant attempted to rape the victims based solely upon a mistaken finding that he intended only to sodomize them. Thus, there was no need to define "sexual intercourse," and no error or constitutional violation occurred.

### f. *Consciousness of Guilt*

Defendant raises two challenges to the "consciousness of guilt" instructions given by the trial court over his objection. He contends the instructions were impermissibly argumentative "pinpoint instructions" and also improperly allowed the jury to draw irrational inferences from the evidence at issue. We have rejected similar claims on many prior occasions and do so again here.

The two instructions at issue informed the jury that in determining his guilt or innocence, it could consider evidence of (1) defendant's willfully false or deliberately misleading statements about the crimes as proof of consciousness of guilt,[37] and (2) defendant's flight from the area after the crimes were committed.[38]

Defendant is correct in observing that argumentative instructions unfairly highlighting particular facts favorable to one side are improper. (*People v. Mincey* (1992) 2 Cal.4th 408, 437 [6 Cal.Rptr.2d 822, 827 P.2d 388].) He also acknowledges, however, that we previously have rejected challenges to instructions similar to those given in the present case as being improperly argumentative. (See, e.g., *People v. Jackson, supra,* 13 Cal.4th at p. 1224; *People v. Kelly* (1992) 1 Cal.4th 495, 531 [3 Cal.Rptr.2d 677, 822 P.2d 385] (*Kelly*); *People v. Bacigalupo* (1991) 1 Cal.4th 103, 128 [2 Cal.Rptr.2d 335, 820 P.2d 559].) We decline defendant's request to reconsider those decisions.

---

[37] The trial court gave CALJIC No. 2.03, as follows: "If you find that before trial Mr. Rundle made a willfully false or deliberately misleading statement concerning the crimes for which he is now being tried, you may consider such statements as a circumstance tending to prove a consciousness of guilt. However, such conduct by itself is not sufficient to prove guilt, and its weight and significance, if any, are matters for your determination."

[38] The trial court gave a modified version of CALJIC No. 2.52, as follows: "Evidence has been introduced that the defendant left the Colfax area after the commission of the crimes for which he's charged. The flight of a person after the commission of a crime or after he's accused of a crime is not sufficient in itself to establish guilt, but is a fact which if proved may be considered in light of all other proved facts in deciding the question of his guilt or innocence.

"The weight to which such circumstance is entitled is a matter for the jury to determine; however, you may only consider evidence of flight as indicating the defendant's guilt if you find that the reason or reasons he left were related to his commission of the crimes charged.

"Moreover, you may only consider evidence of flight as bearing on a required intent or mental state in the commission of a crime if you find that the defendant's conduct in leaving actually reflected such intent or mental state at the time of the crimes."

Defendant also contends these instructions improperly were given, because there is no "rational connection between consciousness of guilt and actual guilt." He then explains why evidence of his false statements and departure from the area might not reflect his guilt of the crimes charged. These might have been proper arguments in attempting to convince jurors that they should not draw an adverse inference concerning the issues in this case. The arguments do not, however, convince us it would be entirely irrational for jurors to draw a connection between defendant's guilt and his lying about his involvement in the killings of Garcia and Sorensen, or his flight from the area after he committed those killings and became a prime suspect in Garcia's disappearance. Although defendant admitted during his testimony at trial that he killed Garcia and Sorensen, he did not plead guilty to any charge, and in light of his various denials and admissions, his credibility in general was highly suspect. It therefore was not improper for the trial court to instruct the jury that it could consider defendant's falsehoods and his flight as other relevant evidence in its determination of defendant's guilt or innocence. (See *People v. Breaux* (1991) 1 Cal.4th 281, 304 [3 Cal.Rptr.2d 81, 821 P.2d 585].)

Defendant, primarily relying upon our decision in *People v. Anderson*, *supra*, 70 Cal.2d 15, also argues the instructions went beyond referring to mere evidence of guilt in the general sense and impermissibly invited the jury to infer from his postoffense behavior that he had a particular mental state at the time he committed the killings. (See *id.* at p. 33 [in reviewing sufficiency of evidence of premeditation and deliberation, evidence that defendant cleaned up the murder scene and made false statements about what happened was "highly probative of whether defendant committed the crime, but it d[id] not bear upon the state of the defendant's mind at the time of the commission of the crime"].) Defendant's argument is unpersuasive.

We repeatedly have rejected the claim that the standard consciousness of guilt instructions, such as the one given by the trial court in the present case regarding defendant's false statements, improperly describe the issue of the defendant's state of mind at the time of the crime or direct the jury to draw any impermissible inference on that subject. (See *People v. Jurado* (2006) 38 Cal.4th 72, 125 [41 Cal.Rptr.3d 319, 131 P.3d 400] [citing cases].) Further, the trial court's modification of the flight instruction correctly stated the law—that the jury could not consider defendant's flight as evidence of his state of mind when the killings occurred, unless it found "defendant's conduct in leaving actually reflected such intent or mental state at the time of the crimes." If the jury did not find the requisite connection between the two, in which case, as defendant argues, an inference about his mental state would be irrational, the jury simply would not consider evidence of defendant's flight for the purpose of determining his intent and mental state at the time he killed the victims. In this sense, this instruction actually benefited defendant by highlighting this requirement, and certainly did not

improperly direct the jury to draw an inference concerning defendant's mental state from defendant's flight in the event it found the logical connection between the two was lacking.

We previously have rejected defendant's additional claim that the consciousness of guilt instructions improperly allow the jury to draw an inference of guilt as to all of the charged crimes. (See *San Nicolas, supra,* 34 Cal.4th at p. 667; *People v. Griffin* (1988) 46 Cal.3d 1011, 1027 [251 Cal.Rptr. 643, 761 P.2d 103].) We see no reason to reconsider those decisions.

For the foregoing reasons, the trial court did not err in giving the consciousness of guilt instructions. Because no error occurred, defendant's state and federal constitutional rights were not violated. (*People v. Benavides* (2005) 35 Cal.4th 69, 100 [24 Cal.Rptr.3d 507, 105 P.3d 1099].)

### g. *Asserted Dilution of the Reasonable Doubt Standard*

Defendant raises a familiar claim that several of the then standard instructions given in this case individually and cumulatively "diluted" the jury's understanding of the reasonable doubt standard it was constitutionally required to apply to the determination of his guilt, and that this error violated his rights to due process of law, to a jury trial, and to be free from cruel and unusual punishment under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. (See *In re Winship* (1970) 397 U.S. 358, 364 [25 L.Ed.2d 368, 90 S.Ct. 1068]; see also *Sullivan v. Louisiana* (1993) 508 U.S. 275, 278–282 [124 L.Ed.2d 182, 113 S.Ct. 2078].)[39] Defendant did not raise these challenges below and therefore has forfeited them.

 To the extent that under section 1259 we may review defendant's claims despite his failure to preserve them, we recently rejected the same challenges in *Rogers, supra,* 39 Cal.4th 826. Defendant's claims are without merit for the same reasons we stated in that case: "We previously have rejected claims that the challenged instructions, alone or in combination, somehow dilute or undermine the reasonable doubt standard and thus deprive defendants of due process. (E.g., *People v. Samuels* (2005) 36 Cal.4th 96, 131 [30

---

[39] Defendant cites the following instructions as the cause of this asserted error: a modified instruction combining CALJIC Nos. 2.01 and 8.83 (sufficiency of circumstantial evidence to prove guilt of offenses and truth of special circumstances); a modified instruction combining CALJIC Nos. 2.20 and 8.83.1 (sufficiency of circumstantial evidence to prove intent and mental state underlying offenses and truth of special circumstances); CALJIC No. 2.21.1 (discrepancies in testimony); CALJIC No. 2.21.2 (willfully false witnesses); CALJIC No. 2.22 (weighing of conflicting testimony); CALJIC No. 2.27 (sufficiency of evidence of one witness); and CALJIC No. 2.51 (motive).

Cal.Rptr.3d 105, 113 P.3d 1125] [CALJIC No. 2.01 does not undermine the requirement of proof beyond a reasonable doubt]; *People v. Stitely*[, *supra*,] 35 Cal.4th [at pp.] 555–556 . . . [CALJIC No. 2.01 does not diminish prosecution's burden of proof]; *People v. Stewart* [(2004) 33 Cal.4th 425,] 521 [15 Cal.Rptr.3d 656, 93 P.3d 271] [CALJIC Nos. 2.01 and 2.02 do not unconstitutionally lessen the prosecution's burden of proof]; *People v. Crew*[, *supra*,] 31 Cal.4th [at pp.] 847–848 . . . [CALJIC Nos. 2.21.2 and 2.22 do not improperly lessen the prosecution's burden of proof; CALJIC No. 2.51 does not relieve the prosecution of its burden of proof]; *People v. Frye*[, *supra*,] 18 Cal.4th [at p.] 958 . . . [CALJIC No. 2.51 does not shift the burden of proof to defendant]; *People v. Noguera*[, *supra*,] 4 Cal.4th [at pp.] 633–634 . . . [CALJIC Nos. 2.02, 2.21, and 2.27 do not permit conviction upon proof less than beyond a reasonable doubt].) We decline to revisit these holdings. Because defendant's Sixth and Eighth Amendment claims are intertwined with his due process claim, we reject those claims for the same reasons. (See *People v. Samuels*, *supra*, 36 Cal.4th at p. 131 [CALJIC No. 2.01 does not violate Sixth Amendment]; *People v. Stitely*, *supra*, 35 Cal.4th at pp. 555–556 [CALJIC No. 2.01 does not violate defendant's rights to trial by jury and to a reliable verdict].)" (*Rogers*, *supra*, 39 Cal.4th at pp. 888–889.)

■ Finally, defendant asserts the instructions cumulatively diluted the prosecution's burden of proof. As noted above, however, several of our prior opinions involved challenges to multiple instructions and rejected such claims. We adhere to those decisions. "Here the jury was instructed on the presumption of innocence and reasonable doubt under the then standard California instruction, CALJIC No. 2.90. The United States Supreme Court has held that this instruction satisfies due process requirements. (*Victor v. Nebraska* [(1994)] 511 U.S. [1,] 7–17 [127 L.Ed.2d 583, 114 S.Ct. 1239]; *People v. Millwee* (1998) 18 Cal.4th 96, 161 [74 Cal.Rptr.2d 418, 954 P.2d 990].) No federal constitutional violation occurred." (*Rogers*, *supra*, 39 Cal.4th at p. 889.)

### 5. *Attempted Rape As the Basis of a Special Circumstance Finding*

Defendant contends that, as a matter of California law, there can be no special circumstance finding under section 190.2, subdivision (a)(17)(C) predicated upon a killing that occurs in conjunction with an attempted rape. He argues that because once the victim has been killed it is legally impossible thereafter to commit rape (see *Kelly*, *supra*, 1 Cal.4th at p. 526), no killing during the course of an attempted rape can further the purpose of completing the crime; such a killing, in fact, prevents completion of the offense. Accordingly, he claims, the killing cannot be said to have been committed in order to advance the independent felonious purpose of attempted rape. (See

*People v. Morris* (1988) 46 Cal.3d 1, 21 [249 Cal.Rptr. 119, 756 P.2d 843], disapproved on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 543–544, fn. 5 [37 Cal.Rptr.2d 446, 887 P.2d 527].) Defendant is mistaken.

The "independent felonious purpose" rule that we have discussed in *Morris* and many other cases is a mechanism for ensuring that a felony-murder special-circumstance finding is based upon proof that the defendant intended to commit the underlying felony separately from forming an intent to kill the victim; that is, the felony was not merely an afterthought to the murder, as when, for example, the defendant intends to murder the victim and after doing so takes his or her wallet for the purpose of making identification of the body more difficult. (See *Raley, supra,* 2 Cal.4th at p. 902.) This does not equate, as defendant argues, with a converse rule that if the defendant has an independent felonious purpose, the killing necessarily must further the goal of committing the underlying crime if the special circumstance is to apply. (See *People v. Berryman* (1993) 6 Cal.4th 1048, 1089–1090 [25 Cal.Rptr.2d 867, 864 P.2d 40], overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 [72 Cal.Rptr.2d 656, 952 P.2d 673] (*Hill*) ["the felony-murder special circumstance does not require a strict 'causal' or 'temporal' relationship between the 'felony' and the 'murder' " and "extends even to the situation in which the 'murder was committed while the defendant was engaged in . . . the immediate flight *after* committing' the felony"]; *People v. Horning* (2004) 34 Cal.4th 871, 907 [22 Cal.Rptr.3d 305, 102 P.3d 228] [concluding our cases have established only one requirement—that the evidence establish the felony was not merely incidental to the murder—and, therefore, the trial court's failure to instruct the jury that it must also find that the murder was committed " 'in order to carry out or advance' " the commission of the felony was not erroneous].) Therefore, although intentionally killing the victim during an attempted rape ultimately might thwart, in the legal sense, the perpetrator's goal of committing a rape, this circumstance does not mean the murder was not "committed while the defendant was engaged in . . . the . . . attempted commission of . . . [¶] . . . [¶] . . . Rape," which is what the statute requires. (§ 190.2, subd. (a)(17)(C).)[40]

---

[40] The murders of Garcia and Sorensen occurred during the "window period" between our decisions in *Carlos v. Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862] (holding intent to kill is an element of the felony-murder special circumstance, even when the defendant is the actual killer) and *People v. Anderson* (1987) 43 Cal.3d 1104, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306] (overruling *Carlos* and holding that intent to kill is not required if the defendant is the actual killer). Intent to kill, therefore, was an element of the special circumstance allegations to be proved at defendant's trial, and the jury was so instructed. (*People v. Wharton* (1991) 53 Cal.3d 522, 586, fn. 16 [280 Cal.Rptr. 631, 809 P.2d 290].) Even in *Carlos*, however, the intent at issue was solely the intent to kill the victim, not the intent to kill the victim for the purpose of accomplishing the underlying felony. (*Carlos, supra,* 35 Cal.3d at p. 134.)

### 6. *Asserted Prosecutorial Misconduct*

Defendant raises numerous claims of prosecutorial misconduct under both the state and federal Constitutions, which we shall address in turn. Under California law, a prosecutor commits reversible misconduct if he or she makes use of "deceptive or reprehensible methods" when attempting to persuade either the trial court or the jury, and when it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. (*People v. Strickland* (1974) 11 Cal.3d 946, 955 [114 Cal.Rptr. 632, 523 P.2d 672].) Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights—such as a comment upon the defendant's invocation of the right to remain silent—but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " (*Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 106 S.Ct. 2464] (*Darden*), quoting *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 643 [40 L.Ed.2d 431, 94 S.Ct. 1868] (*DeChristoforo*).)

" '[A] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]' " (*People v. Stanley* (2006) 39 Cal.4th 913, 952 [47 Cal.Rptr.3d 420, 140 P.3d 736].) Defendant argues the prosecutor engaged in pervasive misconduct that excuses defendant's numerous failures to object in the trial court to the supposed instances of misconduct he raises on appeal (see *Hill, supra,* 17 Cal.4th at p. 821), and that, beyond this, we should abolish the long-standing requirement that a defendant object and request an admonition if doing so would not be futile.

We decline defendant's invitation to eliminate the requirement that defendants afford trial courts an opportunity to remedy in the first instance any prosecutorial misconduct that may have occurred during trial. Further, as will become evident in our discussion of defendant's claims, there was no pervasive misconduct—if there was any at all—that would excuse defendant's failure to object and request an admonition concerning particular asserted instances of misconduct.

#### a. *Use of Defendant's Suppression Hearing Testimony During Cross-examination*

Defendant contends the prosecutor engaged in misconduct in cross-examining him by making reference to the transcripts of his suppression hearing testimony, because that testimony was admitted for a limited purpose

and its use at trial was misleading. This contention is without merit for the same reasons discussed *ante,* in part II.C.1.a.; that is, there was no error—or misconduct—in the use of the hearing testimony, because defendant placed his credibility and state of mind at issue by choosing to testify and contradicting his confessions to the officers, and his hearing testimony was relevant and properly admitted to impeach him.

### b. *Cross-examination of Dr. Yarvis*

Defendant contends misconduct occurred when the prosecutor asked questions during the cross-examination of defense expert Dr. Yarvis concerning the terms "sexual psychopath" and "sadistic rape" and other aspects of the psychology of rapists. He argues the questions exceeded the scope of the direct examination and were asked only to insinuate without any evidentiary support that, for example, defendant was a sexual psychopath who engaged in sadistic rape. After the trial court sustained defendant's initial objection to a question about the term "sexual psychopath," and thereafter clarified the acceptable scope of cross-examination on the subject of the psychology of rapists, defendant did not object to the prosecutor's subsequent questions on this subject, nor claim the prosecutor had engaged in misconduct or ask the court to give an admonition to the jury. Defendant therefore may not raise this claim on appeal. In any event, his claim also is without merit, because there was nothing deceptive, reprehensible, or improper about these questions, which were well within the scope of questioning permitted by the court and, being general questions about the psychology of rape without reference to defendant or the circumstances of this case, in no way improperly "impl[ied] or insinuate[d] the truth of the facts about which questions are posed." (*Visciotti, supra,* 2 Cal.4th at p. 52.)

### c. *Asserted Attempts to Elicit Testimony Regarding the Lactawen Murder*

Before trial, the prosecutor represented to the trial court and defendant that he would not seek to introduce evidence of the Lactawen murder during the guilt phase of the trial. Later, immediately before defendant was to testify in his defense, the prosecutor moved to introduce the Lactawen murder during cross-examination. The trial court found the evidence normally would be admissible under section 1101, subdivision (b) of the Evidence Code, but excluded it because defendant had relied upon the prosecutor's general statement that evidence concerning this murder would not be introduced at the guilt phase. Defendant contends the prosecutor committed misconduct by nonetheless attempting to elicit testimony on this subject during cross-examination of defendant and defense witness Philip Bodily.

When questioning defendant about the supposed fit of rage that caused him to strangle Sorensen without "thinking," the prosecutor asked, "[H]ow often do you get [so] furiously mad that you don't think?" Defendant replied, "It's happened before." After asking whether this happened with Garcia, to which defendant answered, "Correct," the prosecutor inquired, "Is this an everyday occurrence that you get furiously mad enough to kill people?" Defendant answered, "No, but it has happened before." Defense counsel then asked to approach the bench, and said, "Should I move for a mistrial now or later." The prosecutor stated he did not "plan on mentioning the Sacramento incident," but the trial court admonished him that "the continual invitation to answers that are going to be calling for a direct denial of other conduct needs to be avoided." The prosecutor said, "Fine," and the questioning resumed. Later, after questioning spanning approximately 12 pages of the transcript, the prosecutor asked defendant about tying up Sorensen's arms, and posed the question whether defendant "like[d] to tie women up like you were doing to this lady at that time?" Defendant answered, "In that set of feelings, yes." The prosecutor then asked, "Did you like to tie them up while they're alive, also?" The trial court sustained defense counsel's objection and told the prosecutor this was the "No. 2 warning."

Assuming defendant preserved prosecutorial misconduct challenges to these exchanges, we are not persuaded by defendant's claims that through these questions the prosecutor was attempting to bait defendant into making a response that would open the door to the introduction of the Lactawen evidence. After the first challenged question was asked, the prosecutor told the trial court he did not intend to mention the Lactawen murder, and it appears the court accepted that representation, although it advised him to avoid the apparently unintended problem of asking questions that might lead in that direction. Moreover, this first question—whether it was an everyday occurrence for defendant to get "furiously mad" enough to kill someone— seems essentially to have been a rhetorical question designed to discredit defendant's claim that he had fits of rage that prevented him from thinking about what he was doing, and probably would lead to a negative answer, not a statement related to the Lactawen murder. Had the prosecutor been attempting to force defendant into making some such statement or a denial that arguably would allow for impeachment with the Lactawen evidence, he might have asked a question inviting a more factual response, such as "on what other occasions have you been furiously mad enough to kill someone?"

The second question—whether defendant liked to tie up women when they are alive—is, again, insufficient to suggest the prosecutor, despite his earlier assurance to the trial court to the contrary, intended to elicit an answer calling for the introduction of evidence of the Lactawen murder. The question, asked in response to defendant's statement that he liked to tie up women "[i]n that set of feelings" (meaning, possibly, when the woman was dead), appears to

have been an attempt to clarify defendant's answer. It also simply called for a yes or no answer about what defendant "like[d]," which was not likely to elicit a statement related to what he had done in the past. Because the trial court sustained the objection to the question and the prosecutor proceeded to a different topic, it would be unduly speculative to conclude, based upon the question itself, that the prosecutor was attempting to force defendant into opening the door to the admission of evidence of the Lactawen murder. Accordingly, we discern no indication of prosecutorial misconduct in the cross-examination of defendant.

Near the end of the cross-examination of defense witness Philip Bodily, defendant's childhood friend who testified about defendant's mother's sexual advances and activities with a neighborhood boy, the prosecutor asked Bodily, without objection, three questions regarding Bodily's knowledge of the charges faced by defendant in this case. Bodily ultimately answered that defendant was charged with "Triple murder." Counsel then asked Bodily whether he had communicated with defendant in the previous five years, to which Bodily answered no. This concluded Bodily's testimony, and he was excused and the next witness was called. At a sidebar conference, the court mentioned the triple-murder answer and stated it assumed the defense did not "wish to emphasize it any further," to which defense counsel replied, "You've got that right." The court then stated, "We'll deal with it later, if at all." No further discussion of the question and answer was held.

Defendant's claim on appeal—that the prosecutor's cross-examination on the subject of Bodily's knowledge of the charges was misconduct because it was intended to lead to the introduction of the Lactawen evidence—is forfeited and in any event also is without merit. Defendant had three opportunities to object to these questions as improper attempts to circumvent the trial court's order, before Bodily gave the triple-murder answer. The defense failed to do so. Moreover, even at the sidebar conference that took place after Bodily was excused, defense counsel did not mention prosecutorial misconduct.

Defense counsel likely did not raise a misconduct claim in the trial court because it was apparent this circumstance was simply an unexpected, erroneous answer by the witness. Shortly before the questions about the charges, the prosecutor had explored Bodily's testimony that he did not tell anyone about defendant's mother's sexual activities until several years later, and the only persons he had told about it prior to trial were Bodily's father and the defense investigator. The prosecutor therefore seemed to be challenging Bodily's credibility, and the circumstance that Bodily, a childhood friend of defendant's, knew defendant was facing serious charges was relevant on that issue. In addition, for the supposed prosecutorial misconduct to have occurred, the

prosecutor would have had to suspect that Bodily, a defense witness who resided in Utah and, as far as the record shows, might not have spoken with the prosecutor or his investigator prior to testifying, knew about the uncharged Lactawen murder and incorrectly would answer that defendant was charged with three murders in this one case. Moreover, the prosecutor let the matter drop, despite the absence of any objection from the defense, and did not seek to establish before the jury that Bodily's answer was anything other than a mistake on his part.

In sum, we conclude there is no evidence the prosecutor, through the cross-examination of defendant and Bodily, engaged in misconduct by purposefully seeking to undermine the trial court's ruling excluding the Lactawen evidence. Even had defendant established that the prosecutor engaged in deceitful and reprehensible conduct in this regard, we would conclude there is no evidence the outcome or the fairness of the trial would have been adversely affected. The jury simply never heard about the Lactawen murder during the guilt phase of the trial. It also had no reason to suspect the prosecutor's questions to defendant had anything to do with a third rape and murder, or that Bodily's triple-murder answer was anything other than a misunderstanding on his part. Even if the prosecutor had been attempting to subvert the trial court's ruling, he was unsuccessful, and the outcome of the trial was not affected.

### d. Argument Regarding Condition of Victims' Bodies and Clothing

Defendant contends the prosecutor engaged in misconduct during closing argument by telling the jurors they could "use your imaginations based on what you have heard here to recreate what those women would have looked like if we had found the bodies the next day," and by theorizing the victims' clothing was not torn because they might have given in to defendant's demands in the hope of avoiding harm. Defendant claims the prosecutor improperly argued the existence of facts outside the record and, in suggesting what the victims might have said to defendant, improperly sought to inflame the passions of the jury. Defendant did not object to the statements regarding the state of the victims' bodies, and therefore has forfeited any challenge to that comment. Even had he preserved that claim, we would conclude that, like challenges he preserved to other parts of the prosecutor's argument, it is without merit.

The prosecutor's comments properly asked the jurors to draw certain inferences from the evidence presented at trial. This is not a case like those cited by defendant in which a prosecutor's statements implied the existence of facts outside the record of which counsel, but not the jury, were aware. (See, e.g., *People v. Benson* (1990) 52 Cal.3d 754, 794–795 [276 Cal.Rptr.

827, 802 P.2d 330]; *People v. Bolton* (1979) 23 Cal.3d 208, 212–213 [152 Cal.Rptr. 141, 589 P.2d 396].) Here, the whole point of the prosecutor's statements was that there was no available credible evidence regarding the state of Garcia's and Sorensen's bodies immediately after the murders were committed or what actually happened to the victims during the killings. It was therefore necessary for the jury to draw inferences based upon the evidence presented at trial. Counsel's suggestions concerning those inferences were not improper invitations to the jury to engage in speculation or references to facts outside the record. The prosecutor properly left it to the jury to determine the reasonableness of his suggestions. (*People v. Navarette* (2003) 30 Cal.4th 458, 520 [133 Cal.Rptr.2d 89, 66 P.3d 1182]; *People v. Dennis* (1998) 17 Cal.4th 468, 522 [71 Cal.Rptr.2d 680, 950 P.2d 1035].) In any event, the prosecutor's description of the possible scenario of the victims submitting to defendant's demands and his suggestion of what might have been said was not prejudicial misconduct, especially in light of the evidence of the brutal killings already presented to the jury.

### e. *Argument Assertedly Appealing to Jury's Fear of Crime*

At one point during his argument, the prosecutor discussed the prevalence of the crime of rape, and argued that defendant was beyond the "ordinary" rapist in that he not only wanted to satisfy his "sexual lust" and desire for control over his victims, but also chose to kill them. Defendant contends the prosecutor's comments that the prevalence of rape had caused society to act in a more protective and restrictive manner "improperly played upon the generalized fears of the jurors." Defendant did not object to the prosecutor's statements below or request an admonition, and does not demonstrate that such objection would have been futile. He therefore may not raise this challenge on appeal. Even if we were to assume for the sake of argument that defendant's claim was preserved and that the prosecutor's reference to societal concerns about crime was improper, we would conclude that this isolated, brief remark, when viewed in the context of the entire argument, which focused on defendant's own culpability for these particular offenses, could not have inflamed the jury's passions to the point where the outcome of the trial was affected or the trial became fundamentally unfair.

### f. *Asserted Exploitation of Exclusion of the List from Sorensen's Address Book*

Defendant claims the prosecutor engaged in misconduct by arguing it was unlikely that Sorensen would instigate sexual activity with defendant in the manner described in defendant's testimony, in light of their being essentially strangers. According to defendant, the prosecutor was taking unfair advantage of the exclusion of the list of names from Sorensen's address book that

defendant claimed represented a list of sexual partners. Defendant did not object or seek an admonition at trial, and therefore is barred from claiming error on appeal. Moreover, as discussed *ante*, in part II.C.1.b., defendant failed to establish the list was relevant evidence on the issue of Sorensen's sexual proclivities, especially with regard to strangers, and thus there is no basis for a claim that the prosecutor took unfair advantage of its exclusion or misled the jury in this regard.

#### g. *Asserted Personal Attack upon Defendant*

Defendant challenges two comments by the prosecutor—that defendant "didn't learn how to conduct himself like a human being," but instead acted "like a caveman"—as improperly denigrating him before the jury. Because defendant did not object and seek an admonition, he has forfeited this challenge. Even if preserved, this challenge would fail because the prosecutor's statements were a fair use of colorful language to explain the prosecutor's view of the evidence: that defendant did what he wanted to his victims in spite of the most basic societal constraints and any protestations on their part. (*People v. Williams* (1997) 16 Cal.4th 153, 221 [66 Cal.Rptr.2d 123, 940 P.2d 710].)

#### h. *Asserted Attack upon the Honesty and Integrity of Defense Counsel*

Defendant contends the prosecutor engaged in misconduct during closing argument by "insinuating that defense counsel and appellant fabricated a defense shortly before trial," when the prosecutor mentioned that defendant met with defense counsel and the defense psychiatrist to "clear up and get to the true version of what happened," and then argued that defendant's version of the killings was "designed to avoid criminal responsibility for attempted rape, first degree felony murder, commission of a rape, and the special circumstances involving rape, and for no other reason." No misconduct occurred. The central issue at the trial was defendant's credibility. Defendant admitted he had learned before trial it would be beneficial to his defense if it was established he did not form the intent to have sexual intercourse with the victims until after they were dead. The prosecutor's statements constituted fair comment upon the evidence regarding the supposed need for defendant, who was the only living person who witnessed the killings, to meet with others to determine the truth of what happened, and a reasonable suggestion of a possible motive for defendant to lie about the murders. The prosecutor did not directly accuse defense counsel of encouraging defendant to lie, but even to the extent the statements swept counsel up in defendant's asserted lies, this was not an improper comment in the context of this case, in which defendant's story changed drastically during trial preparations. (*People v. Earp*

(1999) 20 Cal.4th 826, 862 [85 Cal.Rptr.2d 857, 978 P.2d 15] ["A prosecutor's suggestion or insinuation that defense counsel fabricated the defense is misconduct only when there is 'no evidence to support that claim.' "].)

### D. Claims Relating to Alleged Juror Misconduct

#### 1. Background

The guilt phase of the trial was completed and the jury began deliberating on Wednesday, May 17, 1989. After an evening recess, the jury reached its guilt phase verdicts the following day. On Friday, May 19, the court conducted an ex parte in camera proceeding with defense counsel, David Humphreys, who was lead counsel, and Lawrence Smith, who had been appointed as cocounsel pursuant to *Keenan v. Superior Court* (1982) 31 Cal.3d 424 [180 Cal.Rptr. 489, 640 P.2d 108].[41] Defendant was not present. Smith told the court he had learned from a "fairly unimpeachable" source that the jury foreman, Juror T.W., who was a medical doctor, had been overheard in a public area of the courthouse, making a statement to the effect that "if he were to accept [the defense] theory of the case, . . . he would be violating his Hippocratic Oath."[42] Smith explained that the person who told him of the statement did not hear the juror utter it, but rather was told of it by the person who did hear the statement. Smith provided no information concerning when the juror made the comment or when Smith learned of it. Further, Smith explained, he did not wish to reveal the source of the information at that time, because to do so "would cause [him] grave personal problems to the extent that it might even give [him] a conflict of interest."

The trial court and counsel recognized that if true, the circumstance that such a statement had been made might indicate serious misconduct by Juror T.W. in both discussing the merits of the case outside of jury deliberations and in relying upon improper external influences in his decisionmaking. The trial court, however, suggested that investigation of the issue might be delayed until after the penalty phase of the trial in order to avoid "causing a problem for the jurors should we find out after litigation that it is [a]

---

[41] Although Humphreys was designated lead counsel, it appears that he and Smith in a general sense equally shared responsibilities.

[42] The term "Hippocratic Oath" denotes an oath of professional ethics that in modern times often is administered to medical school graduates during commencement proceedings. The oath is named after the Greek medical practitioner and philosopher Hippocrates, although it is not clear that he actually was involved in its creation. There are numerous modern adaptations of the oath, which include additions and deletions from the ancient version, reflecting modern views on various aspects of the practice of medicine. Interestingly, the most well-known proviso of the modern oath, "First, do no harm," is not found in the original. (Markel, *Becoming a Physician: "I Swear by Apollo"—On Taking the Hippocratic Oath* (May 13, 2004) 350 New Eng. J.Med. 2026.)

not-as-it-seems kind of thing." The court later reiterated its concern that immediate investigation of the report needlessly might "sour" the jury before it completed the case if the report ultimately proved to be incorrect. Both defense counsel agreed that prejudicing the jury was a concern. No decision concerning a course of action was reached, and the issue was put over to the next court day.

On Tuesday morning, May 23, 1989, the trial court again met with defense counsel in chambers to discuss the possible juror misconduct, without defendant or the prosecutor present. Both Smith and Humphreys stated they agreed with the court's concern that questioning the jurors about the supposed statement might "alienate" them. The court stated it could see no detriment in postponing the investigation of the possible misconduct to avoid prejudicing the jury "should it be determined that the events as reported did not happen, or that if they happened, they happened in some fashion that did not constitute misconduct." Again, no final decision was reached, and it was resolved that the issue would be further discussed with input from the prosecutor.

The court thereafter reconvened in a closed session with defense counsel, defendant, the prosecutor, and court staff present. The trial court generally recounted the information Smith had disclosed, and asserted that the juror's supposed statement "doesn't make a lot of sense in the form we received it, but there may be more out there." The court once again expressed its view that delaying investigation into the making of the statement would not create prejudice. The court explained that in its view, if the alleged misconduct occurred, both the guilt phase and penalty phase verdicts might be set aside. The court apparently reasoned that in light of this situation, for the time being it was preferable to defer exploring the issue of Juror T.W.'s possible misconduct. The court expressed concern that "inquiring and finding that there was nothing could leave an impact on the jury that would prejudice one side or another or both." The trial court rejected the prosecutor's suggestion that an investigator interview the witnesses, because the court was "concerned it will get to the jury in some fashion." The court also noted Smith might be required to become a witness in the matter, and unless and until it proved necessary to do so, the court did not want to initiate steps that might force Smith to withdraw from the case. Smith stated that in his view, if the firsthand source of the information were directly questioned concerning the statement, it was "very likely that that person would claim certain privileges which would start a legal controversy and quickly become very public and blow the whole thing up." The court adjourned discussion of the matter until the afternoon in order to allow the prosecutor to consider what to recommend.

# 166

That afternoon, another closed court session was held with defense counsel, defendant, the prosecutor, and court staff present. The prosecutor initially and strongly suggested that the witnesses be identified and questioned about the statement as soon as possible. He did concede, however, that "it would be dangerous to start questioning the jury now." It appears the prosecutor contemplated first questioning the witnesses, and then possibly the jurors, depending on what information was gained from the witnesses. Smith stated that if he "were to disclose the source of the alleged comment at this time, it would just create an impossible situation to me that I think would be a conflict of interest. . . ." Smith then agreed to discuss the identities of the witnesses, first without the prosecutor present. Smith disclosed that the source of the information was his wife, who worked at the local newspaper, and the witness to the juror's supposed statement was a reporter for the newspaper, Angus Thomson, who was covering the trial. Smith explained that Thomson told Smith's wife about the statement in the course of a personal conversation between the two of them. Smith's difficulties arose because a condition of his wife's employment with the newspaper specified that she was not to disclose to Smith information she learned at the newspaper, and thus if Thomson were directly questioned about the supposed statement, he probably would deduce that Smith's wife had informed Smith, which in turn would jeopardize her employment and, it seemed, the Smiths' marriage.

The court again stated its belief there would be no problem in proceeding with the trial of the penalty phase and deferring investigation into the statement until after that portion of the trial was completed. When Smith agreed and said this course of action was his "preference," the court clarified: "[M]y motivation is in the control of the integrity of these proceedings, and I don't see any damage to this Court's obligations which, quite frankly, are not to your personal situation, [but to] Mr. Rundle, the People and the law, and I don't see there is a problem with that." The court then summoned the prosecutor, summarized the new information, and again suggested that all questioning of the witnesses related to this issue be postponed until after the jury began its deliberations. Final resolution of the matter was postponed until the following morning so the prosecutor could develop any final recommendations, but the court stated its tentative plan to order that Thomson not be contacted concerning the statement, but instead to question Thomson after the jury had begun the penalty phase deliberations, and possibly to question the jurors after they reached a verdict.

There is no record of any meeting the next day, May 24, 1989—or for the next three weeks—concerning this matter. Consistently with the trial court's concluding remarks, however, the subject was raised again on June 15, 1989, after the jury had retired to deliberate on the penalty. The court's bailiff was called as a witness and testified he had a conversation with the reporter, Thomson, outside the courtroom after the jury had reached a guilt phase

verdict, but before the verdict was announced in court.[43] The bailiff recalled mentioning to Thomson that he was surprised Juror T.W. had been chosen for this jury. The bailiff did not remember hearing a reference to the Hippocratic Oath in this conversation or at any other point during the trial, or hearing Juror T.W. or any other juror speak about the case in public. It was the bailiff's impression, in fact, that Juror T.W. was "very quiet and usually hangs by himself during the whole trial." Another bailiff was called as a witness, but testified he did not recall the substance of any conversation with Thomson because he was concentrating upon monitoring the jury.

Next, Thomson was called to testify. He did not remember the bailiff's comments regarding being surprised that Juror T.W. remained on the jury. He also did not remember hearing anyone speak of that juror, or hearing Juror T.W. speak of the case or the Hippocratic Oath. Thomson's answers regarding whether he heard mention of the term "Hippocratic Oath" were somewhat awkwardly stated, but although there was some unresolved ambiguity, a logical reading in the context of the questioning is that he had not heard anyone related to this trial employ the term.[44] Thomson was not asked whether he had spoken with Smith's wife about overhearing such a statement. Smith's wife was not called as a witness. After the questioning of Thomson concluded, the trial court stated it would question the jurors on the subject after they reached a verdict. Humphreys and the prosecutor agreed this should be done.

After the jury's verdict was rendered later that day, the trial court conducted another closed session during which the jurors and alternates were individually questioned concerning whether they had heard any juror talking about the case outside of the jury's deliberations. All of the jurors and alternates answered in the negative. Juror T.W. also was asked specifically whether he could "recall any conversation that you may have been involved in during this trial, whether or not it involved the case, where you may have been discussing with anybody the subject of your oath as a doctor, the Hippocratic Oath." He answered, "No. No, other than—" at which point the court interrupted and said, "Not during jury deliberation. I am talking about a

---

[43] Before defense counsel questioned the bailiff, Smith stated that due to his wife's involvement, he would be "recusing" himself from these particular proceedings. Humphreys thereafter conducted the questioning of the witnesses.

[44] Humphreys asked Thomson whether he "ever heard that term [the Hippocratic Oath] mentioned during the course of this proceeding—your course of covering these proceedings, I should say, other than outside the courtroom?" The trial court interjected and Humphreys rephrased the question to state, "[o]ther than inside the courtroom?" Thomson answered, "[o]ther than inside the courtroom and in the court building, no." Humphreys then stated, "Okay," and Thomson added, "Or outside the court building by members of the jury or by other people within the earshot of members of the jury, no." Humphreys then asked, "You never heard it?" Thomson answered, "No." Thomson was then excused.

conversation outside the normal court proceedings." Juror T.W. then answered, "Not that I can recall." Neither defense attorney accepted the trial court's invitation to approach the bench with any other questions to be posed. The issue of the supposed statement by Juror T.W. never was discussed again in the course of the trial court proceedings.

On appeal, defendant contends he was denied the assistance of counsel guaranteed under the federal and state Constitutions because of a conflict of interest created by the personal difficulties faced by Smith as a result of disclosing and pursuing the issue of the alleged misconduct of Juror T.W.[45] He also contends that the trial court erred in failing to inquire into the possibility of a conflict of interest, and in conducting an inadequate investigation of the alleged juror misconduct. Finally, he contends his absence from the initial two ex parte meetings between the trial court and defense counsel violated his constitutional and statutory rights to be present during trial. As explained below, we reject each of defendant's contentions.

### 2. *Asserted Denial of Right to Counsel Due to Conflict of Interest*

The Sixth Amendment to the federal Constitution, made applicable to the states through the due process clause of the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." Similarly, article I, section 15 of our state Constitution provides that "[t]he defendant in a criminal cause has the right . . . to have the assistance of counsel for the defendant's defense . . . ." It has long been held that under both Constitutions, a defendant is deprived of his or her constitutional right to the assistance of counsel in certain circumstances when, despite the physical presence of a defense attorney at trial, that attorney labored under a conflict of interest that compromised his or her loyalty to the defendant. (See *Glasser v. United States* (1942) 315 U.S. 60, 70 [86 L.Ed. 680, 62 S.Ct. 457] (*Glasser*); *People v. Lanigan* (1943) 22 Cal.2d 569, 575–576 [140 P.2d 24] [discussing art. I, former § 13 of Cal. Const., which guaranteed the defendant's right "to appear and defend, in person and with counsel"]; *People v. Chacon* (1968) 69 Cal.2d 765, 776–777, fn. 3 [73 Cal.Rptr. 10, 447 P.2d 106] (*Chacon*); *People v. Mroczko* (1983) 35 Cal.3d 86, 104 [197 Cal.Rptr. 52, 672 P.2d 835] (*Mroczko*).) Defendant contends a conflict of interest existed in the present case and denied him his federal and state constitutional rights to counsel.

---

[45] The Attorney General concedes there is nothing in the record suggesting that defendant ever knowingly and voluntarily waived any conflict of interest his attorneys may have had.

### a. *Federal Constitutional Claim*

 A recent decision of the United States Supreme Court, *Mickens v. Taylor* (2002) 535 U.S. 162 [152 L.Ed.2d 291, 122 S.Ct. 1237] (*Mickens*), clarified several aspects of the applicable law concerning the determination whether a conflict of interest acted to deny a defendant the Sixth Amendment right to counsel. In its central holding, the high court decided that in cases in which the trial court should have inquired into the possibility of a conflict of interest on the part of defense counsel but failed to do so, before reversal is warranted the defendant nonetheless must demonstrate that an actual conflict of interest affected counsel's performance. (*Mickens, supra,* 535 U.S. at pp. 173–174.) As relevant to the present case, the high court also confirmed that conflict-of-interest claims are a category of ineffective-assistance-of-counsel claims, which, pursuant to the court's decision in *Strickland v. Washington* (1984) 466 U.S. 668 [80 L.Ed.2d 674, 104 S.Ct. 2052] (*Strickland*), generally require the defendant to demonstrate (1) deficient performance by counsel, and (2) " 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (*Mickens, supra,* 535 U.S. at p. 166, quoting *Strickland, supra,* 466 U.S. at p. 694.) In the context of a claim of conflict of interest, however, the deficient-performance prong of the *Strickland* test is satisfied by a showing that defense counsel labored under an actual conflict of interest, that is, "a conflict *that affected counsel's performance*—as opposed to a mere theoretical division of loyalties." (*Mickens, supra,* 535 U.S. at p. 171.) As to the second prong—that a defendant demonstrate prejudice in the outcome—the court recognized an exception to this requirement, applicable when there exist " 'circumstances of [the] magnitude' " of the denial of counsel entirely or during a critical stage of the proceeding. (*Id.* at p. 166.) The court acknowledged that several of its cases held that circumstances of that magnitude existed when the defendant's attorney had "actively represented conflicting interests," and thus no showing of prejudice was required in such circumstances. (*Ibid.*; see also *United States v. Cronic* (1984) 466 U.S. 648, 659, fn. 26 [80 L.Ed.2d 657, 104 S.Ct. 2039].) Those earlier cases established what has become known as a "presumption of prejudice" that would relieve the defendant of the otherwise applicable burden of demonstrating a reasonable probability that the conflict affected the outcome of the trial. (See *Glasser, supra,* 315 U.S. 60, 76; *Cuyler v. Sullivan* (1980) 446 U.S. 335, 349–350 [64 L.Ed.2d 333, 100 S.Ct. 1708] (*Sullivan*).)

In determining whether a defendant has demonstrated the existence of an actual conflict of interest satisfying the first prong of the analysis, we consider whether "the record shows that counsel 'pulled his punches,' i.e., failed to represent defendant as vigorously as he might have had there been no conflict." (*People v. Easley* (1988) 46 Cal.3d 712, 725 [250 Cal.Rptr. 855, 759 P.2d 490] (*Easley*).) And yet we must bear in mind, as we observed in

*People v. Roldan* (2005) 35 Cal.4th 646, 674 [27 Cal.Rptr.3d 360, 110 P.3d 289] (*Roldan*), that when " 'a conflict of interest causes an attorney *not* to do something, the record may not reflect such an omission. We must therefore examine the record to determine (i) whether arguments or actions omitted would likely have been made by counsel who did not have a conflict of interest, and (ii) whether there may have been a tactical reason (other than the asserted conflict of interest) that might have caused any such omission.' "

Defendant contends that his attorneys labored under an actual conflict of interest that adversely affected their performance in two general respects: first, their decision to agree to delay investigation into the alleged statement until the end of the trial, and second, their handling of the inquiry when the witnesses and jurors ultimately were questioned. We find it unnecessary to determine whether the decision to delay the inquiry was a reasonable tactical choice by counsel or a result of divided loyalties, because we agree with defendant that counsel "pulled their punches" during the questioning of the witnesses.

Although Smith's report was multiple-level hearsay, some pieces of known information—that Juror T.W., the jury foreman, was a medical doctor and possibly undertook the Hippocratic Oath at some point in his career—fit with the specifics of the statement as recounted by Smith, affording some indication of reliability. Moreover, despite the trial court's view that the statement, taken literally, did not "make a lot of sense," it is reasonably possible to discern a meaning behind the words: for example, that the juror felt an obligation to society to protect it from a confessed killer such as defendant, quite apart from the juror's view of the evidence presented at the trial.[46] Indeed, the trial court repeatedly mentioned the possibility that confirmation of the report might lead it to declare a mistrial as to both the guilt and penalty phases.

In light of the foregoing, there appears to be no reasonable explanation for defense counsel's ultimate failure to ask news reporter Thomson specifically

---

[46] Of course, under the rules of evidence, even had a more thorough and probing investigation been undertaken, evidence of Juror T.W.'s mental process in arriving at his verdict would not be admissible to impeach the verdict in a direct manner; that is, it would be improper to rely upon this evidence to establish that he actually rejected the defense theory of the case because he felt bound to follow the Hippocratic Oath. (Evid. Code, § 1150, subd. (a).) Nonetheless, if further inquiry produced credible information demonstrating that, despite his denial, Juror T.W. did make the alleged statement, the statement itself might constitute competent evidence of "overt acts" of misconduct that if established might have given rise to a presumption of bias (see *In re Hamilton* (1999) 20 Cal.4th 273, 294–295 [84 Cal.Rptr.2d 403, 975 P.2d 600]): namely, that Juror T.W. (1) had discussed the case outside of jury deliberations, and (2) might have been untruthful during voir dire concerning his ability to judge the case on the evidence, and not to be affected by his professional training and responsibilities.

whether he told Smith's wife about the alleged statement by Juror T.W., other than the desire to protect Smith's personal interest in not publicly exposing his wife as the source of the report. It seems unlikely that if Smith had learned of the alleged statement from an acquaintance who had a casual conversation with Thomson on the street—instead of from Smith's own wife, who allegedly had a confidential conversation with Thomson in connection with her employment—Thomson would not have been pointedly questioned about the conversation, even in light of the denials offered at the hearing by the other percipient witnesses. We doubt that unconflicted counsel would have ended the investigation of this potentially serious allegation of juror misconduct without asking more direct and probing questions of the witness who supposedly had heard the alleged statement.

The Attorney General observes that defendant at all times was represented by two attorneys, and contends the record on appeal does not establish that defendant's other counsel, Humphreys, labored under a conflict of interest. We disagree. Even assuming we could consider separately the actions of Humphreys from those of Smith such that Smith's conflict would not automatically "taint" the entire defense team's handling of the juror misconduct issue, we believe Humphreys's sense of loyalty to his cocounsel was sufficient to create an actual division of loyalties on his part when viewed in light of the unreasonable failure of either counsel adequately to explore with Thomson the statement attributed to Juror T.W. Attorneys Humphreys and Smith at that time had worked together on defendant's case for more than one and a half years. Smith spoke repeatedly of the serious personal difficulties he perceived he would face if the source of his information were publicly exposed, and he and the trial court mentioned that he even might be required to withdraw from the case, depending upon how the matter was handled. (See *Roldan*, *supra*, 35 Cal.4th at pp. 726–727.) Under these circumstances, we believe the record demonstrates that Humphreys also labored under an actual conflict of interest.

In sum, we conclude defense counsel's questioning of Thomson was inadequate compared to what reasonable and unconflicted counsel would have done, was a result of Smith's predicament and both attorneys' desire not to exacerbate it, and could not have been based upon a strategic choice regarding how best to protect defendant's rights. Defendant therefore has demonstrated that an actual conflict of interest affected counsel's performance.

Turning to the second prong of the analysis—the question of prejudice arising from this actual conflict of interest—we conclude no presumption of prejudice should be applied in this case, and, further, the appellate record does not demonstrate a reasonable probability that, absent the conflict of interest, the result of the trial would have been different.

As the Attorney General observes, dictum in *Mickens* expressed some uncertainty concerning the circumstances in which a presumption of prejudice should be applied. The court observed that its previous conflict-of-interest cases (*Glasser, supra,* 315 U.S. 60; *Holloway v. Arkansas* (1978) 435 U.S. 475, 489–490 [55 L.Ed.2d 426, 98 S.Ct. 1173]; *Sullivan, supra,* 446 U.S. 335), in which a showing of prejudice to the outcome was not required, all involved situations in which a single defense attorney represented jointly charged defendants. The court further observed that despite this common factual underpinning, lower courts had applied the presumption of prejudice " 'unblinkingly' to 'all kinds of alleged attorney ethical conflicts,' " even though "the language of *Sullivan* itself does not clearly establish, or indeed even support, such expansive application." (*Mickens, supra,* 535 U.S. at pp. 174, 175.) The court stated that whether the presumption properly would be applied to other conflicts "remains, as far as the jurisprudence of this Court is concerned, an open question." (*Id.* at p. 176.)

In evaluating claims of Sixth Amendment violation based upon conflicts of interest, we in the past have stated that the presumption of prejudice would be applicable in a variety of factual circumstances, including matters in which, as in the present case, it was alleged that the personal interests of the attorney conflicted with those of the defendant. (See, e.g., *People v. Dunkle* (2005) 36 Cal.4th 861, 914 [32 Cal.Rptr.3d 23, 116 P.3d 494] (*Dunkle*) [conflict based upon possibility that the attorney might be a defense witness]; *Roldan, supra,* 35 Cal.4th at p. 674 [conflict based upon defense attorney's having been threatened by the defendant]; *Frye, supra,* 18 Cal.4th at p. 998 [conflict based upon defense attorney's upcoming suspension from the practice of law]; *Mayfield, supra,* 5 Cal.4th at p. 206 [conflict based upon defense attorney's financial and reputational interests].) The only cases in which we have had occasion to actually *apply* the presumption, however, have involved, like the high court's cases, concurrent representation of adverse clients by a single attorney. (See *Easley, supra,* 46 Cal.3d 712; *Mroczko, supra,* 35 Cal.3d 86; see also *Chacon, supra,* 69 Cal.2d at p. 767.) In all other cases in which we mentioned the presumption of prejudice in the recitation of the applicable law, we concluded that the defendant failed to establish that an actual conflict of interest adversely affected counsel's performance; that is, we determined " 'the constitutional predicate for [the] claim of ineffective assistance' " was lacking. (*Mickens, supra,* 535 U.S. at p. 175, quoting *Sullivan, supra,* 446 U.S. at p. 350.) Our past decisions, therefore, do not constitute controlling authority concerning the question whether the presumption of prejudice applies to all or only some conflict-of-interest situations, and we are especially reluctant to interpret those holdings broadly here, in light of the skepticism expressed by the high court in *Mickens* concerning an expansive application of the presumption.

■ As the high court pointed out in *Mickens*, the presumption of prejudice is a prophylactic measure established to address "situations where *Strickland* itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel." (*Mickens*, *supra*, 535 U.S. at p. 176.) Only when the court concludes that the possibility of prejudice and the corresponding difficulty in demonstrating such prejudice are sufficiently great compared to other more customary assessments of the detrimental effects of deficient performance by defense counsel, must the presumption be applied in order to safeguard the defendant's fundamental right to the effective assistance of counsel under the Sixth Amendment. (*Mickens*, at p. 175.) We conclude that the *Strickland* standard is not "inadequate" in this case, and, accordingly, no presumption of prejudice is called for.

Defendant does not contend that the conflict affected his counsel's performance related to their conduct of the trial itself, apart from counsel's reaction to the juror misconduct issue in question. As a result, the complained-of shortcomings of counsel in this case are fundamentally different from those found in typical conflict-of-interest situations. In most conflict cases, in which a conflict of interest affected the presentation of the defense case to the jury, the problem in assessing prejudice to the outcome of the proceeding has arisen from the reviewing court's difficulty in evaluating how extensively the conflict affected counsel's choices and, ultimately, in predicting how the presence or absence of certain evidence or arguments at trial would have affected the jury's deliberations and verdict.

In the present case, we must examine how counsel's conflict affected the resolution of the allegation of juror misconduct and the possibility of defendant's moving for and receiving a mistrial on that basis.[47] This determination does not pose the same level of difficulty as attempting to gauge the effect of a conflict upon how counsel conducted the defense case at trial, and further to predict how a jury would have reacted if counsel had put forth a different defense. Rather, it essentially involves a factual determination of whether any misconduct occurred and, if so, a legal determination of whether such misconduct would have provided grounds for moving for and granting a mistrial. Accordingly, we cannot say that any difficulty in assessing the prejudice resulting from the type of conflict of interest at issue in this case is so great that the *Strickland* standard is inadequate. We therefore conclude we should not apply the prophylactic presumption of prejudice under these circumstances.

---

[47] We shall assume for the sake of argument that the loss of the procedural right to request and be granted a mistrial implicates a fundamental procedural right that, if proved to result from ineffective assistance of counsel due to a conflict of interest, would constitute prejudice to the outcome of the proceeding for Sixth Amendment purposes, even if defendant would have been convicted and sentenced to death following a retrial. (See *U.S. v. Ramsey* (D.D.C. 2004) 323 F.Supp.2d 27, 39–44; *Davidson v. U.S.* (W.D.Pa. 1996) 951 F.Supp. 555, 558–559.)

We further conclude, based upon the appellate record, that defendant has not carried his burden of demonstrating a reasonable probability he would have received a more favorable outcome were it not for his counsel's conflict of interest—that is, of demonstrating that more extensive questioning of the witnesses would have uncovered sufficient grounds to support the making and granting of a motion for a mistrial. Smith revealed to the court the reported statement and his concerns surrounding it. Other than Smith's unsworn statements and possibly Juror T.W.'s half-statement that he had spoken of the Hippocratic Oath at some point, the evidence in the appellate record, including a logical reading of Thomson's testimony, strongly contradicts the allegation that Juror T.W. made the statement in question. We also cannot determine at this time whether, even if Juror T.W. did make the statement as reported, such action constituted misconduct, or if it did, that it would warrant a mistrial. Similarly, even were we to assume that counsel's decisions to delay investigation of Smith's report and not to call Smith's wife as a witness at the hearing also were products of a conflict of interest, there is nothing in the record before us establishing that a different course of action would have exposed any more convincing evidence of misconduct. Therefore, based upon this record, we conclude there is no reasonable probability that, absent the conflict, defendant would have received a more favorable out-come—specifically, a ruling by the trial court granting a mistrial based upon juror misconduct.[48]

### b. *State Constitutional Claim*

 As noted, the California Constitution provides that a defendant is guaranteed the right to have "the assistance of counsel for the defendant's defense." (Cal. Const., art. I, § 15.) We long have recognized that under state law, "[t]he right to counsel is a fundamental constitutional right, which has been carefully guarded by the courts of this state." (*In re James* (1952) 38 Cal.2d 302, 310 [240 P.2d 596].) We also have characterized our state provision as calling for a "somewhat more rigorous standard of review" of conflict-of-interest claims compared with the analysis employed in the Sixth Amendment context. (*Mroczko, supra,* 35 Cal.3d at p. 104.)

Although the federal Constitution—regardless of whether a presumption of prejudice applies—requires proof of an actual conflict of interest, that is,

---

[48] To the extent it might prove to be true that counsel's conflicted performance retarded the development of the appellate record concerning the alleged misconduct, habeas corpus is available to expand upon the existing record in the event defendant uncovers evidence of juror misconduct that counsel should have developed at trial. (See *People v. Snow* (2003) 30 Cal.4th 43, 111 [132 Cal.Rptr.2d 271, 65 P.3d 749] (*Snow*) ["normally a claim of ineffective assistance of counsel is appropriately raised in a petition for writ of habeas corpus [citation], where relevant facts and circumstances not reflected in the record on appeal . . . can be brought to light . . ."].)

proof that counsel's conflict adversely affected his or her performance during the proceedings (*Mickens, supra,* 535 U.S. at p. 172, fn. 5), under the state Constitution we have required only that the record support an "informed speculation" that a "potential conflict of interest" impaired the defendant's right to effective assistance of counsel. (*Mroczko, supra,* 35 Cal.3d 86, 105; see *Chacon, supra,* 69 Cal.2d at pp. 767, 776–777, fn. 3, citing *Lollar v. United States* (D.C. Cir. 1967) 126 U.S. App.D.C. 200 [376 F.2d 243, 247] (*Lollar*).)[49] Because a conflict of interest may retard counsel's development of evidence or arguments in support of the defense—and possibly even evidence of the conflict itself—we have retained this stricter standard in order to "closely guard" the fundamental right to the assistance of counsel. "The very failure to produce or emphasize such information . . . produces a void and results in a record which shields the fact of any possible conflict and makes it difficult to demonstrate on appeal that a conflict did in fact exist. [Citation.] Accordingly, a [defendant] . . . need not establish that there was an actual conflict of interest, but rather it is sufficient if the record provides an adequate basis for an 'informed speculation' that there was a potential conflict of interest which prejudicially affected the defendant's right to effective counsel. [Citations.] [¶] Permissible speculation giving rise to a conflict of interest may be deemed an informed speculation but only when such is grounded on a factual basis which can be found in the record." (*People v. Cook* (1975) 13 Cal.3d 663, 670–671 [119 Cal.Rptr. 500, 532 P.2d 148].)

We apply a standard stricter than that applied under the federal Constitution for determining the existence of a conflict of interest, but our ultimate resolution of defendant's state constitutional claim is no different from the resolution of his federal claim. As already discussed with regard to the determination whether an actual conflict of interest exists under the federal test, the record supports an informed speculation that a potential conflict of interest impaired defendant's right to the effective assistance of counsel. Smith's desire to avoid the public disclosure of his wife as the source of the report, as well as Humphreys's desire not to cause serious personal difficulties for Smith and to avoid Smith's possible withdrawal, created the potential for divided loyalties. As also discussed above, the record additionally supports an informed speculation that counsel "pulled punches" because of these conflicts, as reflected in the manner in which counsel pursued the issue with news reporter Thomson during the hearing conducted at the conclusion of the trial. We conclude, however, that, as under Sixth Amendment standards, no

---

[49] We note that our 1968 opinion in *Chacon, supra,* 69 Cal.2d 765, predated *Sullivan, supra,* 446 U.S. 335, in 1980, and articulated a single standard that applied to both federal and state constitutional claims of conflicted counsel. Although *Sullivan* subsequently clarified the federal standard as being different from that articulated in *Lollar,* we have maintained the *Chacon* standard as a matter of state law. (See, e.g., *Dunkle, supra,* 36 Cal.4th at p. 915.)

presumption of prejudice is appropriate under state law under the circumstances of this case. We further conclude, based upon the appellate record, that defendant has not carried his burden of demonstrating he was prejudiced by the perceived conflict, including, if we assume them to be conflicted actions, counsel's decisions to delay the investigation and not to question Smith's wife. Counsel's conflicts did not affect the presentation of the defense case to the jury. Moreover, defendant has not established that Juror T.W. made the statement attributed to him by Attorney Smith, or that even if he did make some statement pertaining to the Hippocratic Oath, this constituted misconduct that would have warranted moving for, and being granted, a mistrial.[50]

### 3. Assertedly Inadequate Investigation by the Trial Court of Conflict of Interest and Juror Misconduct

Defendant contends the trial court violated its duty under *Wood v. Georgia* (1981) 450 U.S. 261, 272 [67 L.Ed.2d 220, 101 S.Ct. 1097] to conduct an investigation into the possibility that Attorney Smith may have been laboring under a conflict of interest, before it decided to delay its inquiry into the alleged juror misconduct and to proceed with the penalty phase of the trial. We disagree. Although, with the benefit of hindsight, we have concluded above that defendant's attorneys were affected by an actual conflict of interest in the manner in which they conducted their examination of the witnesses at the hearing, we do not believe the circumstances "impose[d] upon the court a duty to inquire further" into the possibility of a conflict of interest. (*Wood, supra,* 450 U.S. at p. 272.)

When the allegation of juror misconduct was raised, the possibility of a conflict of interest as to Smith was openly discussed by the court and counsel, with defendant present at the later discussions. Smith, in fact, eventually revealed the source of his information and explained the particular difficulties he faced, despite his earlier reluctance to do so. Moreover, there is no evidence, and not even an allegation by defendant, that any conflict had an impact on how the defense case was presented to the jury. The conflict of interest concerned only the collateral issue of whether jury misconduct had occurred, an issue the trial court thought could be adequately explored at the conclusion of the trial, at which time Smith "recused" himself and Humphreys took charge of the matter for the defense. It is unclear what would have been accomplished by a further inquiry by the trial court into the possibility of a conflict of interest of counsel, and we therefore conclude that no duty to inquire was breached.

---

[50] Again, to the extent any undeveloped evidence supporting a claim of misconduct might exist, such evidence can be raised in a habeas corpus petition.

Defendant also contends the trial court's investigation of the possible juror misconduct was inadequate and thereby deprived him of his right to a fair and impartial jury under the federal and state Constitutions. The existing record, however, shows neither misconduct nor bias on the part of Juror T.W. (or any other juror) and, in fact, strongly contradicts any such claim. There simply is no indication that the jury was not fair and impartial. To the extent defendant claims the trial court abused its discretion concerning how it chose to determine whether Juror T.W. engaged in misconduct or was biased, we disagree. (See *People v. Seaton* (2001) 26 Cal.4th 598, 676 [110 Cal.Rptr.2d 441, 28 P.3d 175] ["specific procedures to follow in investigating an allegation of juror misconduct are generally a matter for the trial court's discretion"]; see also *People v. Burgener* (1986) 41 Cal.3d 505, 520 [224 Cal.Rptr. 112, 714 P.2d 1251] ["Failure to conduct a hearing sufficient to determine whether good cause to discharge [a] juror exists is an abuse of discretion subject to appellate review."].) The record demonstrates that the court at all times properly was concerned with avoiding the possibility that the jury foreman would be erroneously accused of misconduct—and the jury thereby prejudiced in some manner—based upon uncertain information, and the court's cautious choice of how to avoid this consequence while still adequately addressing the allegation was within the bounds of reason. (See *People v. Osband* (1996) 13 Cal.4th 622, 666 [55 Cal.Rptr.2d 26, 919 P.2d 640].)

### 4. Defendant's Absence from Meetings Between the Trial Court and Defense Counsel Concerning the Alleged Juror Misconduct

Defendant was not present during the first two ex parte in camera hearings concerning Smith's report of the alleged misconduct on the part of Juror T.W. He contends on appeal that his absence from these proceedings violated his federal and state constitutional rights, as well as state statutory law.

"As a constitutional matter, a criminal defendant accused of a felony has the right to be present at every critical stage of the trial. (*Illinois* v. *Allen*[, *supra*,] 397 U.S. [at p.] 338 . . . .) The right derives from the confrontation clause of the Sixth Amendment to the federal Constitution and the due process clauses of the Fifth and Fourteenth Amendments, and article I, section 15 of the California Constitution." (*Frye, supra*, 18 Cal.4th at p. 1010.) A critical stage of the trial is one in which a defendant's " 'absence might frustrate the fairness of the proceedings' (*Faretta* v. *California*[, *supra*,] 422 U.S. [at p.] 819, fn. 15 . . .) or 'whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge' (*Snyder* v. *Massachusetts*[, *supra*,] 291 U.S. [at pp.] 105–106 . . .)." (*Rodriguez, supra*, 17 Cal.4th at p. 260.)

The ex parte meetings between the trial court and defense counsel concerning Juror T.W.'s alleged statement, at which defendant was not present, were not critical stages of the trial for constitutional purposes, because they were merely exploratory discussions concerning the potential problem of juror misconduct and possible courses of action that might be taken to resolve that issue. Defendant, in arguing to the contrary, relies primarily upon the three-judge-panel decision in *Campbell v. Rice* (9th Cir. 2002) 302 F.3d 892. After completion of briefing in the present appeal, the *Campbell* opinion was vacated by the Ninth Circuit Court of Appeals' decision to order an en banc rehearing of the appeal. (*Campbell v. Rice* (9th Cir. 2004) 386 F.3d 1258.) The court's subsequent en banc decision declined to determine whether error occurred, instead concluding that the California Court of Appeal was not unreasonable in holding that any error resulting from the defendant's absence while the trial court and counsel discussed a possible conflict of interest was harmless. (*Campbell v. Rice* (9th Cir. 2005) 408 F.3d 1166, 1172–1173 (en banc).) Even to the extent the three-judge opinion might carry some persuasive value, however, the *Campbell* case is factually distinguishable. In the present case, no final decisions were made during the meetings in question, and the information possessed by the court and defense counsel and their contemplated course of action subsequently were conveyed to defendant (and the prosecutor) in the closed court sessions before any course of action was determined. (Cf. *Campbell, supra,* 302 F.3d at p. 899 ["the in-chambers hearing held *to determine* whether Campbell's right to conflict-free counsel had been violated must have been a critical stage of the criminal proceedings" (italics added)].)

There is no indication in the case before us that defendant's presence during the preliminary meetings held between the court and defense counsel was necessary to ensure the fairness of the proceedings or that defendant's absence in any way affected his defense. Indeed, the record reflects that defendant was present during the several discussions that subsequently took place concerning the subjects of the alleged misconduct and Smith's possible conflict of interest, and never sought to add his personal input into the decisionmaking process. Accordingly, defendant's constitutional right to be present was not violated by his absence at the earlier meetings.

■■■ Turning to defendant's statutory claims, we have long held that the presence requirement under sections 977 and 1043 is similar to that of the constitutional provisions: under the statutes, a defendant " ' "is not entitled to be personally present during proceedings which bear no reasonable, substantial relation to his opportunity to defend the charges against him . . . . [Citation.]" [Citation.]' [Citations.]" (*Rogers, supra,* 39 Cal.4th at p. 855; see also *People v. Kelly* (2007) 42 Cal.4th 763, 781–782 [68 Cal.Rptr.3d 531, 171 P.3d 548]; *People v. Ervin* (2000) 22 Cal.4th 48, 74 [91 Cal.Rptr.2d 623, 990 P.2d 506]; *People v. Bradford* (1997) 15 Cal.4th 1229, 1357 [65

Cal.Rptr.2d 145, 939 P.2d 259]; *People v. Beardslee* (1991) 53 Cal.3d 68, 103 [279 Cal.Rptr. 276, 806 P.2d 1311]; *People v. Jackson* (1980) 28 Cal.3d 264, 309 [168 Cal.Rptr. 603, 618 P.2d 149].) Therefore, essentially for the same reasons we have articulated above in finding that defendant's constitutional right to be present was not violated, we conclude he has not established a violation of the statutes—his personal presence at the in camera hearings did not bear a reasonable, substantial relation to his opportunity to defend the charges against him. Even to the extent that defendant contends the statutory requirement is broader than the constitutional right to be personally present, there is no reasonable probability that a result more favorable to defendant would have been reached had he been personally present at the in camera discussions. Accordingly, any error would in no sense be prejudicial under *Watson, supra,* 46 Cal.2d at page 836. (See *Weaver, supra,* 26 Cal.4th at p. 968.)

### E. *Penalty Phase Claims*

#### 1. *Defendant's Competency to Proceed with the Penalty Phase*

As mentioned above, during a noon recess in the presentation of the prosecution's opening statement at the penalty phase of the trial, defendant told court staff he did not wish to be present for the remainder of the trial. The trial court subsequently mentioned this on the record outside the presence of the jury, and a second recess was taken to allow defendant to discuss this matter with his counsel. After this recess, the court held an in camera meeting with defense counsel, at which counsel requested the court to adjourn for the day to allow more discussions with defendant. During this meeting, counsel stated their belief that defendant was "totally irrational and is not making a rational judgment as to whether or not he should absent himself from these proceedings and does not . . . have a reasoned understanding of the effects that decision may have on him." The defense attorneys stated they believed they "had better declare a doubt," but suggested that before the court did "anything that radical," the court might consider adjourning for the remainder of the day and then seeing whether defendant "gets back in his chair by tomorrow morning." Resuming proceedings in open court, the court adjourned the case until the following morning and advised defendant it was concerned that his decision be made in a careful, rational, calm, and reflective manner. The court mentioned to defendant that his absence during the penalty phase was likely to "make it worse" for himself. Defense counsel were directed to "report" to the court by 8:30 a.m. the next day, at which point the prosecution and the jurors would be notified as to when the proceedings would resume.

The following morning, on the record and outside the presence of the jury, the trial court "confirm[ed] for the record that at present there is no request

from Mr. Rundle at this time to be absent." Defense counsel agreed that was correct. The trial then proceeded with defendant present.

Defendant now contends that the trial court should have conducted a competency hearing based upon counsel's representation that defendant was "totally irrational" in his initial desire to absent himself from the penalty phase proceedings, and that the court's failure to do so violated defendant's various constitutional and statutory rights. This claim is without merit.

■■■ It is true that an incompetent defendant—one who, because of a mental disorder or developmental disability, lacks an understanding of the nature of the proceedings and is unable to assist his attorneys rationally in conducting the defense—may not be subjected to trial, and that a trial court faced at any point in a trial with a "bona fide doubt" based upon substantial evidence whether a defendant is competent must conduct an adequate investigation into the defendant's ability to proceed. (§§ 1367, subd. (a), 1368, subd. (a); *Pate v. Robinson* (1966) 383 U.S. 375, 385 [15 L.Ed.2d 815, 86 S.Ct. 836]; *People v. Welch* (1999) 20 Cal.4th 701, 738 [85 Cal.Rptr.2d 203, 976 P.2d 754].) It also is clear from the record that defendant's "irrational" behavior was an emotional reaction to the stress of the penalty phase of the trial, reflecting a difference of opinion between defendant and his attorneys concerning the strategic decision whether defendant should absent himself from further proceedings. There was no evidence, let alone substantial evidence, that defendant's behavior was caused by a mental disorder that prevented him from understanding the proceedings or assisting his attorneys in a rational manner. Defendant had behaved rationally throughout the pretrial and guilt phases of the trial and had testified, in a completely rational manner, in his own defense. Despite his attorneys' gratuitous remark to the trial court that they thought they "had better declare a doubt," counsel's description of defendant's state of mind was not that he was mentally incompetent, but that he was very emotional and "adamant" in his decision not to be present despite counsel's best arguments to the contrary. Indeed, counsel stated defendant was "having an extreme anxiety attack right now," and might benefit from some tranquilizing medication. Defense counsel never stated they did not believe the trial could proceed, nor did they directly ask the trial court to explore the issue of defendant's mental competency. The court appropriately adjourned the proceedings for the day in an attempt to permit defendant's emotional stress to dissipate, which it apparently did, as there were no further difficulties the next morning and defendant's counsel thereafter expressed no "doubt" regarding defendant's behavior. Accordingly, there was no statutory or constitutional error in the decision not to conduct a more searching inquiry on this matter. (Cf. *Frye, supra,* 18 Cal.4th at p. 1005 ["An angry and emotional reaction to a verdict of guilt does not indicate an inability to understand the nature of the criminal proceedings, or to rationally assist counsel."].)

### 2. *Assertedly Erroneous Evidentiary Rulings*

#### a. *Admission of Testimony of Defendant's Ex-wife*

Defendant raises several challenges to the admission of his ex-wife's testimony that he repeatedly forced her to engage in sodomy and oral copulation against her will and physically assaulted her on other occasions, as evidence of other violent offenses under section 190.3, factor (b) (factor (b)). None of these challenges is subject to appellate review, however. The sole challenge by the defense to the admission of this evidence at trial was that the testimony did not establish the sexual acts were performed against her will, because she continued in the marriage and engaged in other consensual sexual activities with defendant. Even if these contentions had not been forfeited, we would conclude they are without merit.

Defendant contends the admission of evidence concerning the physical assaults was erroneous because the statute of limitations for the prosecution of charges of assault and battery had run before the commencement of trial in this matter. We repeatedly have rejected such claims, as defendant acknowledges, and see no reason to reconsider our decisions. (See, e.g., *Huggins*, *supra*, 38 Cal.4th at p. 246.)

Next, defendant contends the trial court erred by not excluding the evidence of his sexual assaults upon his ex-wife under section 352 of the Evidence Code. Contrary to defendant's assertion on appeal, his attorneys asked only for a hearing on the admissibility of her testimony in general, and never objected to the admission of her testimony on the ground that under this statute its probative value was substantially outweighed by the likelihood of its causing undue prejudice. Nor did counsel raise such an objection after defendant's ex-wife testified at the ensuing hearing held outside the presence of the jury, and the trial court therefore never had occasion to weigh the probative value and potential for undue prejudice. Defendant has forfeited any claim that the trial court abused its discretion in this regard. (Evid. Code, § 353; *People v. Anderson* (2001) 25 Cal.4th 543, 586 [106 Cal.Rptr.2d 575, 22 P.3d 347] (*Anderson*).)

Defendant also claims his ex-wife's testimony was so unreliable as to render the jury's penalty determination constitutionally defective. Although, as defendant observes, the prosecution presented no corroboration of her accusations, the asserted untrustworthiness of this testimony goes to its credibility, an issue that was for the jury to determine.[51] The claimed lack of

---

[51] The trial court's subsequent statement (during its ruling on the motion to modify the verdict) of its view that the testimony regarding the sexual assaults was not convincing is

reliability did not deny defendant his constitutional right to a reliable penalty determination. (*Anderson, supra*, 25 Cal.4th at p. 587.)

Defendant next contends that instructions given by the court, in the course of explaining factor (b), unconstitutionally diluted the reasonable doubt standard applicable to these sexual offenses. This contention is without merit. The trial court properly directed the jury at the beginning of the factor (b) instructions to consider this evidence "only if it is established by proof beyond a reasonable doubt that the Defendant committed such criminal acts." The challenged instruction, which followed the trial court's instructions concerning the elements of the factor (b) offenses of assault likely to cause great bodily injury and battery, informed the jury that "[w]ith respect to any act of violence, other than one involving a crime of a sexual nature testified to by [defendant's ex-wife], you may consider such evidence as a circumstance in aggravation only if the elements of one of the specific offenses which I have just described to you have been proven." This instruction simply defined for the jury, if it found them to have occurred, defendant's assaultive acts (such as throwing his ex-wife to the ground and hitting her head against the floor) as either an assault likely to cause great bodily injury or a battery, but told them that other potential offenses might have been committed by defendant in the course of his alleged forcible sexual conduct. The instruction did not dilute the previously given controlling instruction that all of the factor (b) crimes had to be proved beyond a reasonable doubt before the jury could consider the testimony as evidence in aggravation.

Defendant raises two final, related challenges to this testimony, primarily concerning the circumstance that his ex-wife testified in a general manner to a nonspecific series of acts occurring over a period of several months, without providing exact dates upon which specific acts of forcible sodomy or oral copulation occurred. Defendant contends admission of this "generic testimony" unconstitutionally deprived him of notice of the allegations and the opportunity to present a defense, and constituted insufficient evidence of the offenses to allow the jury to consider this testimony under factor (b). We disagree.

█ We previously have addressed similar challenges raised in cases in which the defendant was charged with child molestation and the alleged child victim testified to a series of acts occurring over a period of time without providing specific details regarding the exact dates of particular acts. (See *People v. Jones* (1990) 51 Cal.3d 294, 314–316 [270 Cal.Rptr. 611, 792 P.2d 643] (*Jones*) [approving the use of generic testimony in such circumstances if certain requirements are satisfied].) As defendant recognizes, there is a

---

beside the point. That the trial court stated it was not convinced by the ex-wife's testimony is not a finding that no rational juror could have found the testimony credible.

fundamental difference between *Jones* and the present case: although *Jones* involved the admissibility of such evidence to prove substantive criminal charges, the evidence here at issue was introduced at the penalty phase of the trial as evidence in aggravation. "[T]he penalty phase of trial [is not] the equivalent of a criminal prosecution for purposes of due process . . . analysis. Evidence of prior unadjudicated violent conduct is admitted not to impose punishment for that conduct, but rather, in part, to give the jury in the capital case 'a true picture of the defendant's history since there is no temporal limitation on evidence in mitigation offered by the defendant.' [Citation.] As this court noted in *People v. Balderas* [(1985)] 41 Cal.3d 144, 205, footnote 32 [222 Cal.Rptr. 184, 711 P.2d 480], the 'penalty phase is unique, intended to place before the sentencer all evidence properly bearing on its decision under the Constitution and statutes.' " (*People v. Stanley* (1995) 10 Cal.4th 764, 822–823 [42 Cal.Rptr.2d 543, 897 P.2d 481].) We agree with defendant that *Jones* and cases like it, concerning substantive charges, are distinguishable with respect to our analysis of the issue of "generic testimony" introduced at the penalty phase of a capital trial. This distinction does not, however, lead us to conclude that the admission of generic factor (b) testimony at the penalty phase of defendant's trial was improper.

█ We instead shall apply to defendant's claim the general principles we previously have enunciated concerning similar due process challenges to the admission of factor (b) evidence. "In *People v. Rodrigues* (1994) 8 Cal.4th 1060 [36 Cal.Rptr.2d 235, 885 P.2d 1], we concluded that the admission of violent criminal conduct occurring many years before the penalty trial is not necessarily inconsistent with a defendant's rights to due process, a speedy trial and a reliable penalty determination. We reasoned that 'the state has a legitimate interest in allowing a jury to weigh and consider a defendant's prior criminal conduct in determining the appropriate penalty, so long as reasonable steps are taken to assure a fair and impartial penalty trial.' [Citation.] We identified those 'reasonable steps' as including notice of the evidence to be introduced, the opportunity to confront the available witnesses, and the requirement of proof beyond a reasonable doubt. When these steps have been taken, we concluded, the remoteness of the offense affects its weight, not its admissibility. [Citation.]" (*People v. Yeoman* (2003) 31 Cal.4th 93, 136–137 [2 Cal.Rptr.3d 186, 72 P.3d 1166]; see also *Anderson, supra,* 25 Cal.4th at pp. 585–586; *Kraft, supra,* 23 Cal.4th at pp. 1070–1071.)

█ We further emphasize that, unlike a criminal charging document, which must allege with sufficient specificity particular *offenses* (§ 952), the notice required under factor (b) is notification of the *evidence* to be introduced (§ 190.3). Notice of factor (b) evidence "is sufficient if the defendant has a reasonable opportunity to respond." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1051 [47 Cal.Rptr.3d 467, 140 P.3d 775] (*Lewis and Oliver*).) Furthermore, we observe that, unlike what must be established with regard to

substantive criminal charges, there is no requirement that a capital sentencing jury unanimously find the existence of a violent criminal offense to be proved beyond a reasonable doubt before an individual juror may consider such evidence in aggravation under factor (b). (*People v. Griffin, supra,* 33 Cal.4th 536, 585.)

 For these reasons, our review of whether factor (b) evidence properly was admitted and considered by the jury is quite different from our review of the sufficiency of the evidence presented to support a criminal conviction.[52] It long has been the rule under both the federal and state Constitutions that in resolving a due process challenge such as that made by defendant, we must balance the competing interests at issue—on the one hand, the defendant's interest in having a fair opportunity to respond to the accusations and ensuring the reliability of the evidence offered against him, with, on the other hand, the state's interest in presenting the sentencing jury with a complete picture of the defendant's character. (*Mathews v. Eldridge* (1976) 424 U.S. 319, 335 [47 L.Ed.2d 18, 96 S.Ct. 893]; *People v. Ramirez* (1979) 25 Cal.3d 260, 269 [158 Cal.Rptr. 316, 599 P.2d 622].) We believe that adherence to the "reasonable steps" mentioned above with regard to the admission of "generic" factor (b) testimony—keeping in mind the goal of achieving a fair, reliable, and complete penalty proceeding—ensures a defendant due process. If those reasonable steps have been undertaken, the nonspecific nature of the testimony will affect its weight rather than its admissibility or the constitutionality of defendant's trial.

In this case defendant received notice of the evidence to be introduced, through the prosecution's filing of a written notice of intent to offer evidence of defendant's sexual and physical assaults upon his ex-wife, as well as the sworn statement she made to the prosecution (which was provided to the defense before trial) and her testimony at the hearing held to determine the admissibility of the statement. Defendant had the opportunity to confront the available witness (his ex-wife) at trial, and the jury was instructed that before it could consider such evidence in aggravation, it must find beyond a reasonable doubt that defendant committed any violent offense against his ex-wife. Other than unsupported allegations, defendant makes no showing how the "generic" nature of this testimony denied him the opportunity to respond. (Cf. *Jones, supra,* 51 Cal.3d at pp. 319–320 [observing it is unlikely a defendant who had continuous access to a victim over a significant period of time would offer an alibi or misidentification defense, and a defendant can

---

[52] Similarly, we observe that, unlike cases involving a conviction based upon insufficient evidence resulting in a " 'legally inadequate theory,' " in which automatic reversal of the conviction generally is required (*People v. Guiton* (1993) 4 Cal.4th 1116, 1128 [17 Cal.Rptr.2d 365, 847 P.2d 45]), any error regarding the admission of factor (b) evidence is subject to harmless-error review in light of other properly admitted aggravating evidence. (See, e.g., *People v. Medina* (1995) 11 Cal.4th 694, 768 [47 Cal.Rptr.2d 165, 906 P.2d 2].)

respond to the generic testimony of a victim by choosing to testify or by attacking the victim's credibility in other ways].)

Indeed, the response made by defendant to his ex-wife's testimony apparently was sufficiently effective to cause at least the trial court to entertain doubts about her veracity. Regardless of the trial court's view of the evidence, and keeping in mind the objective of presenting the jury with a view of defendant's character as complete as possible, we cannot conclude, as a matter of law, that the testimony was insufficient to enable any rational juror to find beyond a reasonable doubt that defendant committed a violent offense against his ex-wife. The absence of testimony associating particular acts with specific dates may have affected the weight of the evidence, but did not render the testimony so unreliable that as a matter of constitutional due process the jury should not have been permitted to consider it as potential evidence in aggravation.

b. *Admission of Evidence of Defendant's Juvenile Misconduct*

Defendant contends evidence of his sexual assaults upon Rebecca Y., Brian M., and Cori H., should not have been admitted because defendant was a juvenile at the time of the incidents, and thus his actions were the "impetuous and ill-considered" product of his youth and immaturity and the admission of this evidence violated his constitutional rights to due process and a reliable verdict. This claim was not raised at trial and therefore is forfeited. (*People v. Pinholster* (1992) 1 Cal.4th 865, 959–960 [4 Cal.Rptr.2d 765, 824 P.2d 571].) In any event, defendant's characterization of this evidence was a proper subject for argument to the jury concerning the weight it should be accorded, but does not establish that the jury's consideration of his juvenile adjudications was constitutional error. Moreover, as defendant observes, we have rejected several similar statutory and constitutional challenges to the admission of juvenile adjudications as evidence in aggravation. (See *People v. Lucky* (1988) 45 Cal.3d 259, 295 [247 Cal.Rptr. 1, 753 P.2d 1052]; *People v. Burton* (1989) 48 Cal.3d 843, 862 [258 Cal.Rptr. 184, 771 P.2d 1270]; *Raley, supra,* 2 Cal.4th at pp. 909–910; *People v. Lewis* (2001) 26 Cal.4th 334, 376–380 [110 Cal.Rptr.2d 272, 28 P.3d 34].)

c. *Admission of Evidence of the Lactawen Murder*

Prior to trial, defendant filed an in limine motion to exclude evidence of the Lactawen murder from the penalty phase or, in the alternative, to compel joinder of all three murder cases into one trial and to change

the venue of the trial of the consolidated charges to Sacramento County.[53] Defendant contends denial of this motion and the subsequent admission of the Lactawen evidence was error and denied him his constitutional rights to confront the witnesses against him, to present a defense, and to be accorded due process and a reliable penalty verdict. Like the defendant in *People v. Avena* (1996) 13 Cal.4th 394, 429 [53 Cal.Rptr.2d 301, 916 P.2d 1000], defendant here essentially argues that "because no trier of fact had decided his guilt of the [Lactawen] murder beyond a reasonable doubt when evidence of that offense was admitted, he was placed in the untenable position of either (i) testifying and denying the crime, whereupon he would lose the privilege against compelled self-incrimination for a future trial in the [Lactawen] matter, or (ii) remaining silent, thereby leaving the evidence of his guilt unrebutted." Accordingly, defendant asserts that out of fear of incriminating himself at a future trial, he was coerced into forgoing the opportunity to present mitigating evidence (or at least to controvert aggravating evidence) at the penalty phase. (*Ibid.*) As in *Avena*, we reject this contention because a defendant's being compelled to make such a choice does not violate his or her constitutional rights. (*Ibid.*)[54]

### d. *Exclusion of Evidence Regarding Sentence of Life Imprisonment Without the Possibility of Parole*

■ Defendant sought to admit the testimony of an employee of the California Department of Corrections concerning the conditions of prison confinement such as the size of cells, the restrictions upon prisoners' activities, the lack of privacy, the treatment of sexual offenders by other inmates, and the availability of prison programs for defendant's benefit. The trial court denied the request, based upon our decision in *People v. Thompson* (1988) 45 Cal.3d 86, 138–139 [246 Cal.Rptr. 245, 753 P.2d 37]. Defendant contends the exclusion of this evidence was error under section 190.3 and in various ways violated his due process and Eighth Amendment rights. "Evidence concerning the rigors of confinement has no bearing on the character or background of the individual offender or the circumstances of the capital offense. It is therefore irrelevant and inadmissible under section 190.3, factor (k)."

---

[53] At the time the motion was filed, no charges had been filed relating to the Lactawen killing.

[54] Defendant also argues that the prosecutor's comment during closing argument upon the lack of any defense evidence rebutting the proof that defendant murdered and raped Lactawen, somehow rendered the trial court's admission of the evidence constitutional error. He is mistaken. The trial court, in response to defense counsel's objection that this comment was "*Griffin* error," admonished the jury that the burden of proof as to the factor (b) other-offenses evidence remained upon the prosecution, and that defendant bore no burden in that regard. Contrary to defendant's assertion, the prosecutor's comment did not somehow relate back to the decision to admit the Lactawen evidence in the first instance. The comment, to the extent it may have been improper, is a matter wholly separate from the admission of this evidence. We discuss in part II.E.4.g., *post*, whether the prosecutor's remark constituted "*Griffin* error."

(*People v. Ray* (1996) 13 Cal.4th 313, 352–353 [52 Cal.Rptr.2d 296, 914 P.2d 846] (*Ray*); see also *Thompson, supra,* 45 Cal.3d at p. 139 ["Describing future conditions of confinement for a person serving life without possibility of parole involves speculation as to what future officials in another branch of government will or will not do."].) "Moreover, even under the Eighth Amendment to the federal Constitution, the trial court retains the authority to exclude irrelevant evidence in the first instance. (See *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604, fn. 12 [57 L.Ed.2d 973, 98 S.Ct. 2954].)" (*Frye, supra,* 18 Cal.4th at p. 947, fn. 1; see also *DeSantis, supra,* 2 Cal.4th at pp. 1249–1250.) There was no statutory error or violation of defendant's constitutional rights in the exclusion of the proffered evidence.

### 3. *Asserted Instructional Errors*

#### a. *Failure to Define Sentence of Life Imprisonment Without the Possibility of Parole*

██ Defendant contends the trial court erred by failing to instruct the jury on its own motion concerning the meaning of a sentence of life imprisonment without the possibility of parole, and thereby caused "an unfair, capricious and unreliable penalty determination and prevented the jury from giving effect to the mitigating evidence presented at the penalty phase in violation of the Sixth, Eighth and Fourteenth Amendments." Defendant's reliance upon *Simmons v. South Carolina* (1994) 512 U.S. 154 [129 L.Ed.2d 133, 114 S.Ct. 2187] and other United States Supreme Court cases arising from the State of South Carolina is misplaced. As we previously have explained, juries in California specifically are instructed in capital cases that the choice of penalty is between a sentence of death and one of life imprisonment without the possibility of parole, and not merely life imprisonment—as the juries were instructed in *Simmons* and similar cases. (*People v. Smith* (2003) 30 Cal.4th 581, 635–636 [134 Cal.Rptr.2d 1, 68 P.3d 302] (*Smith*).) There was no error.

#### b. *Failure to Instruct Regarding the Presumption of Innocence and to Define Reasonable Doubt Regarding Other-crimes Evidence*

Defendant contends the trial court erred by failing to reinstruct the jury at the penalty phase that he was presumed to be innocent of the factor (b) other-crimes evidence until his guilt of those offenses was proved beyond a reasonable doubt, and by failing to redefine the term "reasonable doubt." Defendant did not preserve this challenge by raising it in the trial court, and thus has forfeited it. It also is meritless, because the court informed the jury that the guilt phase instructions applied during the penalty phase except when

the court's penalty phase instructions differed, and the jury was provided with a copy of the written guilt phase instructions, which discussed the presumption of innocence and the meaning of reasonable doubt. The trial court also specifically instructed the jury concerning defendant's right not to testify during the penalty phase and instead to rely upon the failure of the prosecution to carry its burden of proof, further informing it that the factor (b) evidence was to be considered by the jury only if it found the crimes had been proved beyond a reasonable doubt. Additional instructions could have emphasized this, but were not required.

### c. Failure to Instruct Regarding Which Guilt Phase Instructions Applied at the Penalty Phase

Defendant contends the trial court erred by not rereading all of the still-applicable guilt phase instructions at the penalty phase, or at least informing the jury which specific instructions remained applicable. Defendant did not raise this claim below and therefore has forfeited it. If we were to reach the merits of defendant's claim, we would conclude there was no error in the trial court's instruction as to the general continued applicability of guilt phase instructions subject to specific exceptions. (*Lewis and Oliver, supra*, 39 Cal.4th at p. 1067; *People v. Hawthorne* (1992) 4 Cal.4th 43, 73–74 [14 Cal.Rptr.2d 133, 841 P.2d 118].)

We agree with defendant, however, that two limiting instructions given at the guilt phase were inapplicable at the penalty phase and should not have been included in the written instruction packet provided to the jury: a modified version of CALJIC No. 1.00, which in part instructed the jury to "reach a just verdict regardless of the consequences," and a modified version of CALJIC No. 3.32, which in part instructed the jury it could consider evidence of defendant's mental condition "solely for the purpose of determining whether or not the defendant actually formed any intent or mental state which is an element of the crimes charged."[55] The trial court's error in failing to delete these instructions, however, was harmless under any standard.

---

[55] We shall assume for the sake of argument that defendant contends the inclusion of these instructions at the penalty phase constituted incorrect statements of the law regarding the jury's role at that phase of the trial and, therefore, that defendant did not forfeit these claims despite his failure to object at trial. (See *Hudson, supra*, 38 Cal.4th at p. 1012 [the general rule of forfeiture "does not apply when . . . the trial court gives an instruction that is an incorrect statement of the law"].)

Despite the inclusion of CALJIC No. 1.00 in the packet of written instructions, as other instructions and counsel's arguments made clear, the jury's role at the penalty phase was so obviously contrary to this part of the instruction that no reasonable juror possibly could have been confused by the inclusion of the written instruction not to consider the consequences of the verdict, an instruction that was not given orally to the jury at the penalty phase. (*People v. Hayes* (1990) 52 Cal.3d 577, 644 [276 Cal.Rptr. 874, 802 P.2d 376]; *People v. Howard* (1988) 44 Cal.3d 375, 443 [243 Cal.Rptr. 842, 749 P.2d 279].)

Similarly, with regard to the erroneous inclusion of CALJIC No. 3.32, the trial court, consistent with CALJIC No. 8.85, orally instructed the jury that during the penalty phase, "[i]n determining which aggravating and mitigating factors are to be applied and in deciding which penalty is to be imposed on the Defendant, you are to consider all of the evidence which has been received during both the guilt and penalty phases of the trial, except as you might be specifically instructed. [¶] Your consideration of that evidence and your deliberations are to be in accordance with these instructions and the instructions which I have previously given you with certain specific exceptions that I will note for you in these instructions." The court then told the jury it was to consider in mitigation "any aspect of the crimes or of the Defendant's character, background and record that suggests that death is not the appropriate punishment," "any sympathetic or other aspect of the Defendant's conduct or record, and any sympathetic aspect of his character, upbringing and childhood circumstance that the Defendant offers as a basis for a sentence less than death, whether or not related to the offenses for which he's been convicted" and, even more specifically, "[w]hether the Defendant was subjected to sexual or other abuse as a child and whether such abuse contributed to his criminal conduct." This modified version of CALJIC No. 8.85 also was provided to the jury in written form. The arguments of defense counsel and the prosecutor further explained that defendant's asserted mental condition could be considered in mitigation. Accordingly, the clear import of the instructions as a whole, in conjunction with counsel's arguments, was that such evidence could be considered as mitigating evidence, beyond the limitation of its use at the guilt phase.

### d. Failure to Clarify Instruction Under Section 190.3, Factor (d), Regarding Mental Disturbance

Defendant contends the trial court erred by not instructing the jury it could consider in mitigation evidence of defendant's mental or emotional disturbance at the time of the crimes "regardless of whether there was a reasonable explanation or excuse for such disturbance." He did not preserve an objection to the trial court's instruction on this mitigating factor and therefore has

forfeited this claim. (*Hudson, supra,* 38 Cal.4th at pp. 1011–1012.) In any event, there is no likelihood that the instruction as given, which modified the standard instruction to indicate that the jury could consider mental or emotional disturbance even if it was not a defense to the substantive charges, would have confused the jury or prevented it from considering the evidence offered by the defense in mitigation.

### e. *Asserted Unconstitutionality of CALJIC No. 8.88*

Defendant raises several challenges to CALJIC No. 8.88, which described for the jury the general process by which it was to reach its penalty verdict. To the extent defendant contends the instruction was an incorrect statement of the law, this claim is not forfeited despite his failure to challenge the instruction below, and we shall therefore assume this claim is preserved. (See *Hudson, supra,* 38 Cal.4th at p. 1012.) These challenges, however, are without merit, as we previously have held. (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 123–124 [17 Cal.Rptr.3d 710, 96 P.3d 30] [the use of terms "so substantial" and "warrants" in the instruction is not unconstitutionally vague or misleading; the instruction does not fail adequately to inform the jury that the death penalty may be imposed only if aggravating factors outweigh mitigating factors or that a sentence of life imprisonment without possibility of parole is required if evidence in mitigation outweighs evidence in aggravation; the jury need not be informed that it may impose life imprisonment without possibility of parole even if evidence in aggravation outweighs evidence in mitigation].)

### 4. *Asserted Prosecutorial Misconduct*

A prosecutor commits reversible misconduct under California law if he or she makes use of "deceptive or reprehensible methods" in attempting to persuade either the trial court or the jury, and there is a reasonable possibility that without such misconduct, an outcome more favorable to the defendant would have resulted. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1019 [108 Cal.Rptr.2d 291, 25 P.3d 519].) Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights—such as the denial that ensues from a comment upon the defendant's invocation of the right to remain silent—but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " (*Darden, supra,* 477 U.S. at p. 181, quoting *DeChristoforo, supra,* 416 U.S. at p. 643.)

Defendant first claims that the alleged prosecutorial misconduct at the guilt phase carried over to the penalty phase, making that part of the trial unfair and unreliable as well. We have concluded that there is no merit in any of defendant's claims of guilt phase misconduct, even assuming they properly were preserved and can be raised on appeal. We therefore reject defendant's claim that the penalty phase was tainted by earlier misconduct.

### a. *Reading of Transcripts During Opening Statement*

Defendant contends the prosecutor committed misconduct by reading extensively, during his opening statement at the penalty phase, from the transcript of defendant's interviews with the officers concerning the Lactawen murder. This claim lacks merit because the reading of the transcripts was not deceptive, reprehensible, or otherwise improper.

### b. *Argument That Death Penalty Was Required*

Defendant takes issue with a preliminary statement in the prosecutor's closing argument, that "[i]t is no secret that I am going to be asking you based solely on this evidence and the law in this case and everything you have heard concerning this case over the last, oh, approximately two to three months since the first witness was called, that I believe this evidence, this evidence alone, requires the maximum punishment allowed by California law." Defendant contends this was an inaccurate statement of the law and also minimized the jury's role in determining the penalty, because "a death verdict is never required or preordained by the state of the evidence." This claim, like the majority of the following claims of misconduct, has not been preserved for appellate review due to defendant's failure to object and request an admonition. In any event, there was no misconduct, because the comment, viewed in context, was simply proper argument by the prosecutor concerning his view of the state of the evidence. (*People v. Mayfield, supra,* 14 Cal.4th at p. 804 ["it is not misconduct for a prosecutor in the penalty phase of a capital case to express in argument a personal opinion that death is the appropriate punishment, provided the opinion is grounded in the facts in evidence"].)

### c. *Argument Assertedly Minimizing Jurors' Sense of Responsibility*

Defendant contends the prosecutor engaged in misconduct by urging the jurors not to "feel guilty about making this kind of decision, [or be] afraid to make the hard decision you have to make," and by observing that "hundreds of juries" previously have made penalty decisions. Even if it had not been forfeited by defense counsel's failure to object, this claim is without merit, because the statements, taken in context, simply admonished the jury to

follow the law in its deliberations and in no way minimized the "hard decision" faced by the jury.

### d. *Comment upon Defendant's Absence During His Mother's Testimony*

Defendant contends, again for the first time on appeal, that the prosecutor's comment upon defendant's decision to absent himself during his mother's testimony, as proof that defendant's own guilt phase testimony was false, constituted (1) an improper comment upon defendant's exercise of his constitutional rights, (2) an improper suggestion that the jury should consider this circumstance as an aggravating factor in the penalty determination, and (3) unfair exploitation of the trial court's decision to exclude evidence concerning the molestation of defendant's mother by her father.[56] No misconduct occurred. Concerning the second and third claims, the prosecutor's comment constituted proper rebuttal to the character evidence presented by the defense in mitigation, and not a suggestion that this was an aggravating factor (*People v. Mayfield, supra,* 14 Cal.4th at p. 804, fn. 15), and, as discussed *ante,* in part II.C.1.c., because the evidence of molestation allegedly committed by defendant's grandfather properly was excluded, the prosecutor's comment did not take unfair advantage of the court's ruling.

The prosecutor's remark also did not improperly penalize any assertion by defendant of his constitutional rights. No error based upon *Griffin v. California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229] (*Griffin*) occurred, because the prosecutor's comment was directed to defendant's *waiver* of his constitutional right to be present, not the *assertion* of some constitutional right, such as the right to remain silent at issue in *Griffin.* (Cf. *Griffin, supra,* 380 U.S. at p. 614 [The practice of allowing comment upon the defendant's failure to testify "is a penalty imposed by courts for exercising a constitutional privilege. It cuts down on the privilege by making its assertion costly."].) Simply, there is no constitutional right to be voluntarily absent during trial. (*Frye, supra,* 18 Cal.4th at p. 1011 ["[T]hese qualifications to the right to be present [namely, waiver and removal for disruption] do not confer an affirmative right to be *absent* from trial. Nor are we aware of any decision recognizing a concomitant right of the defendant not to be present or to otherwise avoid being confronted with the witnesses against him."].)

Moreover, this is not a situation such as was present in *Doyle v. Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240], where the defendant was

---

[56] The prosecutor stated: "Here is a person who blames, essentially, his mother and says the most ridiculous assertions of what his mother did to him as he grew up; and I would suggest to you he lied extensively about what his mother may have done to him, and then didn't have the guts in this courtroom to sit here while his lawyers questioned her about having sexual intercourse with him, because he couldn't look her in the eyes with those ridiculous lies."

misled concerning the possible effect of his choice to be absent. In the present case, defendant was, in fact, advised several times that voluntarily absenting himself likely would be detrimental to his defense, and he acknowledged he realized this before he was allowed to waive his presence. Nor was defendant faced with the Hobson's choice of having to relinquish one constitutional right in order to preserve another. (See *Simmons v. United States* (1968) 390 U.S. 377, 394 [19 L.Ed.2d 1247, 88 S.Ct. 967].)

■■■ The circumstance that, as we observed above, it was statutory error for the trial court to allow defendant to voluntarily absent himself during his mother's testimony does not render the prosecutor's comment upon his absence misconduct. (Cf. *Visciotti, supra,* 2 Cal.4th at p. 82 ["Regardless of whether an appellate court may later conclude that a piece of evidence was erroneously admitted, argument directed to the evidence does not become misconduct by hindsight."].)

### e. *Asserted Exploitation of Exclusion of List from Sorensen's Address Book*

As he did in his guilt phase prosecutorial misconduct claims, discussed *ante,* in part II.C.6.f., defendant asserts that the prosecutor committed misconduct in the penalty phase argument by taking unfair advantage of the exclusion of the list of names in Sorensen's address book. In light of the lack of objection at trial, this claim has not been preserved for appeal. Moreover, as discussed above, because this evidence properly was excluded, the prosecutor took no unfair advantage.

### f. *Argument Assertedly Calling for the Jury to Speculate Regarding the Circumstances of the Murders*

■■■ Echoing another guilt phase misconduct claim, defendant contends the prosecutor engaged in misconduct at the penalty phase by suggesting to the jury it should consider evidence of the physical trauma to Lactawen in filling in the gaps in the evidence regarding the Garcia and Sorensen murders and the condition of their bodies immediately after defendant murdered them.[57] Defendant claims this argument improperly invited the jury to

---

[57] The prosecutor stated, "And I want you to imagine, if you can, when you are assessing the weight to give to the way Mr. Rundle killed and sexually tortured these women, try to consider the humiliation, terror and pain each of these women underwent at the hand of that man before he violently strangled them. . . . [¶] And I think that for you to really consider what Ms. Garcia and Ms. Sorensen went through at the hands of Mr. Rundle, that it will assist you—and I'm not asking you to do it, but if you think you need to—look again at Ms. Lactawen's pictures. She was found the same day. [¶] As I told you in my final argument a month or so ago, because the defendant was very clever in concealing these bodies, those photographs could not graphically show you what he did to Ms. Garcia and Ms. Sorensen. If

speculate, misstated the evidence, "violated the propensity rule" by arguing that all three murders were committed in the same manner, and improperly sought to inflame the passions of the jury. Defendant did not object or request an admonition, and therefore has forfeited this claim. In any event, no misconduct occurred. For the same reasons we stated *ante*, in part II.C.6.d., the argument challenged here fairly suggested inferences the jury properly could draw from the evidence presented at trial, especially in light of the striking similarities among the murders, and left for the jury the decision whether to accept or reject those suggestions. (See also *People v. Slaughter* (2002) 27 Cal.4th 1187, 1212 [120 Cal.Rptr.2d 477, 47 P.3d 262] [at the penalty phase, the prosecutor is permitted "to invite the jurors to put themselves in the place of the victims and imagine their suffering"]; *People v. Lewis* (2001) 25 Cal.4th 610, 672 [106 Cal.Rptr.2d 629, 22 P.3d 392] ["At the penalty phase of a capital trial, a prosecutor is permitted to argue any reasonable inferences from properly admitted evidence of a defendant's prior violent crime, even if such inferences relate to the defendant's character as revealed in the prior violent crime itself or in its surrounding circumstances."]; *Ray, supra*, 13 Cal.4th at pp. 349–350 [factor (b) permits the jury's consideration of "evidence of violent criminality committed at any time in the defendant's life, and whether or not adjudicated, to show his propensity for violence"]; *People v. Kelly* (1990) 51 Cal.3d 931, 964 [275 Cal.Rptr. 160, 800 P.2d 516] [photographs of victims properly were admitted at penalty phase when they supported the prosecution's theory of the crimes and were not "unduly gruesome"].)

> g. *Reference to the Absence of a Defense to the Lactawen Murder*

During his penalty phase argument, the prosecutor stated, with regard to the factor (b) evidence, "And we all know, you didn't see any defense to any of these crimes. We didn't see anything presented to rebut testimony about Ms. Lactawen's murder." When defendant objected to this statement as "*Griffin* error" (see *Griffin, supra*, 380 U.S. 609) the trial court reminded the jury that the burden to prove the factor (b) evidence rested upon the prosecution and that defendant bore no burden. Defendant contends on appeal that the prosecutor's comment violated defendant's constitutional right to choose not to testify, and that the trial court's admonition was insufficient to cure the alleged error. He is mistaken.

The People assert the prosecutor's comments properly emphasized the absence of evidence controverting the prosecution's evidence. (See *People v. Mitcham* (1992) 1 Cal.4th 1027, 1051 [5 Cal.Rptr.2d 230, 824 P.2d 1277].)

---

you want to get an inkling of the violence he performed on each of those women, take a look at Ms. Lactawen's photograph one more time if you think it is necessary."

Even if we were to assume otherwise, as urged by defendant—that the prosecutor's comment violated defendant's constitutional right to refrain from testifying, under *Griffin, supra,* 380 U.S. 609 (see *People v. Johnson* (1992) 3 Cal.4th 1183, 1229 [14 Cal.Rptr.2d 702, 842 P.2d 1] (*Johnson*)), because only his own testimony could have rebutted the evidence against him—we would conclude that any misconduct was harmless beyond a reasonable doubt. The prosecutor's statement was, at most, "an indirect, brief and mild reference to defendant's failure to testify as a witness." (*People v. Mincey, supra,* 2 Cal.4th at p. 446.) The prosecutor did not suggest that the jury should draw any additional inference of guilt from defendant's failure to testify beyond the inference of guilt established by the evidence that had been presented. "Such references have uniformly been held to be harmless error." (*Id.* at p. 447; see *People v. Hovey* (1988) 44 Cal.3d 543, 572 [244 Cal.Rptr. 121, 749 P.2d 776].) Moreover, the overwhelming proof that defendant committed the Lactawen murder, and the trial court's timely admonition to the jury regarding the burden of proof and its instruction that the jury could not draw any adverse inference from defendant's decision not to testify at the penalty phase, further ameliorated any possibility of harm. (*People v. Carter* (2005) 36 Cal.4th 1215, 1267 [32 Cal.Rptr.3d 838, 117 P.3d 544].) Accordingly, any misconduct would have been harmless beyond a reasonable doubt.

Defendant also contends the prosecutor's statement took unfair advantage of the denial of defendant's in limine motion to exclude the Lactawen murder evidence, because the prosecutor "place[d] appellant in an untenable position and subsequently argue[d] that the choice appellant was forced to make supported sentencing him to death." Even if defendant had not forfeited this claim by failing to raise it below, we would conclude that it fails because, as discussed above, any possible misconduct would have been harmless beyond a reasonable doubt.

> h. *Asserted Denigration of Defendant's Evidence in Mitigation*

Defendant claims the prosecutor engaged in misconduct by arguing "the entire defense in this case is to blame others," by calling the defense that had been presented "penalty phase madness," and by referring to defendant as a "snitch" in discussing his assistance to the authorities at the jail. In view of the lack of objection at trial, these challenges have been forfeited. They also lack merit. There was nothing deceptive or reprehensible about these comments, and they did not, individually or cumulatively, improperly denigrate defendant's evidence in mitigation.

i. *Asserted Suggestion That Lack of Evidence in Mitigation Was an Aggravating Circumstance*

■ Defendant contends the prosecutor's argument highlighted what the prosecutor viewed as a lack of evidence in mitigation and accordingly was an indirect invitation to the jury to find that the absence of such evidence constituted an aggravating factor. (See *People v. Davenport* (1985) 41 Cal.3d 247, 289–290 [221 Cal.Rptr. 794, 710 P.2d 861].) Defendant did not object or request an admonition in response to this argument and therefore has forfeited this challenge. In any event, the prosecutor never stated that the absence of a statutory mitigating factor amounted to an aggravating factor; to the contrary, he described such a circumstance as "neutral." There is nothing improper in arguing that mitigating factors are not present and that, by contrast, the facts of the crimes are aggravating factors under section 190.3, factor (a)—which is the argument made by the prosecutor in this case. (*Clark, supra,* 5 Cal.4th at pp. 1030–1031.)

j. *Argument That Personality Disorder Was Not a Mitigating Factor*

Defendant contends the prosecutor engaged in misconduct by arguing that the absence of psychosis in this case, as testified to by the expert witnesses, demonstrated that mitigating factors based upon defendant's mental state (§ 190.3 factors (d), (h)) were inapplicable. Defendant forfeited this claim by not objecting at trial, but in any event it is without merit. The challenged argument generally constituted permissible comment upon the state of the evidence and did not misstate the law, especially in light of the proper instructions given to the jury. It is true the prosecutor twice inaccurately described the experts' opinions concerning whether defendant suffered from a mental illness or defect.[58] The prosecutor's comments were brief, however, and the jury was instructed on various occasions during the trial that statements by the attorneys were not evidence. Moreover, the prosecutor did not argue simply that because there was no diagnosis of psychosis, these factors in mitigation were inapplicable. Rather he discussed at length defendant's "personality disorder" and ultimately argued the evidence was notmitigating. Finally,

---

[58] The prosecutor twice stated that all three experts agreed that defendant did not suffer from a disease or mental defect, whereas only one so testified, another described defendant's character disorder as a mental defect, and the third was not asked to give an opinion on this subject.

defense counsel did not argue that defendant suffered from a mental disease or defect, and, in fact, seemed to agree with the prosecutor's assessment of the experts' testimony.

### k. Argument Regarding the Role of Evidence in Mitigation

Defendant takes issue with the prosecutor's argument at various points that mitigation involved lessening defendant's "responsibility" and "culpability." Defendant argues this was misconduct because it misstated the law, in that the jury is to consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." (§ 190.3, factor (k).) Again, the lack of an objection and request for an admonition forfeited this claim. Moreover, we discern no misconduct. The prosecutor's isolated remarks regarding responsibility and culpability, even if erroneous, were not so significant as to overshadow the prosecutor's other correct statements of the definition of mitigation. The prosecutor in no way argued that the jury could not consider defendant's evidence in mitigation, and in fact he discussed essentially the entire defense case and often pointed out that it was for the jury to determine whether and to what degree particular evidence amounted to a mitigating factor. Any possible misconduct would be of minimal significance, and was rendered even less potentially harmful by defendant's penalty phase argument, which stressed the jury's ability to consider mercy and sympathy, and the trial court's proper instructions on the scope of the mitigating factors.

### l. Cumulative Impact of Asserted Penalty Phase Prosecutorial Misconduct

Finally, defendant summarizes the various claims of guilt and penalty phase misconduct discussed above, arguing pervasive misconduct occurred that cumulatively denied him his rights under the Eighth and Fourteenth Amendments to a fair and reliable penalty determination. He also argues this misconduct excuses his numerous failures below to object to the alleged instances of misconduct he has raised on appeal (see *Hill*, *supra*, 17 Cal.4th at p. 821), and that, beyond this, we should abolish the long-standing requirement that defendant object and request an admonition if doing so would not be futile.

As with his guilt phase claims, we decline defendant's invitation to eliminate the requirement that defendants afford trial courts an opportunity to remedy in the first instance any prosecutorial misconduct that may have occurred during trial. Furthermore, we have not found any misconduct in this case. Even in the few instances discussed above in which we have assumed

that misconduct may have occurred, we have concluded beyond a reasonable doubt that any misconduct would have been harmless. We therefore conclude there was no pervasive prosecutorial misconduct that excused defendant's failure to object and to request an admonition, or that denied defendant his constitutional right to a reliable and fair penalty proceeding.

### 5. *Challenges to the Constitutionality of California's Death Penalty Statute*

Defendant reiterates various constitutional challenges to California's death penalty law, all of which we repeatedly have rejected. Defendant does not provide any persuasive reason for us to reexamine our prior decisions.

Section 190.3, factor (a), which directs the jury to consider in determining the penalty the "circumstances of the crime," is neither impermissibly vague nor overbroad, and does not result in an arbitrary or capricious penalty determination. (*People v. Harris* (2005) 37 Cal.4th 310, 365 [33 Cal.Rptr.3d 509, 118 P.3d 545] (*Harris*); *Stitely, supra*, 35 Cal.4th at p. 574; *Maury, supra*, 30 Cal.4th at p. 439.) Because capital defendants are not situated similarly to noncapital defendants, California's death penalty law does not deny equal protection of the laws by depriving capital defendants of certain procedural rights accorded noncapital defendants. (*Johnson, supra*, 3 Cal.4th at pp. 1242–1243; *People v. Allen* (1986) 42 Cal.3d 1222, 1286–1287 [232 Cal.Rptr. 849, 729 P.2d 115].) Accordingly, the jury may consider unadjudicated offenses under factor (b) as aggravating factors without violating a defendant's rights to a fair trial, confrontation, an impartial and unanimous jury, due process, and a reliable penalty determination. (*People v. Sapp* (2003) 31 Cal.4th 240, 316 [2 Cal.Rptr.3d 554, 73 P.3d 433] (*Sapp*); *People v. Bolden* (2002) 29 Cal.4th 515, 566 [127 Cal.Rptr.2d 802, 58 P.3d 931].)

The use of terms such as "extreme," "reasonably believed," and "at the time of the offense" in the list of potential mitigating factors does not impermissibly restrict the jury's consideration of evidence in mitigation or otherwise result in an arbitrary or capricious penalty determination. (*Harris, supra*, 37 Cal.4th at p. 365; *Sapp, supra*, 31 Cal.4th at p. 316; *Maury, supra*, 30 Cal.4th at p. 439.)

"The statute is not invalid for failing to require (1) written findings or unanimity as to aggravating factors, (2) proof of all aggravating factors beyond a reasonable doubt, (3) findings that aggravation outweighs mitigation beyond a reasonable doubt, or (4) findings that death is the appropriate penalty beyond a reasonable doubt." (*Snow, supra*, 30 Cal.4th at p. 126.) The decisions in *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] and *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435,

120 S.Ct. 2348] do not affect California's death penalty law. (*Smith, supra,* 30 Cal.4th at p. 642.) Moreover, " '[b]ecause the determination of penalty is essentially moral and normative [citation], and therefore different in kind from the determination of guilt,' the federal Constitution does not require the prosecution to bear the burden of proof or burden of persuasion at the penalty phase. [Citations.]" (*Sapp, supra,* 31 Cal.4th at p. 317.)

Except as to "other crimes" evidence under section 190.3, factors (b) and (c), the court need not instruct regarding any burden of proof, or instruct the jury that there is no burden of proof at the penalty phase. (*Carpenter, supra,* 15 Cal.4th at pp. 417–418; see also *Harris, supra,* 37 Cal.4th 310, 360; *People v. Box* (2000) 23 Cal.4th 1153, 1216 [99 Cal.Rptr.2d 69, 5 P.3d 130].) The court need not omit from the instructions factors that apparently are inapplicable. (*Raley, supra,* 2 Cal.4th at p. 919.) The claim that section 190.3, factor (g), which concerns "extreme duress," has no relevance in this case and should not have been mentioned to the jury is of no consequence, because defendant acted alone in perpetrating the murders. (*Rogers, supra,* 39 Cal.4th at pp. 895–896.) There is no reasonable possibility that in light of the instructions as a whole and the arguments of counsel, the jury could have been misled by the inclusion of factor (g) to conclude that mitigating evidence could not be considered unless it constituted a legal excuse for defendant's crimes.

The statute is not invalid for failing to create a presumption in favor of a sentence of life imprisonment without the possibility of parole, nor is the trial court or this court required to engage in intercase proportionality review when examining a death verdict. (*Sapp, supra,* 31 Cal.4th at p. 317.) The existence of prosecutorial discretion in deciding in which cases the death penalty should be sought does not render that punishment unconstitutional. (*Ibid.*)

F. *Asserted Cumulative Error*

Defendant contends the cumulative effect of the asserted errors requires reversal of his conviction and death sentence even if none of the errors is prejudicial individually. We disagree. In the few instances in which we have found error or assumed the existence of error, we have concluded that any error was harmless. These errors combined do not compel the conclusion that defendant was denied a fair trial.

### III. CONCLUSION

We affirm the judgment in its entirety.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied May 14, 2008, and the opinion was modified to read as printed above.